FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

01 DEC 21 PM 3: 44

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT COURT
ORLANDO, FLORIDA

CASE NO. 6:01-CV-1366-ORL-31DAB

H.T.E., Inc., a Florida corporation,
      Plaintiff,

v.

TYLER TECHNOLOGIES, INC., a
Delaware corporation,
      Defendant

---

## HTE'S MEMORANDUM IN OPPOSITION TO TYLER'S MOTION TO QUASH SERVICE OF PROCESS AND TO DISMISS COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND VENUE

Pursuant to Local Rule 3.01(b), Plaintiff, H.T.E., Inc. ("HTE"), a Florida corporation, files this memorandum in opposition to Defendant's Motion to Quash Service of Process and to Dismiss Complaint for Lack of Personal Jurisdiction and Venue dated November 20, 2001 (the "Motion"). For the reasons more fully set forth below, the Motion should be summarily denied.

## I. BACKGROUND AND PERTINENT FACTS

**A. Procedural History**

This action arises out of Tyler Technologies, Inc.'s ("Tyler") control share acquisition in Florida of a Florida corporation's (HTE's) common stock from two Florida residents and HTE's redemption of the same, under Florida law. Tyler has contested HTE's redemption of Tyler's HTE stock under Florida law and, therefore, on October 30, 2001, HTE instituted an action seeking declaratory relief, styled H.T.E., Inc. v. Tyler Technologies, Inc., in the Circuit Court of the Eighteenth Judicial Circuit, in and for Seminole County, Florida, Case No. 01-CA-2432-16-W.

18

On November 20, 2001, Tyler removed the action to federal court and filed a motion to quash the service of process and to dismiss HTE's complaint for a purported lack of personal jurisdiction and venue (the "Motion").  HTE opposes the Motion because, as will be discussed more specifically below, the evidence demonstrates that (a) Tyler has operated, conducted, engaged in or carried on a business or business venture in the state of Florida, and (b) Tyler has engaged in substantial and not isolated activity within the state of Florida[1].  Moreover, HTE has filed contemporaneously with this Memorandum a First Amended Complaint adding a claim for tortious interference, which also subjects Tyler to jurisdiction under Fla. Stat. §48.193(b).

Tyler acquired the HTE stock from two Florida residents, Dennis and Jack Harward (the "Harwards"), in exchange for Tyler stock.[2]  From HTE's perspective, the stock deal between Tyler and the Harwards constituted a breach of a severance agreement.  This led to litigation between HTE and the Harwards styled Dennis J. Harward and Jack L. Harward v. H.T.E., Inc., in the Circuit Court of the Eighteenth Judicial Circuit, in and for Seminole County, Florida, Case No. 99-CA-1195-CA-15-W (hereinafter called the "Prior Litigation").  On February 8, 2001, the Seminole County Circuit Court entered partial summary judgment for HTE and specifically found, in pertinent part, that the Harwards had acted as a group when they collectively purchased more than 5% of Tyler's stock and that said purchase constituted a breach of the severance

---

[1] Tyler has acknowledged that its objections to venue are moot.  Tyler's Memorandum @ p. 2n 1.

[2] The Harwards founded HTE in the early 1980's.  On August 3, 1999, the Harwards and HTE entered into a severance agreement pursuant to which, among other things, the Harwards resigned their positions as officers and employees of HTE; however, until their stock exchange transaction with Tyler, which occurred on August 17, 1999, the Harwards continued to be major shareholders and directors of HTE.

agreement.  See "Order Granting Partial Summary Judgment for [HTE"], App. Tab 15.  The

Harwards and HTE settled the Prior Litigation on February 15, 2001.[3]

**B.**     **Statement of the Facts**

      **1.**     **Business or Business Venture Operated, Conducted, Engaged in or Carried on by Tyler in Florida.**

HTE is a Florida corporation which is headquartered in Lake Mary, Seminole County,

Florida. Gornto Aff., ¶ 2.  Tyler is a competitor of HTE.  More specifically, like HTE, Tyler

engages in the development and marketing of software applications in the public sector

marketplace and otherwise engages in competition with HTE in the United States, including

Florida.  Vickers Aff., ¶ 3; Gornto Aff., ¶ 23.  See also Waters Depo. @21; Marr Depo. @7;

Moore Depo. @ 11-12.

Shortly after August 3, 1999, Marr, acting on behalf of Tyler, initiated a phone call to

Jack Harward to express Tyler's interest in acquiring his HTE stock.  Marr Depo. @ 11-12.

Before initiating this call Marr spoke with Waters, and possibly to Tyler's President, John

Yeaman ("Yeaman"), and Oates.  Marr Depo @ 12-13.  Marr had telephone conversations with

the Harwards to inquire for Tyler as to the Harwards' interest in selling their HTE stock to Tyler.

Marr Depo. @16-18.  Waters Depo. @ 18.  Upon invitation by Tyler, the Harwards attended an

---

[3] Tyler was not a party to the Prior Litigation; however, during the course of discovery in the Prior Litigation, depositions were taken of several of Tyler's officers or employees, including: H. Lynn Moore, Jr. ("Moore"), Tyler's in-house corporate counsel; Louis A. Waters ("Waters"), Chairman of Tyler's Board of Directors and Tyler's co-CEO; Sonny Oates ("Oates"), Chairman of Tyler's Executive Committee; and John Marr ("Marr"), President of Tyler's Munis Division.  During their depositions, Tyler's officers and representatives made numerous factual admissions which indisputably demonstrate that Tyler is subject to personal jurisdiction in Florida.  Additionally, HTE has filed the affidavits of L.A. Gornto, Jr. ("Gornto"), HTE's Executive Vice President and General Counsel; Bernard B. Markey ("Markey"), the Chairman of HTE's Board of Directors; Ronald Goodrow ("Goodrow"), HTE's Executive Vice President of Operations; and Tim Vickers ("Vickers"), HTE's Vice President of Sales, in opposition to the Motion.  Finally, there are a number of operative documents which are relevant to the issues raised by Tyler in its Motion.  These documents, which have been authenticated through the above-referenced depositions and affidavits, will be contained in an appendix.  In this Memorandum, HTE will cite to the depositions, affidavits and appendix in the following manner: Moore Depo. @ ___, Gornto Aff., ¶ ___, and App. Tab ___, respectively.

initial meeting during which Tyler gave the Harwards a presentation about Tyler and the parties generally discussed Tyler's acquisition of the Harwards' HTE stock.   Waters Depo. @ 19-23.

By August 13, 1999, Tyler had formulated a plan to take over HTE by first making a control share acquisition of the Harwards' HTE stock.   Indeed, on August 13, 1999, Tyler's board of directors issued a unanimous written consent which stated, in pertinent part:

> The Board of Directors deems it to be in the best interests of the Company to acquire all of the common stock of HTE, Inc. in a single transaction or pursuant to a specific plan which is consummated within one year; and to initiate this specific plan of the Company by acquiring up to 6,143,952 shares (the "Shares") of HTE, Inc. common stock from [the Harwards]...

(Emphasis added). App. Tab 3; Moore Depo. @ 36-37.   See also Waters Depo. @ 17; Marr Depo. @ 24-26; Oates Depo. @ 22.

The Tyler/Harward preliminary meeting was followed by substantive meetings which took place in Orlando, Florida, to negotiate the terms of the proposed transaction.   In fact, on at least two occasions, Tyler representatives including Waters, Yeaman, Oates, Moore and Marr, traveled to Orlando, Florida to negotiate the terms of Tyler's acquisition of HTE stock from the Harwards.   Moore Depo. @ 18-20.   Marr Depo. @ 31-34; Waters Depo. @ 30-31.

During the meeting in Orlando on August 17, 1999, the Harwards and Tyler conducted their final negotiations, after which Tyler and the Harwards drafted the final terms of a stock purchase agreement ("Stock Purchase Agreement"), the Stock Purchase Agreement was signed by the parties, including Tyler, and the transaction was consummated in Orlando, Florida. Moore Depo. @ 24-27.   See also Waters Depo. @ 31-32,  Marr Depo. @ 31-34, and Oates Depo. @ 16.   Additionally, on August 17, 1999, in Orlando, Florida, Tyler and the Harwards signed an escrow agreement (the "Escrow Agreement"), with the law firm of Holland & Knight, as escrow agent, which provided for the delivery of the HTE stock to Tyler in Florida.   App. Tab 2;

Moore Depo. @ 27.  The Escrow Agreement, as signed by Tyler, contains a provision expressly providing that Florida law shall govern. App. Tab 2 @ ¶ 8.[4]

Immediately after signing the Stock Purchase Agreement and Escrow Agreement, and while still located in Orlando, Florida, Waters, initiated a telephone call to Markey.  Moore Depo. @ 31-32; Waters Depo. @ 28.  See also Markey Aff., ¶ 4.  Waters told Markey that Tyler had just then acquired a substantial block of HTE's common stock from the Harwards and that Tyler desired to acquire all of HTE's common stock. Markey Aff., ¶ 4.  Gornto received a similar telephone call from Marr.  Gornto Aff., ¶ 4; Marr Depo. @ 37-40.

On August 20, 1999, Tyler directed and delivered to Holland & Knight, as Escrow Agent, in Florida, a notice authorizing the Escrow Agent to release the escrowed documents to the HTE transfer agent. App. Tab 7; Moore Depo. @ 62.  On that same day, Moore prepared and Waters signed a notice, which was submitted or delivered to HTE in Florida informing HTE of its acquisition of HTE stock and specifically requested a meeting with the HTE board of directors "to discuss a business combination between the two companies." App. Tab 8; Moore Depo. @ 62. See also Gornto Aff. ¶ 5.

On August 23, 1999, Tyler delivered to HTE in Florida, Tyler's "Acquiring Person Statement", which was expressly prepared and provided by Tyler pursuant to Florida law (i.e., § 607.0902(6), Florida Statutes), in an attempt (albeit misguided) to cut off HTE's redemption rights. App. Tab 8; Moore Depo. @ 65-66. See also Gornto Aff., ¶ 8.

---

[4] In addition to the Stock Purchase Agreement and Escrow Agreement, Tyler and the Harwards made an oral side agreement, pursuant to which Tyler promised the Harwards that, if Tyler acquired HTE, Tyler would "fund out" or pay the Harwards' severance agreement.  Moore Depo. @ 111 and 115-117.  Significantly, the severance agreement contemplated that those funds would be paid to the Harwards in Florida.

In approximately September of 1999, Gornto and Markey met with certain of Tyler's officers, including Waters, Yeaman, Oates and Marr.  Gornto Aff., ¶ 24; Markey Aff., ¶ 6. During the meeting, Marr strongly promoted Tyler's acquisition of HTE.  Id.

On or about November 8, 1999, Tyler exercised its call option and acquired an additional 968,952 shares of HTE's common stock from the Harwards. App. Tab 6; Moore Depo. @ 54. Moore then flew to Orlando, Florida, and exchanged the Tyler stock certificates for the HTE stock certificates.  Moore Depo. @ 80-82.  While in Orlando, Moore mentioned to the Harwards or their counsel that Tyler was going to submit a proposal to restructure HTE's Board of Directors.  Id.

On or about December 8, 1999, Tyler delivered to HTE in Florida, its shareholder proposals, which were proposed for inclusion in HTE's proxy statement for the solicitation of proxies in connection with the then, next annual meeting of HTE's shareholders.  Essentially, Tyler was proposing the removal of the then-current members of HTE's Board of Directors and the election of Tyler's 10 nominees as directors.  Each of Tyler's 10 nominees were either employees of Tyler or one of Tyler's affiliates, and the business address of each such nominee was shown by Tyler to be the same business address out of which Tyler operated. App. Tab 10; Moore Depo. @84.  Moore expressly admitted during his deposition that Tyler's shareholder proposal was viewed by Tyler "as a way to take over the company."  Moore Depo. @ 84.  On December 14, 1999, Tyler filed its amended Schedule 13D, providing the public with notice of Tyler's proposal to restructure the Board of Directors of HTE. App. Tab 5; Gornto Aff., ¶ 12, Ex. G.

On December 17, 1999, HTE responded to Tyler's shareholder proposals and, on that same date, Moore delivered or submitted to HTE in Florida, a letter to "clarify Tyler

Technology, Inc.'s letter. . . of December 8, 1999 . . ." App. Tab 11; Moore Depo. @85-87.  <u>See</u> <u>also</u> Gornto Aff., @ 10 and 11, Ex. E and F.

On January 24, 2000, the Harwards' Florida counsel, Louis Conti of Holland & Knight's Orlando office, made telephone calls and forwarded a letter to Moore proposing that Tyler repurchase some of its stock. App. Tab 12; Moore Depo. @ 93 and 97.  A few days later, Moore and Tyler's outside counsel conferred with Mr. Conti, and indicated that it was not interested in repurchasing any of its stock from the Harwards. Moore Depo. @ 93-95.

On November 16, 2000, HTE held its annual shareholders meeting.  Gornto Aff., ¶ 14. Tyler delivered its proxy to HTE's transfer agent, and Tyler's Vice President and Chief Financial Officer, Theodore Bathurst, and possibly other Tyler officers or employees, personally attended the shareholders meeting in Florida.  Gornto Aff., ¶ 15; Markey Aff., ¶ 8. It was at this meeting that the shareholders voted not to confer voting rights on Tyler's HTE stock.  Gornto Aff., ¶ 14; Ex. H.  Markey Aff., ¶ 7.

On October 12, 2001, HTE's Board of Directors adopted resolutions authorizing and directing the redemption of Tyler's shares of HTE common stock pursuant to Florida law (§ 607.0902(10), Florida Statutes).  Gornto Aff., ¶ 17, Ex. I.  In connection with this redemption of Tyler's HTE stock, HTE entered into an escrow agreement with SunTrust Bank ("SunTrust"), pursuant to which SunTrust is holding funds in Florida for payment of the redemption price to Tyler. Gornto Aff., ¶ 18, Ex. J.

On October 29, 2001, HTE effected the redemption of Tyler's HTE common stock pursuant to the authority granted under § 607.0902(10) and § 607.0721(4), Florida Statutes. Gornto Aff., ¶ 21, Ex. K.  On this same date, Tyler delivered to HTE, in Florida, a response to HTE's notice of redemption.  Gornto Aff., ¶ 22, Ex. L.  Relying upon Florida law, Tyler disputed

HTE's right to redeem the stock and, *inter alia*, expressly asserted (albeit incorrectly) that "Tyler continues to be the owner of 5,618,952 shares of HTE common stock and they continue to vote up to 20% of the issued and outstanding shares of HTE common stock held by Tyler." Id.

## 2. *Tyler has Engaged in Substantial and Not Isolated Activities in the State of Florida*

Tyler has attacked this Court's general jurisdiction over it and has filed an affidavit executed by Moore to support its position.   The affidavit of Moore is inconsistent with admissions and statements Tyler has made through the depositions of its corporate officers and directors and in public documents.  For this reason, Moore's Affidavit raises mere paper issues and has forced HTE to file, contemporaneously with this Memorandum, a motion to strike the affidavit of Moore ("Motion to Strike").  The facts set forth in the Motion to Strike sufficiently detail the jurisdictional facts supporting general jurisdiction over Tyler under Fla. Stat. §48.193(2). In order to avoid unnecessary repetition, those facts will not be repeated verbatim in this Memorandum, but instead, this Memorandum incorporates herein by reference the Motion to Strike.

By way of summarizing the relevant facts in the Motion to Strike, Tyler's officers and directors testified in depositions that Tyler is engaged in the business of acquiring and operating companies that develop and market software applications in the public sector.  Tyler's officer and directors also testified as to the interconnectivity between Tyler and its subsidiaries and Tyler's management and high degree of control over its subsidiaries.  Furthermore, through public filings with the Securities and Exchange Commission, Florida's Department of State and in its web site and press releases, Tyler indicates that it has substantial control over its subsidiaries and that it does not distinguish between itself and its subsidiaries.  Among other things, employee functions, operations, management, product and company branding, and offices

of Tyler and its subsidiaries are all interrelated. Tyler or several of Tyler's subsidiaries (or divisions, as Tyler calls them) undisputedly sell products and have offices in the state of Florida.

## II. THE LAW OF PERSONAL JURISDICTION

### A. Standard of Review

In determining whether a district court has personal jurisdiction over a non-resident defendant, the court must undertake a two-part analysis. Nida Corp. v. Nida, 118 F.Supp. 2d 1223, 1226 (M.D. Fla. 2000), citing Venetian Salami Co. v. Parthenais,, 554 So.2d 499, 502 (Fla. 1989). First, the court must determine whether the Florida long-arm statute provides a basis for personal jurisdiction. Id. Second, the court must determine whether sufficient minimum contacts exist between the defendant and the forum state so as to satisfy "tradition notions of fair play and substantial justice" under the due process clause of the Fourteenth Amendment. Id. citing International Shoe Co. v. Washington, 326 U.S. 310, 315-17 (1945).

This Court may properly consider affidavits and admissions submitted by HTE in addition to the Complaint to determine the existence of personal jurisdiction. See Waxoyl, A.G. v. Taylor Brion Buker & Greene, 711 So.2d 1251, 1253 (Fla. 3d DCA 1998). Moreover, as this Court's sister court held in Miot v. Kechijian, 830 F.Supp. 1460, 1462 (S.D. Fla. 1993), "To avoid precipitating too extensive an investigation of the merits at this stage of the litigation, the plaintiff need only make a *prima facie* showing of personal jurisdiction to defeat a jurisdictional motion." The depositions of Tyler's officers and directors as well as its statements made in public filings and to the public at large, support the undeniable fact that this Court has personal jurisdiction over Tyler and Tyler's Motion to Dismiss should be summarily denied.[5]

---

[5] In the alternative, this Court should conduct an evidentiary hearing with respect to the issue of personal jurisdiction over Tyler and should grant the parties sufficient time to conduct discovery on this issue. See Gleneagle Ship
(continued)

## B. Florida's Long-Arm Statute

Since the extent of the long-arm statute is governed by Florida law, federal courts are required to construe it as would the Florida Supreme Court. <u>Id.</u> Absent some indication that the Florida Supreme Court would hold otherwise, the federal courts are bound to adhere to decisions of its intermediate courts. <u>Sculptchair, Inc.</u>, 94 F.3d at 626. Under Florida law, Tyler is subject to personal jurisdiction pursuant to Florida's long-arm statute.

Personal jurisdiction is proper if this Court has either specific jurisdiction or general jurisdiction over Tyler. If the conduct of a defendant that supports personal jurisdiction is related to a stated cause of action, personal jurisdiction is known as "specific jurisdiction". <u>Noorian v. Pine Mutual Insurance Co.</u>, 978 F. Supp. 690, 692 (S.D. Tx 1997). Contacts unrelated to the cause of action may confer general jurisdiction if these contacts with the forum state are continuous, systematic and substantial. <u>Id.</u> Under Florida's long-arm statute, §48.193(1)(a) provides the basis for specific jurisdiction and §48.193(2) provides the basis for general jurisdiction. *See also* <u>Future Tech International, Inc. v. Tae Il Media, Ltd.</u>, 944 F.Supp. 1538, 1557-58 (S.D.Fla. 1996).

### 1. Specific Jurisdiction of this Court Pursuant to Florida's Long Arm Statute, §48.193(1)(a)

Florida's long-arm statute sets forth various acts that subject a non-resident defendant to the jurisdiction of the courts of this state. Florida Statute §48.193 states as follows:

> 48.193. Acts Subjecting Person to Jurisdiction of Courts of State.
> (1) Any person, whether or not a citizen or resident of this State, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

---

Management Co. v. Leondakos, 602 So.2d 1282, 1284 (Fla. 1992) *citing* <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351 (1978).

(a) Operating, conducting, engaging in, or carrying a business or business venture in this state or having an office or agency in this state.

This Court has held that "while much is not required to establish a general course of business activity for pecuniary benefit, there still must be a "course" of activity, that is, more than mere fortuity must be involved." Insight Instruments, Inc. v. A.V.I-Advanced Visual Instruments, Inc., 44 F.Supp. 2d 1269 (M.D. Fla. 1999). Specific jurisdiction under §48.193(1)(a) Florida Statute is demonstrated where non-resident defendants conduct meetings in Florida and have extensive correspondence, phone conversations and telefaxes with Florida plaintiffs which are connected to the business relationship at issue in the lawsuit. Future Tech, 944 F.Supp. at 1556-58; see also, Citicorp Ins. Brokers v. J.R. Charman, 635 So.2d 79 (Fla. 1st DCA 1994) Even when a non-resident defendant only travels to Florida once, jurisdiction is proper under §48.193(1)(a) where the meeting involves significant negotiations relating to the parties' business venture. Miot v. Kechijian, 830 F.Supp. 1460 (S.D. Fla. 1993).

Moreover, personal jurisdiction is proper under Florida Statutes §48.193(1)(a) where the non-resident defendants contract under Florida law with Florida plaintiffs and a Florida attorney. Kim v. Keenan, 71 F.Supp. 2d 1228, 1234 (M.D. Fla. 1999). Even though the defendants' physical location was not in the state of Florida, this Court held that defendants were clearly conducting business within Florida. Id. at 1234; see also, Bank of Wessington v. Winters Gov't Sec. Corp., 361 So.2d 757, 759-60 (Fla. 4th DCA 1978) (an out of state bank which allegedly entered into oral contracts for the sale of securities was engaged in "a general course of business activities in the State for pecuniary benefit".)

Where a defendant is not merely a passive investor of a Florida entity, its actions can subject it to jurisdiction under Florida's specific and general jurisdiction statute. Resolution Trust Corp. v. Pharaon, 915 F.Supp. 351 (S.D. Fla. 1996). In Resolution Trust a non-resident

defendant acquired the second largest block of shares in a Florida bank, Centrust, engaged in communications with the bank's chairman of the board and principal shareholder, and visited Florida in pursuit of an active business interest in furthering Centrust's operations. The court found that Pharaon's involvement with Centrust and activities with the bank's chairman of the board were not those of a passive investor and therefore Pharaon was subject to Florida's long-arm statute under §48.193(1)(b) and 48.193(2). Id. 359.

Furthermore, the term "arising from" as set forth in Florida Statutes §48.193 is interpreted broadly. Citicorp 635 So.2d at 82. It does not mean "proximately caused by" but only requires a direct affiliation, nexus or substantial connection to exist between the basis for the cause of action and the business activity. Id.

### 2. *General Jurisdiction of this Court Pursuant to Florida's Long-Arm Statute, §48.193(2)*

Florida's long-arm statute provides that a court of this state has general personal jurisdiction over a non-resident party if that party is engaged in substantial and not isolated activities in Florida. General jurisdiction under Florida Statutes §48.193(2) is satisfied when,

> A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.[6]

In Future Tech, the court found that the non-resident defendants had engaged in substantial and non-isolated activity within the state when their representatives met with representatives of the Florida plaintiff on multiple occasions in Miami, Florida in furtherance of

---

[6] Moreover, pursuant to §48.181(3), Fla. Stat., a parent company is conclusively presumed to be engaged in substantial and not isolated activity in Florida if it sells its products or services through its subsidiaries which act as a jobber or distributor. *See* Deere 148 So.2d 529, 531 (Fla. 3d DCA 1963).

their existing business relationship and in order to procure additional business. <u>Future Tech</u>, 944 F.Supp. at 1557. The court found that the trips and business communications which were spread out over a period of about a year were not incidental nor insignificant and therefore were sufficient to meet the standard of general jurisdiction under the controlling Florida long-arm statute. <u>Id</u>. 1558; see <u>Resolution Trust</u> supra (when acquiring company not merely a passive investor, its actions in acquiring an entity in the forum can subject it to general jurisdiction).

Moreover, a non-resident parent corporation is subject to personal jurisdiction under Florida's long-arm statute if it exercises control over subsidiaries that conduct business in Florida. In <u>Deere</u>, the court held that a non-resident parent corporation was doing business in the state of Florida even though its only contact with Florida was through one of its wholly owned subsidiaries. The court found that the following factors supported jurisdiction over the parent corporation:

> the appellant [parent corporation] owned 100 percent of John Deere Company's [the subsidiary] stock and votes it at all stockholders' meetings; each company has its own Board of Directors, officers and employees, but many hold offices in both corporations; while the books, accounts and records of the companies are kept separate and distinct, the financial statements of the parent and its subsidiaries are consolidated in its annual reports and the subsidiaries are referred to therein as "Deere branches".

<u>Deere</u>, 148 So.3d at 530; *see also*, <u>Nichols v. Paulucci</u>, 652 So.2d 389, 393 (Fla. 5th DCA 1995).

## C. Tyler's Contacts with the State of Florida Satisfy the Constitutional Due Process Requirements

In order to satisfy the constitutional due process requirements under the Fourteenth Amendment, this Court must determine whether sufficient minimum contacts exist between Tyler and the forum state and whether traditional notions of fair play and substantial justice have

been comported with. Sculptchair, Inc., 94 F.3d at 626. Under the relevant case law, Tyler's contacts with the state of Florida satisfy both parts of this test.

## 1. *Minimum Contacts*

The Eleventh Circuit utilizes a three-part test for determining whether the minimum contacts requirement has been met: first, the contacts must be related to the plaintiff's cause of action or have given rise to it; second, the contacts must involve some act by which the defendant purposely avails itself on the privilege of conducting activities within the forum; and, third, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being hailed into court there. Sculptchair, Inc., 94 F.3d at 1235.

While the mere footfall of a defendant on the State's soil does not invoke the benefits and protections of the laws of the forum, a business meeting in the forum state may constitute purposeful availment if it involves significant negotiations of important terms. Id.. Where defendants avail themselves of the benefits of Florida law by contracting with Florida residents in order to perform services for the Florida residents, minimum contacts are established. Kim, 71 F.Supp.2d at 1235. This is especially true where substantial preliminary negotiations are conducted in the forum state leading to the contract at issue, the contracts at issue contemplate significant acts of performance in Florida, and the agreement provides that Florida law applies to govern the terms of the instrument. Future Tech, 944 F.Supp. at 1560; *see also*, Nucor v. Aceros Y Maquilas de Occidente, 28 F.3d 572 (7th Cir. 1994).

Moreover, in Radlin v. Aero Systems, Inc., 340 So.2d 1260, 1261 (Fla. 3d DCA 1976), the court found that the nonresident defendant had sufficient minimum contacts with the state of Florida where the complaint and documents related to a corporate stock exchange and the nonresident defendant who was a party to the Florida contracts visited Florida relative to the

business of the corporations and executed subsequent modification contracts. The court found that the nonresident had performed these acts for his pecuniary benefit and therefore had minimum contacts sufficient to defeat the motion to dismiss for lack of personal jurisdiction. Id.

Other district courts have held that nonresident acquisition entities are subject to personal jurisdiction in the forum state when their acquisitions are resident entities. *See*, Noorian v. Pie Mutual Insurance Co., 978 F.Supp. 690 (S.D.Tx. 1997); Surovcik v. D&K Optical, Inc., 702 F.Supp. 1166 (M.D.Pa. 1988); and F.D.I.C. v. Kerr, 637 F.Supp. 828 (W.D.N.C. 1986).

Furthermore, active internet solicitation may subject the defendant to personal jurisdiction. Nida Corp., 118 F.Supp.2d at 1229.

## 2. *Fair Play and Substantial Justice*

The relevant factors to consider in determining whether fair play and substantial justice have been met are: the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, and the shared interest of the several states in furthering fundamental substantive social policies. Kim, 71 F.Supp. at 1236, citing Worldwide Volkswagen Corp. vs. Woodson, 444 U.S. 286, 292, 100 S.Ct 559, 62 L.Ed.2d 490 (1980) and Madara vs. Hall, 916 F.2d 1510, 1517 (11th Cir. 1990). In Kim, the fact that the defendant's advertisement on its website stating that they have handled cases in over 40 states was a factor in favor of finding jurisdiction over the defendant. Id. Moreover, when minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant. Nida Corp., 118 F.Supp.2d at 1232-33. Plaintiffs have a great interest in the convenience of litigating in their home state. Id.

### III.  <u>APPLICATION AND ANALYSIS</u>

As in the <u>Nida</u> case, Tyler's contacts with Florida are more than sufficient to satisfy both the Florida Long-Arm Statute and the Due Process Clause.

**A.      <u>The Florida Long-Arm Statute</u>**

**(1)  Tyler is Subject to Specific Jurisdiction under § 48.193(1)(a), Florida Statutes**

Tyler has plainly engaged in business or a business venture in the state of Florida and the instant action arises out of or is related to said business contacts.   More specifically, as demonstrated by the testimony of Tyler's officers, Tyler is engaged in the business of acquiring companies and, in August of 1999,  formulated a plan to take over a Florida corporation (HTE), which was to be accomplished by making a control share acquisition of HTE stock from two Florida residents, the Harwards.   Tyler implemented this plan by contacting the two Florida residents, and traveling into Florida on at least two occasions to negotiate the terms of its acquisition.

Tyler conducted significant negotiations regarding the acquisition, drafted and executed the Stock Purchase Agreement and Escrow Agreement, and consummated its control share acquisition, in Florida.   Then, in furtherance of its plan to take over HTE, Tyler directed substantial correspondence and communications to HTE's representatives in Florida.   These communications by Tyler to Florida residents included Tyler's Acquiring Person Statement, which was expressly prepared by Tyler pursuant to Florida law, and a shareholder proposal pursuant to which Tyler proposed to replace HTE's directors with Tyler nominees, each of whom was an employee or officer of Tyler or one of its affiliates.

At the annual shareholder meeting in Florida, during which the shareholders voted not to confer voting rights on the shares of Tyler's HTE stock, Tyler provided its proxy and, in fact,

personally attended.  When HTE provided Tyler with its notice of redemption, Tyler delivered to HTE, in Florida, its response which relied upon Florida law to dispute (albeit without merit) HTE's right to redeem Tyler's HTE stock.

These activities occurred over the course of more than a year and establish that Tyler was engaged in a general course of business in the state of Florida for its pecuniary benefit.  In short, Tyler engaged in a general course of business activities in the state of Florida which are related to the pending causes of action[7], supporting this Court's specific jurisdiction over Tyler pursuant to §48.193(1)(a), Florida Statutes.

### (2)  Tyler is Subject to General Jurisdiction under § 48.193(2), Florida Statutes

This Court also has general jurisdiction over Tyler because Tyler engages in substantial and not isolated activity in the state of Florida.  Tyler is not a mere holding company of its subsidiaries that conduct business in Florida.  Rather, Tyler is an aggressive, national company that *inter alia* acquires and operates smaller companies throughout the United States and promotes and distributes a broad line of products and services throughout the United States, including Florida.  Tyler conducts substantial and not isolated activity in the state of Florida through its own activities and through its acquisition and operation of "divisions" which do business in Florida.

Tyler has acquired several companies that do business in the state of Florida, i.e. CLT, Munis, FundBalance and Incode.  Tyler's significant activity in the state of Florida to acquire HTE as another one of its companies further evidences Tyler's substantial activities in the state of Florida.  Moreover, Tyler advertises and markets its own products and services through the

---

[7] HTE has filed a First Amended Complaint contemporaneously with this Memorandum adding a claim for tortious interference against Tyler which also subjects Tyler to jurisdiction in Florida pursuant to Fla. Stat. §48.193(1)(b).

internet which is accessible to Florida residents.  Tyler's web site identifies several products which it sells and allows users to contact Tyler in order to purchase such products.

Tyler also exercises a high degree of control over its subsidiaries which conduct business in Florida.  Tyler owns 100% of its subsidiaries' stock, had its officers and directors hold officer and director positions in its subsidiaries, failed to distinguish between the employees of Tyler and its subsidiaries, prepares consolidated financial statements for Tyler and its subsidiaries, consolidated the 401K plans and payroll functions of Tyler and its subsidiaries, executed documents on behalf of its subsidiaries thereby binding its subsidiaries to such agreements and promising its lender that it (Tyler) will control various activities of its subsidiaries, and has implemented a comprehensive corporate branding campaign whereby Tyler's subsidiaries are each identified as a Tyler Technologies company.

The subsidiaries which Tyler has control over, have offices in Florida, attend conferences in Florida, sell products and services in Florida and have sales persons in Florida.  Therefore, Tyler by itself and through its subsidiaries engages in substantial and not isolated activities in the state of Florida thereby subjecting Tyler to the general jurisdiction of this Court pursuant to §48.193(2), Florida Statutes.

### (3) Jurisdiction Over Tyler Comports with Due Process.

Tyler's activities in the state of Florida are sufficient minimum contacts under the due process requirement under the Fourteenth Amendment and comport with traditional notions of fair play and substantial justice.  Tyler has purposely availed itself and purposely directed its activities towards Florida and its residents.  Tyler attended several business meetings in Florida in which it conducted significant negotiations of important terms relating to its acquisition of HTE.  Tyler availed itself of the benefits of Florida law by contracting with Florida residents and

executing several agreements in Florida which required performance in the state of Florida. Tyler's actions in its attempts to take over HTE were for its own pecuniary benefit and Tyler's contacts with Florida were substantial enough that it should have reasonably anticipated that it could be haled into court here.

Tyler contemplated that future consequences of its actions would be regulated by Florida law and affect Florida residents and entities. In fact, Moore testified as follows:

> . . . before we went to Orlando to negotiate the final terms of this transaction, I found on the Internet the Florida Business Corporation Act. . . it's a statement made pursuant to Florida law that if you become more than a 20 percent stockholder in a company, you need to deliver a statement to the company you've done it. I believe that if you do not deliver such a statement, then a company has the right to redeem your shares from you, so the purpose of this was to put them on notice that we had acquired more than 20 percent of their company and to stop them from having any redemption right on the shares we just acquired.

Moore Depo. @ 65-66. These contemplated future consequences support jurisdiction over Tyler. Prior negotiations and contemplated future consequences along with the terms of the contract and the parties actual course of dealing are all factors the court must evaluate in determining whether minimum contacts exist. Surovcik, 702 F.Supp. at 1169 citing Burger King v. Rudzewicz, 471 U.S. 462, 479 (1985).

The factors in determining whether fair play and substantial justice have been met weigh heavily in favor of finding jurisdiction over Tyler. Since minimum contacts have been established, the interest of HTE in litigating in its own state and Florida's interest in interpreting Florida's Control Share Acquisition Act and resolving a dispute concerning the regulation of a Florida company outweigh any burdens on Tyler. The United States Supreme Court has held,

> No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders.

A state has an interest in promoting stable relationships among parties involved in the corporation it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89-91 (1987)

Significantly, Tyler will not be burdened by litigating in Florida. Tyler already conducts business in Florida as stated repeatedly by Tyler in that it does business in 49 states, Canada and Puerto Rico. Tyler knew that its control share acquisition would subject it to the rights, restrictions and dictates of the Florida Business Corporation Act. Moore Depo. @ 65-66. Moreover, Tyler executed the Stock Purchase Agreement, whereby Tyler agreed to the following provision:

> Section 6.8 Jurisdiction: Venue. Any judicial proceeding brought by or against any of the parties to this Agreement on **any dispute arising out of this Agreement or any matter related hereto shall be brought exclusively in any Federal or State court sitting in either Orange County, Florida,** or Dallas County, Texas, and by execution and delivery of this Agreement, **each of the parties to this Agreement accepts for itself the exclusive jurisdiction and venue of the aforesaid courts** as trial courts, and irrevocably agree to be bound by any final non-appealable judgment rendered in connection with this Agreement. (emphasis added).

App. Tab 1.

## IV. CONCLUSION

For the reasons set forth above, Tyler's Motion to Quash Service of Process and to Dismiss Complaint For Lack of Personal Jurisdiction and Venue should be summarily denied. In the alternative, this Court should conduct an evidentiary hearing with respect to the issue of personal jurisdiction over Tyler and should grant the parties sufficient time to conduct discovery.

BAKER & HOSTETLER LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, FL  32802-0112
Attorneys for Plaintiff, H.T.E., Inc.

By: _____
John W. Foster, Sr.
Florida Bar No. 318620
Jerry R. Linscott
Florida Bar No. 148009
Robert C. Yee
Florida Bar No. 0096784

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing memorandum in opposition to Tyler's motion to quash service of process and dismiss complaint for lack of personal jurisdiction and venue has been furnished by hand delivery this 21st day of December, 2001, to William B. Wilson, Esquire, Holland & Knight LLP, 200 S. Orange Avenue, Suite 2600, Orlando, FL  32801.

_____
John W. Foster, Sr.

G:\Jwf0370\25944\00001\Pleadings\FEDERAL\Memo Of Law-Motion Dismiss Complaint Rcy8.Doc