**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

H.T.E., INC.,

     Plaintiff,

vs.

          **Case No. 6:01-cv-1366-Orl-31DAB**

TYLER TECHNOLOGIES, INC.,

     Defendant.

_____/

## TYLER'S MEMORANDUM OF LAW IN OPPOSITION TO H.T.E.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant/Counterclaimant, TYLER TECHNOLOGIES, INC. ("Tyler"), opposes H.T.E. Inc.'s Motion for Partial Summary Judgment (Docket No. 48). H.T.E.'s motion asks this Court to rule as a matter of law that H.T.E.'s purported redemption of Tyler's shares was effective. The motion must be denied because H.T.E.'s argument conflicts with the language and purpose of the statute and raises fact questions not resolvable by summary judgment.

### I. STATEMENT OF THE CASE

This is a declaratory judgment action in which H.T.E. seeks a declaration that its purported redemption pursuant to §607.0902(10), Fla. Stat. (2001), of 5,618,952 shares of common stock in H.T.E. owned by Tyler is valid. Tyler removed the case to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §1332 and §1441(a).

Tyler has raised affirmative defenses (Docket No. 34) and has brought a counterclaim (Docket No. 38) in which it seeks a judicial declaration that H.T.E.'s right of redemption expired long prior to October 29, 2001, the date on which H.T.E. first attempted to redeem common stock in H.T.E. owned by Tyler. Alternatively, Tyler seeks a declaration that, even



if H.T.E. redeemed timely, its right of redemption is limited to only those shares constituting

20% or more of the voting shares of stock of H.T.E. at the time that Tyler acquired those

shares of stock.  Similarly, Tyler asks this Court to declare that H.T.E.'s right to restrict the

voting rights of the H.T.E. stock owned by Tyler is limited to the shares of stock held by

Tyler within that same 20% statutory range.[1]

     H.T.E. has moved for a partial summary judgment that its purported redemption of

all of the H.T.E. common stock acquired by Tyler was valid and effective and that none of

those shares of stock has any voting rights.

## II.    STATEMENT OF FACTS[2]

### The Parties

     Tyler is a Delaware corporation with its principal office located in Dallas, Texas.[3]  It

is a holding company with operating subsidiaries engaged in the business of providing a

diverse suite of software solutions and services to local governments.  Contrary to the

impression left by H.T.E., Tyler has never engaged in a hostile takeover of any company.[4]

Moore's Third Aff. ¶¶ 1-4.

---

[1]  The case presents other issues that are not raised by this motion including H.T.E.'s claim for tortious interference and Tyler's request for a declaration that a transferee of the H.T.E. stock who does not acquire "control shares" would have voting rights.

[2]  While many of the facts in this case are not in dispute, H.T.E.'s characterization of the facts is both misleading and contrary to the established record.  Accordingly, Tyler provides the following statement of facts.

[3]  Tyler's common stock is listed for trading on the New York Stock Exchange.

[4]  In its memorandum, H.T.E. takes deposition testimony out of context in an attempt to erroneously portray Tyler as a "corporate raider" whose sole purpose in acquiring H.T.E. stock was the hostile takeover of H.T.E.  For example, H.T.E. quotes isolated testimony in the depositions of Messrs. Waters, Marr, and Moore to the effect that the acquisition of H.T.E. stock was to take control of the corporation.  In doing so, H.T.E. intentionally ignores the overall testimony that Tyler's intent was to see if a friendly combination of the two companies would work or, in the alternative, to hold the stock as a long-term investment.  Waters Depo at 14, 29, and 35; Marr Depo at 26; Moore Depo at 38, 83-84.  Also, H.T.E. quotes the language in the unanimous written consent of the Tyler Board in support

H.T.E. is a Florida corporation that was founded by Jack and Dennis Harward (the "Harwards").[5]  H.T.E. sells software into the public sector using an AS400 platform which is not compatible with the platform used by the Tyler subsidiaries.  Thus, a customer using an AS400 platform cannot use software from Tyler subsidiaries and vice-versa. D. Harward Depo. at 71.

### Tyler's Acquisition of H.T.E. shares

Tyler's acquisition of H.T.E.'s shares had its genesis in discussions beginning in the early 1990's and again in 1998 between H.T.E., through its founders, the Harwards, and John Marr, now a principle of Tyler.  Those discussions concerned H.T.E.'s possible purchase of what was then a computer software company owned by Mr. Marr.  Marr Depo. at 18–19 and 60; J. Harwood Depo. at 59.   Ultimately, Mr. Marr sold his company to Tyler.  D. Harward Depo. at 63; Marr Depo. at 8 and 20.

In late July, 1999, the Harwards learned that H.T.E.'s Board of Directors was going to remove them as officers and employees of H.T.E.  D. Harward Depo. at 10; J. Harward Depo. at 35-36.  As a result, the Harwards entered into a Severance Agreement and resigned as officers and employees of H.T.E.  When John Marr learned of the these developments, he contacted Jack Harward to express his support and to see if either of the Harwards would be interested in speaking with Tyler.   Marr Depo. at 11-12.  This telephone call led to a meeting between the Harwards and Tyler in which Tyler expressed an interest in purchasing stock in H.T.E. with a view toward approaching the company about a friendly merger or,  in the

---

of its erroneous position, knowing that the specific language was used for the sole purpose of being able to employ the "pooling of interests" accounting method should a friendly merger occur.  Waters Depo at 33-35.
[5]  H.T.E.'s common stock is listed for trading on the NASDAQ.

alternative, holding the stock as a long-term investment.  Waters Depo. at 14, 29 and 35;

Marr Depo. at 25, 35-36, 38-39; and Moore Depo. at 36-38.

The Harwards had a preference for Tyler over others who were interested in their

stock because Tyler was interested in a long-term investment strategy.  D. Harward Depo. at

66-69, Marr Depo. at 20-21, 25-26 and 35-36 and Waters Depo. at 36.  In the Harwards'

view, Tyler had integrity, a business model that was complementary to the H.T.E. business

model, and an impressive management team with much experience.  D. Harward Depo. at 69

and 77, J. Harward Depo. at 70 and 108-111; Waters Depo. at 37.

The favorable nature of the discussions between Tyler and the Harwards led to  a

decision by Tyler to obtain the Harwards' stock in H.T.E.  On August 17, 1999, Tyler and the

Harwards entered into a Stock Purchase Agreement pursuant to which Tyler acquired

5,618,952 shares[6] of H.T.E. stock, or approximately 32.3% of H.T.E., at an average price of

$2.81 per share.[7]  Moore Depo. at 53-54; Moore Third Aff. ¶ 8.

On August 20, 1999, Tyler notified H.T.E. of this transaction and, consistent with its

desire for an amicable relationship, requested a meeting with the H.T.E. Board of Directors

to discuss a possible business combination between the two companies.  That same day,

Tyler issued a press release stating its intent to meet with the H.T.E. Board to propose a

friendly business combination.  Moore Third Aff. ¶ 5.

---

[6]  In its memorandum of law, H.T.E. resorts to the misleading tactic of defining all of these shares as
"Control Shares", knowing that the definition of "control shares" is a central dispute in this action.
[7]  Tyler acquired the stock in two transactions (the purchase of 4,650,000 shares on August 20 and
the exercise on November 8 of an option to acquire 968,952 shares) because of concerns related to the
Hart-Scott-Rodino Antitrust Act of 1976.  Moore Depo at 63,101-02.  Tyler did not acquire an
additional 515,000 shares of the H.T.E. stock owned by the Harwards.  Moore Depo at 76-77.

On August 23, 1999, Tyler provided H.T.E. with an acquiring persons statement under Section 607.0902(6) of the Control Shares Acquisition Act informing H.T.E. and its shareholders of the purchase.[8]   On April 17, 2000, Tyler issued a press release stating that it had "abandoned its previously announced intention to propose to H.T.E. management a business combination of the two companies." Moore Third Aff. ¶ 7.

### The Control-Share Acquisition Act

Florida's Control-Share Acquisition Act, Section 607.0902, Florida Statutes (the "Act"), applies whenever an acquiror, such as Tyler, acquires shares in a public corporation subject to the Act, such as H.T.E., in excess of the 20% threshold set by the Act. §607.0902(1).  The Act prevents the acquiror from gaining voting control of the acquired company until voting control is approved by a majority vote of all pre-existing shareholders, excluding all "interested shares."  § 607.0902(9)(b)2. [9]

By conditioning the acquiror's voting control rights on a vote of all disinterested shareholders, the Act protects the acquired company's shareholders by giving them a considered opportunity to choose between existing management and the acquiror.  See *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 82-83, 91 (1987) (the primary purpose of

---

[8]   Because of  H.T.E.'s deadline for submitting shareholder proposals, on December 8, 1999, Tyler submitted proposals for removal of the then current members of H.T.E.'s Board of Directors and election of Tyler's ten nominees as directors.  After submitting these proposals, Tyler did not lobby or seek proxies or otherwise take steps to obtain shareholder approval of its director slate.   Moore Third Aff. ¶ 6.

[9]   Interested shares ineligible to vote on the potential change of control include shares owned or controlled by (a) the acquiror; (b) officers of the corporation; and (c) any employee of the issuing pubic corporation who is also a director of the corporation.  §607.0902(3).

the Act is to permit shareholders to decide collectively whether a change in control would be desirable).[10]

The Corporation can redeem the acquiror's "control shares" at any time during the period ending 60 days after the last acquisition of control shares by the acquiring person, provided no acquiring person statement has been given. §607.0902(10)(a).  An acquiror can block this redemption by filing an acquired person statement.  § 607.0902(10)(b).  Once such a statement is filed, the corporation has no right of redemption until the disinterested shareholders vote not to accord voting rights to the acquiring persons "control shares".  Thus, the disinterested shareholders remain the final arbitrar of whether the takeover of control is ultimately successful.

### H.T.E.'s Purported Redemption of Tyler's Shares

On November 16, 2000, over a year after Tyler had obtained its H.T.E. stock, H.T.E. held its annual shareholders meeting.  At that meeting, the shareholders voted not to confer voting rights on the H.T.E. stock held by Tyler.[11]  Gornto Supp. Aff. ¶9, Exhibit E.

On October 12, 2001, over two years after Tyler had obtained its H.T.E. stock and almost a year after the shareholders refused to confer voting rights on that H.T.E. stock, H.T.E.'s Board of Directors adopted resolutions authorizing the redemption of all of the shares of H.T.E. owned by Tyler at $1.30 per share,[12] purportedly pursuant to Section

---

[10]   In *CTS,* the Supreme Court considered the purpose of the Indiana Control-Share Acquisitions Act which, as H.T.E. notes, served as a model for Florida's similar Act.  The Florida and Indiana Acts serve the same purpose.

[11]   At that meeting, H.T.E. management put a proposal before its shareholders regarding the voting rights of all 5,618,552 shares owned by Tyler as opposed to the "control shares" owned by Tyler as required by the statute.

[12]   This unilateral action by H.T.E. would result in a loss to Tyler in excess of $8.4 million based on Tyler's average investment price of $2.81 per share.  Moreover, the loss in Tyler's investment is

607.0902(10).  Gornto Supp. Aff., ¶12.  On October 29, 2001, H.T.E. provided Tyler with notice of this purported redemption.[13]

Tyler immediately responded to H.T.E. by disputing the validity and scope of H.T.E.'s redemption.  Tyler asserted that H.T.E.'s right of redemption was subject to the 60-day deadline in Section 607.0902(10).  H.T.E.'s October 29, 2001 attempted redemption came long after this 60-day deadline expired.  Next, Tyler asserted that, even if the 60-day deadline did not apply, H.T.E. did not exercise its right of redemption within a reasonable time.  Finally, Tyler asserted that any right of redemption H.T.E. may have applies to only those shares above the 20% threshold described by Section 607.0902(1)(a).  Gornto Supp. Aff. 17, Ex. J.  This litigation followed.

### III.    THE STANDARD FOR SUMMARY JUDGMENT

The standard governing summary judgment is well-established.  Although Tyler does not disagree with H.T.E.'s articulation of the standard, Tyler disagrees with the suggestion that H.T.E.'s motion presents pure issues of law.

### IV.    ARGUMENT

H.T.E.'s motion for partial summary judgment must be denied because it is based on two fundamental misinterpretations of the Act.  First, H.T.E. overlooks that its attempted redemption occurred long after the 60-day deadline for the redemption of Tyler's "control

---

potentially much greater, as the ten-day trading average (used in part by H.T.E. in its calculation of the redemption price) prior to the filing of this memorandum was $4.78375 per share, or a loss to Tyler in excess of $19.5 million.  Moore's Third Aff. ¶ 8.

[13]   Ironically, H.T.E. initiated a stock repurchase program in the Spring of 2001 without seeking to redeem the Tyler-owned shares.  During this program, H.T.E. repurchased 548,000 shares at an average price of $2.73 per share.  On June 20, 2001, H.T.E. issued a press release announcing this repurchase stating, "We can't think of a better use of our cash. . . . We believe H.T.E.'s stock remains undervalued at current price levels. . ." Moore Third Aff. ¶ 9.

shares" provided by Section 607.0902(10).  H.T.E.'s argument that it is not bound by the 60-day deadline is wrong, but at the very least, creates an issue of fact on whether H.T.E. has acted within a reasonable time.  In either event, summary judgment must be denied.  Second, even if the Court were to rule that H.T.E.'s purported redemption was valid, H.T.E.'s interpretation of the "control shares" subject to that redemption is inconsistent with both the language and intent of the Act.  As we demonstrate below, "control shares" should be defined to include only those shares held by Tyler at or above the 20% statutory threshold – those shares below the statutory threshold are not control shares because they impart no control to the acquiror.

### A. H.T.E. Exercised It's Right Of Redemption Too Late.

H.T.E.'s purported redemption of the shares acquired by Tyler is ineffective because its attempt to redeem came too late.  Section 607.0902(10) provides that the corporation may exercise a right of redemption "at any time during the period ending 60 days after the last acquisition of control shares by the acquiring person."  Here, Tyler's last acquisition occurred on November 8, 1999.  H.T.E. was clearly on notice of the acquisition.  H.T.E. did not attempt to exercise its right of redemption, however, until October 12, 2001, nearly two years after the 60-day deadline set forth in the Act expired.  This Court should enforce the plain language of the Act and hold that H.T.E.'s purported redemption was too late.

H.T.E.'s response reads Section 607.0902(10)(b) in isolation to argue that there is no deadline and that it had an *infinite* amount of time to exercise its right of redemption.  As shown below, this interpretation is contrary to any reasonable interpretation of the Act.  At most, H.T.E. had a reasonable time to exercise its right of redemption.  Whether H.T.E. acted

within a reasonable amount of time is a fact question, not subject to summary judgment. Alternatively, the court could rule as a matter of law that the Florida Legislature has defined 60 days to be a reasonable period of time.  Finally, H.T.E.'s interpretation of the Act would render the redemption provisions of the Act unconstitutional.

### 1.   Section 6.07.0902(10)(a) and (b) Impose a 60-Day Deadline to Redeem "Control Shares".

H.T.E.'s creative attempt to read the 60-day deadline out of the Act is to suggest that Sections 607.0902(10)(a) and (b) must each be read in a vacuum -- independently and without reference to the other.  According to H.T.E., subparagraphs (10)(a) and (10)(b) constitute two separate paths toward redemption, one with a 60-day deadline, the other with an infinite deadline.  H.T.E.'s argument goes something like this: § 607.0902(10)(a) applies to any acquisition of control shares when no acquiring person's statement has been filed with the issuing public corporation.  In such cases, H.T.E. concedes that the corporation has only 60 days to exercise the right of redemption.  Subsection (10)(b), however, applies to any acquisition, such as the instant acquisition, when the acquiror files an "acquiring person statement."  According to H.T.E., because subsection (10)(b) contains no 60-day deadline, no deadline applies at all.

H.T.E.'s argument has serious problems.  To begin with, H.T.E. ignores several fundamental principles of statutory construction.  For example, a statute must be construed in its entirety as a harmonious whole.  *See Borgner v. Brooks,* ____ F.3d ____, 2002 WL 34828 at *1 (11th Cir. 2002); *Palm Beach Canvassing Bd. v. Harris,* 772 So. 2d 1273, 1287 (Fla. 2000).  Related sections of a statute should be read together.  *See Id.; Allstate Ins. Co. v. Rudnick,* 761 So. 2d 289, 292 (Fla. 2000).  Statutory phrases must not be read in isolation,

"but rather within the context of the entire section." *Acosta v. Richter*, 671 So. 2d 149, 154 (Fla. 1996).

The right of redemption set forth in Section 607.0902(10) does not work unless subsections (10)(a) and (b) are read together as an integrated whole.   Subsection (10)(a) is the primary section on redemption.  This subsection includes all the essential terms for redemption, including the requisite corporate authority to invoke redemption ("If authorized in a corporation's articles of incorporation or bylaws before. . ."), the deadline for redemption ("60 days"), the price of the redeemed shares ("fair value"), and the procedures by which the right of redemption will be accomplished (pursuant to "procedures adopted by the corporation").  Subsection (10)(b) overlays subsection (10)(a) by adding a limitation. Subsection (10)(b) prevents a corporation from executing its right of redemption whenever the acquiror files an acquiring person's statement unless the acquiror's control shares are not accorded full voting rights by the shareholders.  There is nothing in subsection (10)(b) to suggest that the right of redemption operates any differently than it does in subsection (10)(a).  To the contrary, the same timing, price, and redemption procedures must apply.  The only difference is that the corporation cannot redeem until management calls a shareholder vote and the shareholders vote not to accord full voting rights.

Subsection (10)(b) cannot be read as a separate and independent path to redemption, for to do so would make no sense.  This has been recognized and acknowledged by H.T.E.[14]

---

[14]   H.T.E. implicitly agrees that these provisions must be read together by itself invoking the procedures contained in Subsection 10(a).  In H.T.E.'s redemption notice to Tyler, it states it is exercising its redemption rights " . . . under Section 607.0902(10)(b) . . ." but also states that it has determined the redemption price " . . . as provided for under Section 607.0902(10)(a) . . ." Gornto Supp. Aff. 16, Exh. I.  A copy of this notice is attached as Exhibit A.  In a press release dated October

Subsection (10)(b) says nothing about the price of those shares.  To find the price, reference must be made back to subsection (10)(a)'s requirement that the price be fair value.  Similarly subsection (10)(b) says nothing about the procedures for purchasing those shares.  Again, reference must be made to subsection (10)(a) to determine the appropriate procedure. Finally, subsection (10)(b) makes no mention of the timing of the redemption.  Once again, reference must be made back to subsection (10)(a) which contains the 60-day limit.  The critical question, for which H.T.E. has no answer, is why should the prerequisite corporate authority, price, and procedures of subsection (10)(a) be read into (10)(b), but not the 60-day deadline?[15]

## 2. H.T.E.'s Interpretation of an Infinite Redemption Right Is Contrary to the Purpose of the Statute.

Even more difficult to explain is why the legislature would place a 60-day deadline for redemption when no acquiring statement has been filed and yet grant an infinite amount of time to redeem when an acquiring persons statement has been filed.  Under the Act, the delivery of an acquiring persons statement, which places the company and its shareholders on notice of a potential change of control, is permissive, not mandatory.  However, the Act is designed to ensure that disinterested shareholders have an opportunity to make an informed

---

29, 2001, H.T.E. stated, "Under applicable Florida statutes, H.T.E. is required to determine and pay a fair price for Tyler's shares pursuant to procedures H.T.E. adopts."  Moore Third Aff. ¶ 10. Moreover, in its memorandum, H.T.E. makes numerous references to the fact that its articles of incorporation specifically authorize redemption, a requirement only found in Subsection 10(a).

[15]  H.T.E. suggests that Tyler's reading is unfair because it could result in the corporation paying for an expedited shareholder's meeting to allow a vote on whether to grant voting rights prior to the expiration of the 60-day redemption period.  The Act is actually quite balanced on this point.  If the acquiror wishes to force an expedited shareholder vote on the issue of its right to vote its shares, it may pay for such a meeting. §607.0902(7)(a).  If, on the other hand, the corporation wishes to exercise its right of redemption, it always has the right, at its expense, to call a shareholders' meeting

decision in their choice between existing management and the acquiror. By placing a moratorium on the company's ability to redeem "control shares" and by providing a mechanism for the acquiror to force a shareholder vote before the corporation can exercise any right of redemption, the Act clearly provides an incentive for the acquiror to file an acquired person statement. To read the Act as H.T.E. suggests, however, would provide a very substantial disincentive for the acquiror to file this statement because it would extend infinitely the amount of time for exercising the right of redemption. The Act should not be interpreted to produce such an unreasonable or absurd result contrary to the purpose of the statute. *See, e.g., Woodall v. Traveler's Indemnity Co.*, 699 So. 2d 1361, 1363 (Fla. 1997) (statute should not be interpreted so as to lead to an absurd result); *J.H. Adams v. Lee*, 89 So. 2d 217, 220 (Fla. 1950) (statute should be construed so as to accomplish the legislative purpose).

### 3.    Assuming the 60-Day Limitation Is Inapplicable, H.T.E. Only Had a "Reasonable Time" to Redeem the Tyler Shares.

Even if H.T.E. convinces this Court that subsections (10)(a) and (10)(b) must be read independently, the statute cannot be interpreted to grant H.T.E. an infinite amount of time to exercise its redemption rights. When a statute is silent on the time for exercising a right, that right must be exercised within a reasonable time.[16] Thus, even if H.T.E. succeeds in its

---

so as to preserve its right to redemption. § 607.0902(10). There is nothing unfair about putting the burden on the party who desires quick action.

[16]    *See Burnsed v. Seaboard Coastline Ry. Co.*, 290 So. 2d 13, 19 (Fla. 1974) (implying a deadline of a reasonable time into the statute); *American Int'l Corp. v. Marine Bank and Trust Co.*, 78 So. 2d 869 872 (Fla. 1955) (same). *University of Florida Foundation, Inc. v. Miller*, 478 So.2d 482 (Fla. 1st DCA 1985) (holding that, with respect to a statute granting a personal representative the right to renounce his or her compensation by filing a renunciation with the court, which statute was not specific as to the time for the renunciation, such renunciation must come "within a reasonable time.").

construction of the Act, it is not entitled to Summary Judgment because whether it acted in a "reasonable time" is a question of fact which cannot be resolved on Summary Judgment.[17]

### 4.    H.T.E.'s Interpretation of the Statute is Unconstitutional.

Finally, to interpret the statute to provide an infinite amount of time for redemption would place an inordinate burden on the sale of securities in violation of the commerce clause of the United States Constitution.  An infinite right of redemption would directly and dramatically impact the interstate buying and selling of securities, regulated under federal law, by making it virtually impossible for Tyler to sell its shares.  For example, H.T.E. could block any sale to any non-resident third party simply by exercising its right to redeem at a price determined by H.T.E., not a willing buyer in the market.[18]

No corresponding local benefit balances against this interference with the national securities markets.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (adopting a balancing test between the legitimate local public interest and the effect on interstate commerce).  The purpose of the Act, which is to provide disinterested shareholders with the right to choose between existing management and the acquiror, is already fully served by the right granted by the Act to withhold voting rights to "control shares."[19]  No additional

---

[17]  One possible interpretation of reasonable time would be to limit the right of redemption to 60 days after the vote of the shareholders on whether to accord voting rights to the acquiror's control shares. Otherwise, the determination of reasonable time must include an examination of the facts and circumstances and is obviously a fact issue precluding summary judgment.

[18]  In addition, such an interpretation would inhibit the initial purchase of a large block of shares, a burden on interstate commerce recognized by the Supreme Court in *CTS* and in *Edgar v. Mite*, 459 U.S. 624 (1982).  Moreover, this interpretation imposes a loss in excess of $8.4 million on Tyler, a Delaware corporation.

[19]  In *CTS*, the Supreme Court held that the right to withhold voting rights on "control shares" was not an excessive burden on interstate commerce because of a state's interest in the "internal affairs" doctrine.  The "internal affairs" doctrine is not implicated by the buying and selling of securities across state lines. *See, e.g., APL Ltd. v. Van Dusen Air, Inc.*, 623 F. Supp. 1216 (D. Minn. 1985)

purpose is served by a right of redemption that extends into infinity. This purported infinite right of redemption is an unconstitutional burden on interstate commerce and should not be adopted because the benefits of the Act can be "promoted as well with a lesser impact on interstate commerce", *i.e.*, by granting the shareholders the right to withhold voting rights to "control shares." *Pike*, 397 U.S. at 142.

### B. H.T.E. Erroneously Interprets "Control Shares."

The parties do not dispute that any right of redemption applies only to "control shares." If H.T.E. has a right of redemption, the question for the Court is whether "control shares" includes all of Tyler's shares purchased during the acquisition at issue or only those shares above the 20% statutory threshold of control.[20] The answer is found in the plain language of the Act, the intent and purpose of the Act, and existing precedent.

### 1.    The Act Defines "Control Shares" as Those Shares in Excess of the 20% Threshold.

The plain language of the statute defines "control shares" as those shares in excess of the 20% threshold. According to the Act:

> "control shares" means shares that, except for this section, would have voting power with respect to shares of an issuing public corporation that, when added to all other shares of the issuing public corporation owned by a person or in respect to which that person may exercise or direct the exercise of voting power, would entitle that person, immediately after acquisition of the shares, directly or indirectly, alone or as part of a group, to exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of voting power:
>
> (a) one-fifth or more but less than one-third of all voting power.
>
> (b) one-third or more but less than a majority of all voting power.

---

[20]  Similarly, the issue before the Court of the voting rights of the shares owned by Tyler turns on the correct application of the definition of "control shares". *See* § 607.0902(5), ". . ., control shares . . . acquired in a control share acquisition have only such voting rights as conferred by subsection (9)."

(c) a majority or more of all voting power.

§ 607.0902(1).[21]

As the definition of "control shares" makes clear, the Act is focused on those shares that allow the acquiror to "exercise . . . voting power of the issuing corporation" in excess of 20%. The Act specifically distinguishes control shares from "all other shares of the issuing public corporation owned by [the acquiror]." § 607.0902(1). Had the Legislature wished to define control shares to include "*all shares* acquired by the acquiror" there would be no reason for the Act to distinguish between shares above the threshold (*i.e.*, control shares) and those "other shares" owned by the acquiror below the threshold. § 607.0920(1). In other words, if the Legislature intended "control shares" to include all shares purchased in an acquisition, it could easily have drafted the statute to do so.

H.T.E. attempts to bolster its erroneous definition of control shares by muddling the definition of control shares with the definition of a "control-share acquisition." While a control-share acquisition includes "all shares . . . acquired within 90 days before or after the date of the acquisition of the beneficial ownership of shares which result in a control-share acquisition," *See* § 607.0902(2)(b), a control share acquisition is still nothing more than the acquisition of "issued and outstanding *control shares*," *See,* § 607.0902(2)(a). Put simply, not every share purchased as part of a control share acquisition is a "control share". To determine whether a share is subject to the Act, one must first determine whether it was purchased as part of a control share acquisition, including shares acquired within a 90-day

---

[21]  For convenience, Tyler will refer to only the twenty percent threshold, the statutory threshold relevant in this case.

period, pursuant to § 607.0902(2), and then determine if it is a "control share" under §607.0902(1).

> This distinction between "control shares" and the scope of the "control-share acquisition" becomes clear by looking to § 607.0902(10), the critical section granting corporations like H.T.E. the right of redemption.[22]  Subsection (10) gives the corporation the power to redeem all "control shares acquired in a control-share acquisition."[23]  Significantly, the right of redemption does not apply to *all shares* acquired in a control-share acquisition, as H.T.E. would suggest.   Instead, the right of redemption applies to only "control shares" acquired in a control-share acquisition; that is, only those shares above the 20% threshold.[24]

> The plain language of subparagraph (10) proves that control shares subject to redemption cannot include all shares acquired in a control-share acquisition, including those shares below the statutory threshold.  First, had the Legislature meant for the right of

---

[22]  H.T.E.'s memorandum incorrectly focuses on § 607.0902(7)(d) which relates to voting rights, not redemption.  Moreover, when the language of subsection (7)(d) is compared to subsections (5) and (10), it is obvious that the omission of the word "control" from subsection (7)(d) was not intended to be substantive.  Subsections (5) and (10) make clear that only "control shares" are subject to voting restrictions and redemption, not all shares acquired in the control-share acquisition.

[23]  §607.0902(10) reads in its entirety as follows: (10) redemption of control shares - -
(a) If authorized in a corporation's articles of incorporation or by-laws before a control-share acquisition has occurred, control shares acquired in a control-share acquisition with respect to which no acquiring person statement has been filed with the issuing public corporation may, at any time during the period ending sixty days after the last acquisition of control shares by the acquiring person, be subject to redemption by the corporation at the fair value thereof pursuant to the procedures adopted by the corporation.
(b) Control shares acquired in a control-share acquisition are not subject to redemption after an acquiring person statement has been filed unless the shares are not accorded full voting rights by the shareholders as provided in sub-section (9).

[24]  To use a simple example, suppose that on January 2, 2001, acquiror purchases a ten percent interest in the corporation.  On January 1, 2002 the acquiror purchases another five percent and on January 30, 2002 the acquiror purchases another ten percent, bringing acquiror's holdings above twenty percent.  The fifteen percent of the shares purchased in January 2002 are part of the control-share acquisition because they were all purchased within 90 days.  § 607.0902(2)  Only those shares above the twenty percent threshold, however, are control shares.  § 607.0902(1).

redemption to apply to all such shares, it would have been easy for the statute to so state. If this were the Legislature's intent, subsection 607.0902(10) would simply read that the right of redemption applies to "all shares acquired in a control-share acquisition." Instead, the Act affords the right of redemption to only "*control shares* acquired in a control-share acquisition." § 607.0902(10) (emphasis supplied).

Similarly, if "control shares" means all shares acquired in a control-share acquisition as H.T.E. suggests, why would Section 607.0902(10) refer to "control shares acquired in a control-share acquisition?" Under H.T.E.'s interpretation of "control shares", the words "acquired in a control-share acquisition" would be completely redundant because control shares, according to H.T.E., already includes all such shares.[25]

It is a well-settled axiom of statutory construction that a court should not read a statute so as to make words or phrases within the statute useless or redundant. *See, e.g., Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 456 (Fla. 1992). Similarly, a court may not add to the statute or change the language of the statue. *See, e.g., Hayes v.* State, 750 So. 2d 1, 4 (Fla. 1999). Thus, this Court must reject H.T.E.'s attempt to change the statutory right of redemption from "control shares acquired in a control-share acquisition" to "all shares acquired in a control-share acquisition."

**2.     H.T.E.'s Interpretation Is Contrary to the Intent and Purpose of the Act.**

As well as conflicting with the plain language of the Act, H.T.E.'s interpretation clashes with the Act's intent and purpose. As noted by the Supreme Court, the purpose of the Act is to protect disinterested shareholders by preventing the exercise of control prior to the

opportunity to vote on such control by disinterested shareholders. *CTS Corporation,* 421 U.S. at 82-83, 91.[26] This purpose is completely accomplished by defining "control shares" to include only those shares that actually result in the acquiror having the opportunity to exercise control. Why should an acquiror's non-controlling shares be subject to voting restrictions not imposed on any other shareholder?

The law favors a shareholder's right to vote, and this right should not be taken away unnecessarily.[27] Thus, this Court should not adopt an interpretation of control shares that causes an acquiror to be disenfranchised any more than necessary to serve the purposes of the Statute.[28]

The more narrow interpretation of "control shares" is also consistent with the legislative history of the Florida Act. A 1989 staff review of Chapter 607 by the Florida Senate Committee on Commerce notes that "control shares" only includes those shares in excess of the statutory 20% threshold. According to Appendix C of this staff review:

---

[25] The Act makes other references to "control shares acquired in a control share acquisition," rather than all shares acquired in a control share acquisition, *see* § 607.0902(5) and (9).

[26] Indeed, H.T.E.'s description of the Act as an anti-takeover statute has been specifically rejected by one of H.T.E.'s principal authorities. *See Business Aviation of South Dakota, Inc.,* 882 P.2d 662, 664-65 (Utah 1994) (defendants' claim that the Act is to protect Utah corporations from outside hostile takeovers is rejected – "no such purpose is stated in the Act, nor can the Act's language be read to imply such a purpose.")

[27] *See Duvall v. Moore,* 276 F. Supp. 674, 679 (N.D. Iowa 1967) ("deprivation of a stockholder's right to vote takes away an essential attribute of his property"); *Smith v. Orange & Rockland Util., Inc.,* 617 N.Y.S. 2d 278, 279-80 (1994) ("right of a shareholder to vote for directors is a valuable and vested property right. . .and should not be annulled for purely technical reasons"); *Carmody v. Toll Bros., Inc.,* 723 A.2d 1180, 1193 (Del. Ch. 1998) ("the fundamental value that the shareholder vote has primacy in our system of corporate governance because it is the ideological underpinning upon which the legitimacy of directorial power rests"); *Holly Sugar Corp. v. Buschbaum,* 1981 WL 1708 at *4 (D. Colo. Oct 28, 1981) ("[n]umerous courts have recognized that voting rights are among the most important rights of shareholders.")

> The Indiana law adopts special rules for "control shares," i.e., shares held by any
> one person or firm in excess of 20% of the total stock outstanding. The law
> deprives these control shares of any voting power unless the shareholders have
> affirmatively voted to authorize such power by a vote that excludes all shares
> held by the controlling person.

Appendix C, Review of Chapter 607, Florida Statutes, Corporations, by staff of the Florida

Senate Review by the Florida Senate Committee on Commerce, Senator Don C. Childers,

Chairman, March 1989.[29]

### 3.    Tyler's Interpretation of "Control Shares" Is Consistent with Federal Precedent.

At least one federal court has concluded that "control shares" are those shares at or

above the 20% statutory threshold. In *Atlantis Group, Inc. v. Partners*, 1991 WL 319384

(W. D. Mich. Aug. 27, 1991), the district court interpreted Michigan's Control-Share

Acquisition Act, which like Florida, was modeled after Indiana.[30]  According to the court, the

statute strips voting control from only those shares over the statutory threshold: "The statute

thus limits a Control Share Acquirer's votes to 20% of the company's voting power, and

strips the remaining shares over the 20% of their suffrage rights." *Id* at *4.

H.T.E. cites no holding to the contrary. The best it can do is to seize upon dicta in

two cases, the *CTS* and *Business Aviation* cases discussed above. In *CTS*, the Supreme Court

observes in a footnote that the case is not moot because the acquiror "will have no voting

rights in *its shares*." 481 U.S. at 78 n.5. (emphasis supplied).  H.T.E. suggests that "its

shares" must be read broadly to include all of the acquiror's shares.  H.T.E. then leaps to the

---

[28] *See, e.g., Preston v. Allison*, 650 A.2d 646, 649 (Del. 1994) ("stockholder's ability to participate in corporate governance through the election of directors is a fundamental part of corporate law.  Thus, there is a general policy against disenfranchisement.")
[29] A copy of this Appendix C to the staff report is attached to this memorandum as Exhibit B.

conclusion that the Supreme Court must be defining control shares to include all of the acquiror's shares.  This leap is made without any authority.

The *Business Aviation* case is no more helpful.  There is nothing in the opinion that indicates that the definition of control shares at issue in this case was presented to the Utah court by any party.  To the contrary, the Utah court was concerned only with the definition of a control-share acquisition.[31]

### CONCLUSION

For all the foregoing reasons, H.T.E.'s Motion for Partial Summary Judgment should be denied.  H.T.E.'s argument is based on a misinterpretation of the definition of control shares and a mistaken view of the deadline for the right of redemption.  At the very least, the case presents a fact issue as to whether H.T.E. exercised its right of redemption with a reasonable time.

Respectfully submitted,

William B. Wilson, Esquire
Florida Bar No. 153167
HOLLAND & KNIGHT LLP
200 S. Orange Avenue, Suite 2600
Post Office Box 1526
Orlando, FL 32802-11526
(407) 425-8500
Attorneys for Defendant,
Tyler Technologies, Inc.

---

[30]  In fact, the Michigan Act definition of "control shares" is identical to the Florida Act.  See Mich. Bus. Corp. Act. Section 450.1790(1).

[31]  Interestingly, the Utah court declined to adopt the expansive definition of "control-share acquisition" urged by the corporation.  The Defendant had argued that three Plaintiffs who collectively owned 51.8 percent had engaged in a "control-share acquisition" by selecting a single agent.  The court held that no acquisition of control shares had taken place within the meaning of the statute.  *Id*. at 665-66.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by hand delivery this *15th* day of April, 2002, to **John W. Foster, Sr., Esquire,** Baker & Hostetler LLP, 2300 Sun Trust Center, 200 South Orange Avenue, Post Office Box 112, Orlando, FL 32802-0112.

Attorney

TPA1 #1216245 v1

21

ALL-STATE® LEGAL  800-222-0510   E0511   RECYCLED



Headquarters:
1000 Business Center Drive, Lake Mary, FL 32746 ♦ (407) 304-3235

Application Solutions for Government
October 29, 2001


        Via Facsimile #(214) 547-4041, U.S. Mail
        and Federal Express #7916 8870 2000


        Tyler Technologies, Inc.
        5949 Sherry Lane, Suite 1400
        Dallas, TX 75225

        Attn:  John M. Yeaman, President


        Re:  Redemption of 5,618,952 Shares of Common Stock of H.T.E., Inc.


        Dear Mr. Yeaman:


        This letter serves as notice to Tyler Technologies, Inc. ("Tyler") that H.T.E., Inc. (the
        "Company") has on October 29, 2001, effective at 8:00 A.M. (Eastern time), exercised its
        right under Section 607.0902(10)(b), Florida Statutes, to redeem the 5,618,952 shares of
        Company common stock (the "Shares") acquired by Tyler in a control share acquisition
        under Section 607.0902, Florida Statutes.  The redemption price the Company is paying
        for the Shares is $1.30 per share, for an aggregate redemption price of $7,304,637.60 for
        all of the Shares.  On October 12, 2001, the Company's Board of Directors approved the
        redemption of the Shares.  The redemption price represents a 17.5% discount from the
        average closing share price for the 10 trading days commencing on October 15, 2001 and
        ending on October 26, 2001, as reported on the NASDAQ National Market for the
        regular trading hours or session each day.  In determining the fair value of the Shares for
        the redemption, as provided under Section 607.0902(10)(a), the Company relied on a
        report prepared for the Company by a national investment banking firm, which
        recommended a discount ranging from 10% to 25% should be deducted from the
        Company's public share price. The Company's Board of Directors approved a discount
        that was at the mid-point of this recommended discount range.


        We have escrowed the aggregate redemption price ($7,304,637.60) with SunTrust Bank
        as escrow agent.  Pursuant to the escrow agreement between SunTrust Bank and the
        Company, SunTrust Bank has an irrevocable obligation to pay to Tyler the aggregate
        redemption price upon its surrender of all of the Shares.  Please return the certificates
        representing the Shares to SunTrust Bank, 225 E. Robinson Street, Suite 250, Orlando,

Case 6:01-cv-01366-GAP    Document 53    Filed 04/15/02    Page 24 of 29 PageID 372

John M. Yeaman, President
Tyler Technologies, Inc.
Page – 2 –

---

FL 32801, Attention: Corporate Trust Division.    Upon receipt of the certificates representing all of the Shares, SunTrust Bank will release the aggregate redemption price to Tyler.  Please indicate to SunTrust Bank how Tyler wishes to receive the funds (i.e., by check or wire transfer), and if by wire transfer, please include in Tyler's transmittal letter to SunTrust Bank the appropriate wiring instructions.

In accordance with Section 607.0721(4), Florida Statutes, the Shares are no longer considered issued and outstanding shares of common stock of the Company, and all rights with respect thereto have ceased, except only the right of Tyler to receive the aggregate redemption price in the amount and manner described above. In that regard, the Company has informed its transfer agent to put a stop transfer order on the Shares.

Very truly yours,

H.T.E., Inc.

By: _____
Joseph M. Loughry, III
President & Chief Executive Officer

ALL-STATE LEGAL   800-222-0510   #051   RECYCLED



A REVIEW OF

CHAPTER 607, FLORIDA STATUTES

CORPORATIONS


By Staff of

THE FLORIDA SENATE COMMITTEE ON COMMERCE

SENATOR DON C. CHILDERS, CHAIRMAN

MARCH - 1989

COPY

reproduced by
FLORIDA STATE ARCHIVES
DEPARTMENT OF STATE
R. A. GRAY BUILDING
Tallahassee, FL 32399-0250
Series _15_ Carton _mq_

REVISED: _____                     BILL NO. CS/SB 404

DATE: _____April 14, 1987_____                              Page _1_

---

SENATE STAFF ANALYSIS AND ECONOMIC IMPACT STATEMENT

| ANALYST | STAFF DIRECTOR | | REFERENCE | ACTION |
|---|---|---|---|---|
| 1. Cochran | Lester / | 1. JCI | Fav./CS |
| 2. Wilkes | Forte | 2. COM | Favorable |
| 3. _____ | _____ | 3. _____ | _____ |
| 4. _____ | _____ | 4. _____ | _____ |

SUBJECT:                                      BILL NO. AND SPONSOR:

    Corporations/Affiliated              CS/SB 404 by Judiciary-Civil Comm.
    Transactions                         and Senator Langley

---

I.  SUMMARY:

    A.  Present Situation:

        Chapter 607, F.S., provides the general regulatory and
        organizational scheme for corporations doing business in
        Florida.  Although various sections of ch. 607, F.S., allow
        corporations to merge or consolidate with other corporations,
        there are no statutory provisions regulating business takeovers
        nor are there any which are protective of minority (dissenting)
        shareholders who oppose formation of the new corporation.
        Generally, a takeover occurs when a person or entity seeks to
        gain control of a corporation by offering to buy a majority of
        the corporation's voting stock either at market price or, in
        many instances, at greater than market price from those
        shareholders willing to tender their shares in exchange.  This
        event is referred to as a tender offer.

        Oftentimes after gaining control of the corporation through a
        successful tender offer, minority shareholders who elected not
        to tender their shares initially will be coerced to accept less
        for them if the new majority shareholder attempts a second step
        merger by acquiring their shares.  Alternatively, shareholders
        believing their shares to be worth more than the price set by
        the tender offeror may, nevertheless, feel pressured into
        accepting the initial offer because of their fear of receiving
        less desirable consideration later.

    B.  Effect of Proposed Changes:

        Committee Substitute for Senate Bill 404 creates s. 607.108,
        F.S., providing certain shareholder protection when affiliated
        transactions by tender offer take place.

        Section 607.108(1)(b), F.S., defines "affiliated transaction"
        as (1) a merger or consolidation, (2) the sale of assets to an
        interested shareholder having a fair market value of more than
        5% of the corporation's assets, (3) the issuance of voting
        shares to the interested shareholder having a fair market value
        greater than 5% of the total market capitalization of the
        corporation's voting shares, (4) any plan of dissolution
        proposed by an interested shareholder, (5) any reclassification
        of securities or other corporate reorganization which has the
        effect of increasing the percentage ownership of the interested
        shareholder by more than 5%, or (6) any guarantee by the
        corporation of the indebtedness of an interested shareholder.

        An "interested shareholder," in turn, is defined as any person
        who is the "beneficial owner" of more than 10% of the
        outstanding voting shares of the corporation.  However, it does
        not include the corporation or its subsidiaries, or employee
        benefit plans of the corporation and their fiduciaries.  A
        person is a beneficial owner of voting shares if he has voting
        power, investment power, or the right to acquire the same.

Case 6:01-cv-01366-GAP   Document 53   Filed 04/15/02   Page 28 of 29 PageID 376

Affiliated transactions between a Florida corporation who has
had more than 300 shareholders during the preceding 3 years and
an interested shareholder (tender offeror) must be approved by
a two-thirds vote of the "voting shares" of the corporation,
not including the beneficially owned shares of the interested
shareholder.  Such a vote would not be required if the
interested shareholder has acquired 90% of the voting shares;
held 80% of the voting shares for at least 5 years; the
affiliated transaction is approved by a majority of
disinterested directors; the corporation is an investment
company registered under the Investment Company Act of 1940; or
the price received by each shareholder is at least equal to the
highest price paid by the interested shareholder for its shares
including any premium over market value.

Interested shareholders are required by the bill to meet
certain procedural requirements during the 3 year period
preceding the affiliated transaction, unless approved by a
majority of disinterested directors, designed to prevent self-
dealing or manipulation of the market price of the
corporation's shares.

The bill does not apply to corporations whose original articles
of incorporation expressly elect not to be so governed or any
amendment to a corporation's articles prior to January 1, 1989,
electing not to be governed by this section.  Corporations may
also elect not to be covered by the act by amending their
articles prior to 18 months following the new sections'
effective date or later than 18 months under certain
circumstances.

II.  ECONOMIC IMPACT AND FISCAL NOTE:

   A.  Public:

      The bill attempts to assure minority shareholders get a fair
      price for their shares in a takeover situation.  However, no
      data is available at this time in support of this.

      The public may benefit by the possible disincentive created by
      the bill for existing Florida corporations to relocate in other
      states and for foreign corporations to reincorporate in
      Florida.

   B.  Government:

      Those corporations not electing to be covered by the act would,
      in some situations, have to file amendments to their articles
      of incorporation with the Department of State.  However, at
      this time, the volume of amendments and corresponding increase
      in workload and filing fees is indeterminate.

III.  COMMENTS:

   Second generation state anti-takeover statutes were developed in
   response to the Court's ruling in Edgar v. MITE Corp., 457 U.S. 624
   (1982), effectively nullifying first generation statutes which
   directly regulated tender offers.

   The United States Supreme Court recently decided a case in which
   the validity of an Indiana second generation anti-takeover statute
   was in question.  In CTS Corp. v. Dynamics Corp. of America, No.
   86-71 (U.S. April 21, 1987), the Court upheld the validity of the
   Indiana Control Acquisitions Chapter against claims that it was
   preempted by the federal Williams Act, (Sections 78 m (d)-(e), 78 n
   (d)-(f), 15 U.S.C.) (which regulates corporate tender offers) and
   unconstitutional under the Commerce Clause.

   The Indiana law adopts special rules for "control shares," i.e.,
   shares held by any one person or firm in excess of 20 percent of
   the total stock outstanding.  The law deprives these control shares

REVISED: _____                    BILL NO. CS/SB 404

DATE: __April 14, 1987___                          Page _3_

of any voting power unless the shareholders have affirmatively
voted to authorize such power by a vote that excludes all
interested shares (including shares held by the controlling
person).

The Indiana Control Shares Acquisitions Chapter applies to
corporations with certain specified assets and a specified number
of shareholders in the state.  A corporation may opt out of the act
by amending its articles of incorporation or bylaws.

Although the Court in this case was not called upon to decide the
validity of a "fair price" statute such as the one in this proposed
legislation, it is instructive to note that when deciding whether
the Indiana Act was preempted by the Williams Act, the Court made
reference to the situation this proposed legislation seeks to cure,
i.e., the depressed price received in a second-step merger by
stockholders who do not tender.

> The Indiana Act operates on the
> assumption, implicit in the Williams Act,
> that independent shareholders faced with
> tender offers often are at a
> disadvantage.  By allowing such
> shareholders to vote as a group, the Act
> protects them from the coercive aspects
> of some tender offers.  _If, for example,_
> _shareholders believe that a successful_
> _tender will be followed by a purchase of_
> _nontendering shares at a depressed price,_
> _individual shareholders may tender their_
> _shares -- even, if they doubt the tender_
> _offer is in the corporation's best_
> _interest -- to protect themselves from_
> _being forced to sell their shares at a_
> _depressed price._  . . . In such a
> situation under the Indiana Act, the
> shareholders as a group acting in the
> corporation's best interest, could reject
> the offer, although individual
> shareholders might be inclined to accept
> it.  _The desire of the Indiana_
> _Legislature to protect shareholders of_
> _Indiana corporations from this type of_
> _coercive offer does not conflict with the_
> _Williams Act.  Rather, it furthers the_
> _federal policy of investor protection._
> (emphasis added).

A study by the Federal Trade Commission focusing
on a 1985 New York law similar to this proposed
legislation found that the stock of 94 publicly
traded companies based in New York fell by one
percent, or a total market value of $1.2 billion,
in the days following the announcement of the
bill's introduction.  Officials of the trade
commission, however, acknowledged that the study
did not analyze the long-term effects of the
legislation, but the short-term reaction of
investors to proposed restrictions on takeovers.
The New York Times, Thursday, April 16, 1987.

In the wake of the recent insider trading scandals
occurring on Wall Street, Congress is considering
legislation to regulate takeovers on a national
level.

IV.  AMENDMENTS:

   None.