RECEIVED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

02 MAY -1  PM 3: 26

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

CASE NO.: 6:01-CV-1366-ORL-31DAB

H.T.E., Inc., a Florida corporation,

     **Plaintiff,**

v.

**TYLER TECHNOLOGIES, INC., a**
**Delaware corporation,**

     **Defendant**

_____

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND SUPPLEMENTAL RELIEF, AND FOR DAMAGES

Pursuant to Fed. R. Civ. P. 15(a), Plaintiff, H.T.E., Inc. (hereinafter "HTE"), amends it complaint against and sues Defendant, Tyler Technologies, Inc. (hereinafter "Tyler"), and alleges:

### Nature of Action

1. This is an action against Tyler for declaratory and supplemental relief to declare valid and enforceable HTE's statutory redemption of Tyler's holdings of HTE common stock in accordance with Section 607.0902(10), Florida Statutes (Florida Control-Share Acquisition Act),[1] and an action for damages in excess of $75,000 exclusive of interest and costs.

2. This action was removed to this Court by Tyler on November 20, 2001, on the basis that this Court would have original jurisdiction under 28 USC § 1332(a) (diversity of citizenship where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs).

_____

[1] This Act is often referred to as "Florida's Takeover Act."

## Parties, Jurisdiction, and Venue

3.  HTE is a Florida corporation which provides computer software and related services in the public sector marketplace throughout the nation, including Florida. Its principal office is located in Lake Mary, Seminole County, Florida. HTE is a publicly-held corporation whose shares are traded on the NASDAQ National Market.

4.  Tyler is a Delaware corporation and is a competitor of HTE. More specifically, like HTE, Tyler provides computer software and related services in the public sector marketplace throughout the United States, including Florida.

5.  Tyler is subject to the specific jurisdiction of this Court in Florida pursuant to Florida's long-arm statute, § 48.193(1)(a), Florida Statutes, because it operated, conducted, engaged in or carried on a business or business venture in this state. More specifically, this action concerns Tyler's control share acquisition in Florida of HTE common stock and HTE's redemption thereof, pursuant to Florida law. Tyler's control share acquisition was made for the specific purpose of effecting a "takeover" of HTE. Tyler's control share acquisition was made under a contract which was negotiated, drafted, signed and closed by Tyler here in Florida. In its endeavor to take over HTE, Tyler directed and submitted substantial correspondence, notices (including its Acquiring Person Statement which was expressly issued by Tyler pursuant to Florida law), and communications to HTE's officers and directors in Florida; and Tyler directed shareholder proposals into Florida in an attempt to restructure HTE's board of directors by removing HTE's then-current directors and nominating as replacement directors several persons associated with Tyler. Additionally, Tyler attended HTE's annual shareholders meeting in Florida and, in express reliance upon Florida law, Tyler has disputed HTE's right of redemption and has asserted that it somehow continues to own HTE common stock despite the statutory

redemption which was effected by HTE.  The funds constituting the redemption price owing to Tyler are escrowed in Florida.  Furthermore, in the agreement pursuant to which Tyler made its control share acquisition of HTE common stock, Tyler expressly stated, in pertinent part:

> Section 6.8 <u>Jurisdiction: Venue</u>.  Any judicial proceeding brought by or against any of the parties to this Agreement on any dispute arising out of this Agreement or any matter related hereto shall be brought exclusively in any Federal or State court sitting in either Orange County, Florida, or Dallas County, Texas, and by execution and delivery of this Agreement, each of the parties to this Agreement accepts for itself the exclusive jurisdiction and venue of the aforesaid courts as trial courts, and irrevocably agree to be bound by any final non-appealable judgment rendered in connection with this Agreement.

6.  Tyler is also subject to the general jurisdiction of this Court pursuant to Florida's long-arm statute, Florida Statute § 48.193(2), because it is a Delaware corporation operating and doing business in the State of Florida through substantial and not isolated activity. Tyler is a competitor to HTE notwithstanding its holdings of HTE common stock and specifically competes with HTE in Florida by itself and through its various affiliates, subsidiaries and divisions over which Tyler has substantial control.  Tyler holds itself out to the public at large as doing business in the State of Florida.

7.  Moreover, Tyler is subject to the jurisdiction of this Court pursuant to Florida Statute § 48.181(3). Tyler sells, cosigns or leases tangible or intangible personal property through brokers, jobbers or wholesalers, or distributors to persons, firms or corporations in Florida.  Tyler by and through its divisions, affiliates, subsidiaries and other agents, sells products and services to customers in Florida.  Therefore, Tyler is engaged in substantial and not isolated activities within Florida and is operating, conducting, engaging in, or carrying on a business or business venture in Florida.

8. Furthermore, Tyler is subject to the jurisdiction of this Court pursuant to Florida Statute § 48.193(1)(b), in that Tyler committed a tortious act within the state.

9. The parties have diverse citizenships and the amount in controversy exceeds $75,000.00.

10. Under 28 USC § 1391(a) and § 1441(a), venue is this action is proper within the Middle District of Florida, because (i) a substantial part of the events or omissions giving rise to the instant claim occurred within the Middle District of Florida, (ii) a substantial part of the property that is the subject of this action is situated within the Middle District of Florida, and (iii) Tyler's removal of this action fixes the federal venue in this judicial district.

## Background and General Allegations

11.     On August 3, 1999, HTE entered into a severance agreement (the "Severance Agreement") with Dennis and Jack Harward (the "Harwards"), pursuant to which the Harwards resigned as officers and employees of HTE.   A true and accurate copy of the Severance Agreement is attached hereto as **Exhibit "A"** and incorporated herein by reference.

12.     Although they resigned as officers and employees, the Harwards remained Directors and major shareholders of HTE.

13.     The Severance Agreement included a non-competition covenant which *inter alia* precluded the Harwards from becoming members of a group exercising direct or indirect control of more than five percent (5%) of any class of capital stock of any competitive corporation.

14.     On or about August 13, 1999, Tyler formulated a plan to take over HTE by first making a control share acquisition of the Harwards' HTE stock.

15.     In furtherance of this plan, on August 17, 1999 (two weeks after the Harwards had executed their Severance Agreement), Tyler and the Harwards entered into a stock purchase

agreement (the "Stock Purchase Agreement"), in Orlando, Florida, pursuant to which Tyler made a control share acquisition of 32% of HTE 's common stock from two Florida residents, the Harwards, and the Harwards collectively received from Tyler more than 5% of Tyler's stock.  A true and accurate copy of the Stock Purchase Agreement is attached hereto as **Exhibit "B"** and incorporate herein by reference.

16.     After executing the Stock Purchase Agreement, Tyler engaged in conduct and took acts to further its plan or scheme to effect a takeover of HTE.

17.     As a result of Tyler's amassing this large block of HTE's  common stock, Tyler's entire concentration of HTE common stock constituted "control shares," as that term is defined under Section 607.0902(1), <u>Florida Statutes,</u>[2] subjecting those shares to statutory limitations on their voting and ownership.  Section 607.0902, <u>Florida Statutes,</u> (Control-Share Acquisitions) is set forth in its entirety in **Exhibit "C"**,  attached hereto.

18.     The purpose of Florida's control-share acquisition statute is to protect shareholders of public corporations by balancing their rights with those of a potential acquirer of corporate stock by allowing shareholders the opportunity to decide whether a change in corporate control is desirable.

19.     HTE's articles of incorporation and bylaws do not exempt "control shares" from the limits on voting rights set forth in  Section 607.0902(5), <u>Florida Statutes,</u> that states:

---

[2] 607.0902 Control-share acquisitions.  (1) "CONTROL SHARES."—As used in this section, "control shares" means shares that, except for this section would have voting power with respect to shares of an issuing public corporation that, when added to all other shares of the issuing public corporation owned by a person or in respect to which that person may exercise or direct the exercise of voting power, would entitle that person, immediately after acquisition of the shares, directly or indirectly, alone or as a part of a group, to exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of voting power:
    (a) One-fifth or more but less than one-third of all voting power.

*   *   *

(5) LAW APPLICABLE TO CONTROL-SHARE VOTING RIGHTS.—Unless the corporation's articles of incorporation or bylaws provide that this section does not apply to control-share acquisitions of shares of the corporation before the control-share acquisition, control shares of an issuing public corporation acquired in a control-share acquisition have only such voting rights as are conferred by subsection (9).

20.     Section 607.0902(9), <u>Florida Statutes</u>, establishes that "control shares" have the same voting rights as accorded shares **only** to the extent granted by a resolution approved by the shareholders of the issuing public corporation.

21.     At the annual shareholders' meeting on November 16, 2000, the shareholders of HTE voted not to confer voting rights on the shares of Tyler's HTE stock.

22.     Section 607.0902(10), <u>Florida Statutes</u>, empowered HTE to redeem Tyler's 5,618,932 "control shares," stating in pertinent part:

(10) REDEMPTION OF CONTROL SHARES

(a) If authorized in a corporation's articles of incorporation or bylaws before a control-share acquisition has occurred, control shares acquired in a control-share acquisition with respect to which no acquiring person statement has been filed with the issuing public corporation may, at any time during the period ending 60 days after the last acquisition of control shares by the acquiring person, be subject to redemption by the corporation at the fair value thereof pursuant to the procedures adopted by the corporation.

(b) Control shares acquired in a control-share acquisition are not subject to redemption after an acquiring person statement has been filed unless the shares are not accorded full voting rights by the shareholders as provided in subsection (9).

23.     On October 12, 2001, HTE's Board of Directors exercised the company's statutory right under Section 607.0902(10), <u>Florida Statutes,</u> to redeem Tyler's 5,618,932 "control shares" of common stock by passing resolutions, a true and correct copy of which is attached hereto as **Exhibit "D,"** approving, authorizing, and ratifying the redemption of Tyler's

5,618,932 "control shares" for a fair value of $1.30 per share, determined by the average of the closing price for the company's stock for each of the 10 trading days as reported on the NASDAQ National Market for the period October 15, 2001 through October 26, 2001, less a fair discount percentage of 17.5% as determined by the Board of Directors after recommendations from Raymond James & Associates, Inc.

24.     HTE notified Tyler on Monday, October 29, 2001 about having exercised the company's statutory right to redeem the "control shares," through a letter, a true and correct copy of which is attached hereto as **Exhibit "E"**.  Thereafter, HTE tendered and made available to Tyler the aggregate purchase price of $7,304,637.60 for the "control shares," deposited into an irrevocable escrow account with SunTrust Bank, Orlando, Florida

25.     On Monday, October 29, 2001, Tyler notified HTE that it objected to HTE's exercising of its right to redeem the "control shares."  A true and correct copy of Tyler's letter is attached hereto as **Exhibit "F"**.

### COUNT I (ACTION FOR DECLARATORY JUDGMENT)

26.     HTE realleges and incorporates herein by reference the allegations set forth in paragraphs 1-25 above.

27.     This is an action in which HTE seeks declaratory judgment under 28 USC § 2201 and Chapter 86, Florida Statutes.

28.     Since exercising its statutory right to redeem Tyler's "control shares," a significant number of shares of common stock have been traded in the public market.  Tyler publicly asserts the redemption is unlawful, creating doubt in the market about whether Tyler continues to own the "control shares."

29.     Because of Tyler's public objections, HTE needs the Court to declare that HTE has the lawful right, power, and privilege to redeem Tyler's "control shares" at the redemption price of $1.30 per share, and to grant such other supplemental relief as is necessary to effect HTE's redemption and cancellation of Tyler's "control shares."

30.     HTE is an interested party seeking a declaration as to its rights and other legal relations.

WHEREFORE, Plaintiff, HTE, respectfully demands that this Honorable Court enter a declaratory judgment, declaring, ordering and adjudging the following:

a.     That HTE's redemption of the Tyler's HTE common stock at a redemption price of $1.30 per share was lawful and effective; and

b.     Such other supplemental relief as is necessary or proper to effect the redemption and cancellation of Tyler's HTE common stock.

## COUNT II (ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT)

31.     HTE realleges and incorporates herein by reference the allegations set forth in paragraphs 1-25 above.

32.     This is an action for damages in excess of $75,000, exclusive of interest and costs.

33.     HTE had a contract with the Harwards.

34.     Tyler knew of the existence of said contract.

35.     Tyler intentionally, maliciously, without justification, and with improper means, caused the breach of and otherwise interfered with HTE and the Harwards' contract.

36.     As a direct and proximate result of Tyler's intentional and malicious interference, HTE has suffered, and will continue to suffer, substantial losses, expenses and other damages.

WHEREFORE, HTE respectfully requests that this Honorable Court enter judgment against Tyler for damages, together with interest, costs and such other relief as may be just and proper.

## COUNT III (ACTION FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)

37.     HTE realleges and incorporates herein by reference the allegations set forth in paragraph 1-25 above.

38.     This is an action for damages in excess of $75,000, exclusive of interest and costs.

39.     At all times material to this action, advantageous business relations existed between HTE and the Harwards.

40.     Tyler knew of the existence of said business relations.

41.     Tyler intentionally, maliciously, without justification, and with improper means, interfered with said business relations.

42.     As a direct and proximate result of Tyler's intentional and malicious interference, HTE has suffered, and will continue to suffer, substantial losses, expenses or other damages.

WHEREFORE, HTE respectfully requests that this Honorable Court enter judgment against Tyler for damages, together with interest, costs and such other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

HTE requests trial by jury regarding all issues so triable.

Dated this 1st day of May, 2002.

Respectfully submitted,

BAKER & HOSTETLER LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, FL 32802-0112
Attorneys for Plaintiff, H.T.E., Inc.

By: _____
John W. Foster, Sr.
Florida Bar No. 318620
Jerry R. Linscott
Florida Bar No. 148009

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Second Amended Complaint for Declaratory and Supplemental Relief and for Damages has been furnished by hand delivery this 1st day of May, 2002, to William B. Wilson, Esquire, Holland & Knight LLP, 200 S. Orange Avenue, Suite 2600, Orlando, FL 32801.

_____
John W. Foster, Sr.

G:\Jwf0370\25944\00001\Pleadings\FEDERAL\Amd Complaint W-Damages (Second).Doc

10

# AGREEMENT

THIS AGREEMENT ("Agreement") is made and entered into as of the 3rd day of August, 1999, by and among H.T.E., INC., ("the Company"), Dennis J. Harward and Jack L. Harward (collectively the "Executives").

## BACKGROUND

The Executives serve as directors and officers of the Company and certain of its subsidiaries, and the Company and Executives desire to enter into this Agreement to provide for a transition of the Executives' relationship with the Company and its subsidiaries.

IN CONSIDERATION of the mutual promises contained herein, the parties hereto hereby agree as follows:

1.  <u>Resignations.</u>  Upon signing this Agreement, Dennis J. Harward is resigning all positions with the Company (including but not limited to the positions of Chairman of the Board, President, Chief Executive Officer and employee of the Company) except as a director of the Company, and also is resigning all positions with each of the Company's subsidiaries (including but not limited to the positions of director, officer, and employee). Upon signing this Agreement, Jack L. Harward is resigning all positions with the Company (including but not limited to the positions of officer and employee of the Company) except as a director of the Company, and also is resigning all positions with each of the Company's subsidiaries (including but not limited to the positions of director, officer, and employee). The parties agree that the foregoing resignations of the Executives shall be deemed effective, without any action required on the part of any party, as of 9:00 a.m. on August 3, 1999.

2.  <u>Severance Payment.</u>  On or before 5:00 p.m. on August 3, 1999, the Executives each shall receive a lump sum payment equal to (i) their base annual salary (which is $_____ as to Dennis J. Harward and $_____ as to Jack L. Harward) for a six month period, less applicable tax withholdings, plus (ii) amounts incurred by them to retain their health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for a six month period. Further, each of the Executives will receive the foregoing base annual salary for a period of eighteen calendar months (commencing with the month of February 2000), less applicable tax withholdings. Such salary shall be paid during such eighteen month period at the same time as the Company pays its other employees. During the foregoing eighteen month period, the Company also shall reimburse the Executives for amounts incurred by them to retain their health insurance coverage under COBRA or, to the extent that the coverage of the Executives expires for purposes of coverage under COBRA, an amount that otherwise would have been paid to the Executives if they had retained their health insurance coverage under COBRA.

3.  <u>Director Positions.</u>  The Executives may continue their service as directors of the Company for the remainder of the respective term for which each Executive is presently serving, except that if the Executives at any time own less than 30% of the outstanding shares of Company

C:\WP\H.T.E.\Agreement

HTE - 0025

common stock, then one of the Executives (to be determined by them) shall promptly resign as a director of the Company and, further, if the Executives at any time own less than 15% of the outstanding shares of Company common stock, then both Executives will promptly resign as directors of the Company.

4.    Stock Sale Issues. If after the date of this Agreement the Company repurchases shares of its common stock in open market transactions, then the Executives shall have the right to sell to the Company an amount of shares of Company common stock equal to the product obtained by multiplying the percentage of outstanding shares of Company common stock purchased by the Company in such open market transactions by the amount of shares of Company common stock owned by the Executives immediately prior to such open market transaction. In order to facilitate the process for such repurchase of shares from the Executives, the repurchases will be effected after the end of each calendar month. Accordingly, within two business days after the end of a calendar month in which the Company repurchases shares of its common stock in open market transactions, the Company will provide notice to the Executives of the number of shares purchased and the average price per share (computed on a weighted average basis) paid by the Company for such repurchased shares. The Executives will then have the ensuing five business days to notify the Company of the amount of shares that the Executives desire to sell to the Company at such average price per share (and subject to the limitation on amount of shares to be repurchased by the Company set forth above), in which event the Company and the Executives shall close the sale of such shares within two business days thereafter. The repurchase of shares by the Company shall be subject to compliance by the Company with all applicable federal and state securities laws.

If after the date of this Agreement the Company elects to register a sale of its shares of common stock (excluding shares registered on Form S-4 or Form S-8, or successor forms, under the Securities Act of 1933), the Executives will have the right to require the Company to use reasonable commercial efforts to include in such registration an amount of shares of Company common stock owned by the Executives which, when included with the other shares sold by the Company in such offering, is a percentage of the shares sold in such offering equal to the percentage of Company common stock owned by the Executives immediately prior to such registration. The shares owned by the Executives will be included in such registration on the basis provided in any underwriting arrangements approved by the Company and shall be subject to the Executives completing and executing all reasonable questionnaires, powers of attorney, indemnities, underwriting agreements, lock-up letters and other documents required under the terms of such underwriting arrangements. In connection with any such registration, the Company shall use reasonable commercial efforts to register and qualify the shares owned by the Executives included in such registration in each jurisdiction reasonably requested by the Executives. The Executives shall pay all discounts, commissions or fees of underwriters, selling brokers, dealer managers or similar securities industry professionals relating to the distribution of the securities owned by the Executives, and the expenses and fees of any person or entity retained by the Executives in connection with such registration. The rights under this Section 4 shall terminate on January 31, 2001.

C:\FONT\Z.V\Agreement

2

5.    <u>Voting Arrangement</u>.  Until August 3, 2001, the Executives will not, except in their capacities as members of the board of directors of the Company, directly or indirectly:  (i) initiate the "solicitation" of proxies with respect to any Company common stock; or (ii) solicit proxies or become a participant or a "person conducting a solicitation" (as such terms are defined in Regulation 14A under the Securities Exchange Act of 1934) with respect to any Company common stock in opposition to the recommendation of the board of directors of the Company with respect to any matters.   In addition, until August 3, 2001, the Executives shall effect such action as may be necessary to insure that (i) all shares of Company common stock which are beneficially owned by them are voted in favor of all of the nominees to, and proposals of, the board of directors as approved by the board of directors, and (ii) are voted and deemed to be present in person or by proxy at all meetings of the shareholders of the Company so that all shares may be counted for purposes of determining the presence of a quorum at such meeting.   The certificates representing the shares owned by the Executives shall not be legended to set forth the foregoing agreement, and any shares sold or transferred by the Executives following the date of this Agreement shall not be subject to the provisions of this Section 5 except to the extent to which such shares in the hands of the transferee are considered beneficially owned by either or both of the Executives.  For purposes of this Agreement, the terms "beneficially own" and "beneficially owned" shall be determined in accordance with the provisions relating to beneficial ownership of securities included in Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

6.    <u>Restrictive Covenants</u>.  Commencing August 3, 1999, Dennis J. Harward shall be subject to Sections 6, 7, and 14 of the Employment Agreement dated February 1, 1997 between the Company and Dennis J. Harward, as if such sections were included in this Agreement and made a part hereof, with August 3, 1999 being considered as the date of the termination of Mr. Harward's employment with the Company for purposes of such Sections.  Commencing August 3, 1999, Jack L. Harward shall be subject to Sections 6, 7, and 14 of the Employment Agreement dated February 1, 1997 between the Company and Jack L. Harward, as if such sections were included in this Agreement and made a part hereof, with August 3, 1999 being considered as the date of the termination of Mr. Harward's employment with the Company for purposes of such Sections.

7.    <u>Contacts with Employees</u>.  The Executives will refrain from having substantive discussions with any employees of the Company about matters of Company business, except contacts with those executive officers necessitated as a part of the performance by the Executives of their obligations as directors of the Company (and in any event will make any such contacts through and in consultation with the Company's Chief Executive Officer or such other persons as permitted by the board of directors).

8.    <u>Consultation on Legal Proceedings</u>.  Until August 3, 2001, the Executives will make themselves available for consultation with the Company from time to time as the Company may reasonably request, and to the extent as would not unreasonably interfere with the Executives' then employment commitments, to assist the Company in defending or prosecuting litigation involving the Company with respect to Company services and products.

C:\POOL.T.E.\Agreement

3

9.    Non-Disparagement. The parties agree that if inquiry is made to any of the parties (and, as to the Company, its directors) respecting the reason or basis of the change in the Executives' employment or service with the Company, the parties (and, as to the Company, its directors) will respond to the effect that the Executives entered into an arrangement with the Company to provide for a transition in the management of the Company and the opportunity for the Executives to pursue other business endeavors, and that the Executives intend to continue their service as members of the board of directors of the Company.

10.    Stock Options. To the extent that such action does not jeopardize the tax qualified status of the Company's stock option plan, the Company will cause the stock options that are currently held by the Executives to be amended (or reissued) on terms that will provide for the Executives to have the right to exercise such options at any time, and from time to time, after the date of this Agreement and on or before August 3, 2001, at the exercise price set forth in such options immediately prior to such amendment or reissuance.

11.    Attorneys' Fees. On or before 5:00 p.m. on August 3, 1999 and upon submission to the Company by the Executives' counsel of an invoice therefor, the Company will pay the reasonable legal fees incurred by the Executives in connection with the matters relating to this Agreement in an amount not to exceed $22,000 in the aggregate (as to which $10,000 has been previously paid by the Company) plus reasonable out-of-pocket expenses.

12.    Governing Law; Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. The sole and exclusive venue for any action arising out of this Agreement shall be a state or federal court located in Orange or Seminole counties, Florida and the parties agree to be subject to the jurisdiction of such courts.

13.    Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement may not be modified in any way unless by written instrument signed by the parties.

14.    Notices. All notices required or permitted to be given hereunder shall be in writing and shall be personally delivered by courier, sent by registered or certified mail, return receipt requested, or sent by confirmed facsimile transmission addressed as set forth herein. Notices personally delivered, sent by facsimile or sent by overnight courier shall be deemed given on the date of delivery and notices mailed in accordance with the foregoing shall be deemed given upon the earlier of receipt by the addressee, as evidenced by the return receipt thereof, or three days after deposit in the U.S. Mail. Notice shall be sent to the parties at the address set forth below their respective signatures to this Agreement, or to such other address as any party hereto may from time to time give notice of to the others.

15.    Benefits; Binding Effect. This Agreement shall be for the benefit of and binding upon the parties hereto and their respective heirs, personal representatives, legal representatives,

C:\WP\WTA\Agreement

4

HTE - 0028

successors and, where applicable, assigns, including, without limitation, any successor to the Company whether by merger, consolidation, sale of stock, sale of assets or otherwise.

16.   Severability.  The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part thereof, all of which are inserted conditionally upon their being valid in law and, in the event that any one or more of the words, phrases, sentences, clauses, or sections contained in this Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted.  If such invalidity is caused by the length of time or size or area, or both, the otherwise invalid provision will be considered to be reduced to a period or area which would cure such invalidity.

17.   Waivers.  No waiver by any party hereto of a breach or violation of any term or provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or violation.

18.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

19.   Equitable Remedies.  The parties agree that, in the event of a breach of this Agreement by any party, the other party or parties may be without an adequate remedy at law owing to the unique nature of the contemplated transactions.  In recognition thereof, in addition to (and not in lieu of) any remedies at law that may be available to the non-breaching party, the non-breaching party shall be entitled to obtain equitable relief, including the remedies of specific performance and injunction, in the event of a breach of this Agreement by the other party, and no attempt on the part of the non-breaching party to obtain such equitable relief shall be deemed to constitute an election of remedies by the non-breaching party that would preclude the non-breaching party from obtaining any remedies at law to which it would otherwise be entitled.  The parties shall not be required to post any bond in connection with any proceeding sought to obtain equitable relief.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

H.T.E., INC.
1000 Business Center Drive
Lake Mary, Florida  32746

By: _____
Name: _____
Title: _____

5

C:\FOX\T.E.\Agreement

08/03/99  TUE 09:52 FAX 407 8    746          SMITH MACKINNON                        ☒002
AUG-03-99 TUE 08:18 AM   HTE, INC.          FAX NO. 14073043279              P. 01
08/03/99  TUE 08:18 FAX 607 843 3466        SMITH MACKINNON                  ☒002

successors and, where applicable, assigns, including, without limitation, any successor to the Company whether by merger, consolidation, sale of stock, sale of assets or otherwise.

16.    **Severability.** The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part thereof, all of which are inserted conditionally upon their being valid in law and, in the event that any one or more of the words, phrases, sentences, clauses, or sections contained in this Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted. If such invalidity is caused by the length of time or size or area, or both, the otherwise invalid provision will be considered to be reduced to a period or area which would cure such invalidity.

17.    **Waivers.** No waiver by any party hereto of a breach or violation of any term or provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or violation.

18.    **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

19.    **Equitable Remedies.** The parties agree that, in the event of a breach of this Agreement by any party, the other party or parties may be without an adequate remedy at law owing to the unique nature of the contemplated transactions. In recognition thereof, in addition to (and not in lieu of) any remedies at law that may be available to the non-breaching party, the non-breaching party shall be entitled to obtain equitable relief, including the remedies of specific performance and injunction, in the event of a breach of this Agreement by the other party, and no attempt on the part of the non-breaching party to obtain such equitable relief shall be deemed to constitute an election of remedies by the non-breaching party that would preclude the non-breaching party from obtaining any remedies at law to which it would otherwise be entitled. The parties shall not be required to post any bond in connection with any proceeding sought to obtain equitable relief.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

H.T.E., INC.
1000 Business Center Drive
Lake Mary, Florida  32746

By: _____
Name: _____
Title: Vice - President

5

Dennis J. Harward
Address: 4645 ALBRITTON RD
ST CLOUD, FL 3Y272

Jack L. Harward
Address: 1286 HIR STREAM DR.
GENEVA FL 32732

6

C:\FORTE\Agreement

HTE - 0031

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made and entered into as of February 1, 1997, by and between H.T.E., INC., a Florida corporation (the "Company"), and DENNIS J. HARWARD (hereinafter called the "Executive").

## R E C I T A L S

A. The Executive is currently employed as the Chief Executive Officer and President of the Company.

B. The Executive possesses intimate knowledge of the business and affairs of the Company, its policies, methods and personnel.

C. The Board of Directors of the Company (the "Board") recognizes that the Executive has contributed to the growth and success of the Company, and desires to assure the Company of the Executive's continued employment and to compensate him therefor.

D. The Board has determined that this Agreement will reinforce and encourage the Executive's continued attention and dedication to the Company.

E. The Executive is willing to make his services available to the Company and on the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein, the parties agree as follows:

1. **Employment**.

    1.1 **Employment and Term**. The Company hereby agrees to employ the Executive and the Executive hereby agrees to serve the Company on the terms and conditions set forth herein. This Agreement having been duly authorized and approved by the Company's Board of Directors, including the Directors representing BancBoston Ventures, Inc. and Meridian Venture Partners, supersedes and replaces that certain Employment Agreement between the Executive and the Company dated November ___, 1994.

    1.2 **Duties of Executive**. During the term of this Agreement, the Executive shall serve as the Chief Executive Officer and President of the Company, and shall diligently perform all services as may be assigned to him by the Board (provided that, such services shall not materially differ from the services

1

currently provided by the Executive), and shall exercise such power and authority as may from time to time be delegated to him by the Board and as provided by the Bylaws of the Company. The Executive shall devote his full time and attention to the business and affairs of the Company, render such services to the best of his ability, and use his best efforts to promote the interests of the Company.

2. __Term__.

2.1 __Initial Term__. The initial term of this Agreement, and the employment of the Executive hereunder, shall commence on February 1, 1997 (the "Commencement Date") and shall expire on December 31, 1999, unless sooner terminated in accordance with the terms and conditions hereof (the "Initial Term").

2.2 __Renewal Terms__. At the end of the Initial Term, this Agreement shall automatically renew for successive one year terms, subject to earlier termination of this Agreement as provided herein.

2.3 __Expiration Date__. The date on which the term of this Agreement shall expire (including the date on which any renewal term shall expire), is sometimes referred to in this Agreement as the Expiration Date.

3. __Compensation__.

3.1 __Base Salary__. The Executive shall receive a base salary at the annual rate of Two Hundred Fifty Thousand Dollars ($250,000) (the "Base Salary") during the term of this Agreement, with such Base Salary payable in installments consistent with the Company's normal payroll schedule, subject to applicable withholding and other taxes. The Base Salary also shall be reviewed, at least annually, for merit and cost of living adjustment increases and may, by action and in the discretion of the Board, be increased at any time or from time to time.

3.2 __Bonuses__. During the term of this Agreement, the Executive shall be eligible to receive bonuses ("Incentive Compensation") pursuant to the H.T.E., Inc. 1997 Executive Incentive Bonus Plan, as may be amended from time to time (the "Incentive Compensation Plan"). Each period for which Incentive Compensation is payable under the Incentive Compensation Plan is sometimes hereinafter referred to as a Bonus Period.

4. __Expense Reimbursement and Other Benefits__.

4.1 __Reimbursement of Expenses__. During the term of Executive's employment hereunder, upon the submission of proper substantiation by the Executive, and subject to such rules and guidelines as the Company may from time to time adopt, the Company shall reimburse the Executive for all reasonable expenses actually

2

paid or incurred by the Executive in the course of and pursuant to the business of the Company. The Executive shall account to the Company in writing for all expenses for which reimbursement is sought and shall supply to the Company copies of all relevant invoices, receipts or other evidence reasonably requested by the Company.

4.2 Compensation/Benefit Programs. During the term of this Agreement, the Executive shall be entitled to participate in all medical, dental, hospitalization, accidental death and dismemberment, disability, travel and life insurance plans, and any and all other plans as are presently and hereinafter offered by the Company to its executives, including savings, pension, profit-sharing and deferred compensation plans.

4.3 Working Facilities. The Company shall furnish the Executive with an office, secretarial help and such other facilities and services suitable to his position and adequate for the performance of his duties hereunder.

4.4 Automobile. The Company shall continue to provide the Executive with an automobile comparable to the existing automobile provided by the Company to Executive, together with reimbursement of the reasonable operating expenses thereof.

4.5 Stock Options. During the term of this Agreement, the Executive shall be eligible to be granted options (the "Stock Options") to purchase common stock (the "Common Stock") of H.T.E., Inc. under (and therefore subject to all terms and conditions of) the Company's 1997 Executive Incentive Compensation Plan as amended, and any successor plan thereto (the "Executive Incentive Compensation Plan") and all rules of regulation of the Securities and Exchange Commission applicable to stock option plans then in effect. The number of Stock Options and terms and conditions of the Stock Options shall be determined by the Committee appointed pursuant to the Executive Incentive Compensation Plan, or by the Board of Directors of the Company, in its discretion and pursuant to the Executive Incentive Compensation Plan.

4.6 Other Benefits. The Executive shall be entitled to eight weeks of vacation each calendar year during the term of this Agreement, to be taken at such times as the Executive and the Company shall mutually determine and provided that no vacation time shall interfere with the duties required to be rendered by the Executive hereunder. Any vacation time not taken by Executive during any calendar year may be carried forward into any succeeding calendar year in accordance with HTE policy. The Executive shall receive such additional benefits, if any, as the Board of the Company shall from time to time determine.

3

5.   <u>Termination</u>.

5.1   <u>Termination for Cause</u>.   The Company shall at all times have the right, upon written notice to the Executive, to terminate the Executive's employment hereunder, for cause. For purposes of this Agreement, the term "cause" shall mean: (a) an action or omission of the Executive which constitutes an intentional, willful and material breach of this Agreement which is not cured within thirty (30) days after receipt by the Executive of written notice of same, (b) fraud, embezzlement, misappropriation of funds or breach of trust in connection with his services hereunder, (c) conviction of any crime which involves dishonesty or a breach of trust, or (d) gross negligence in connection with the performance of the Executive's duties hereunder. Any termination for cause shall be made in writing to the Executive, which notice shall set forth in detail all acts or omissions upon which the Company is relying for such termination. The Executive shall have the right to address the Board regarding the acts set forth in the notice of termination. Upon any termination pursuant to this Section 5.1, the Company shall pay to the Executive his Base Salary to the date of termination. The Company shall have no further liability hereunder other than for: (i) reimbursement for reasonable business expenses incurred prior to the date of termination, subject, however, to the provisions of Section 4.1, and (ii) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

5.2   <u>Disability</u>.   The Company shall at all times have the right, upon written notice to the Executive, to terminate the Executive's employment hereunder, if the Executive shall become entitled to benefits under the Company's Long Term Disability Plan as then in effect, or, if the Executive shall as the result of mental or physical incapacity, illness or disability, become unable to perform his obligations hereunder for a period of 180 days in any 12-month period. The Company shall have sole discretion based upon competent medical advice to determine whether the Executive continues to be disabled. Upon any termination pursuant to this Section 5.2, the Company shall: (a) pay to the Executive any unpaid Base Salary through the effective date of termination specified in such notice, (b) pay to the Executive his accrued and declared but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the date of termination of the Executive's employment with the Company, and (c) pay to the Executive (within forty-five (45) days after the end of the Bonus Period in which such termination occurs) a prorata portion (based upon the period ending on the date of termination of the Executive's employment hereunder) of the Incentive Compensation, if any, for the Bonus Period in which such termination occurs, as calculated pursuant to the Incentive Compensation Plan; provided that the goals under the Incentive Compensation Plan for each period used in the calculation of the Executive's Incentive Compensation, shall be based on: (i) the portion of the Bonus Period through the end of the Bonus Period

4

in which such termination occurs and (ii) unaudited financial information prepared in accordance with generally accepted accounting principles, applied consistently with prior periods, as approved and reviewed by the Board. The Company shall have no further liability hereunder other than for: (x) reimbursement for reasonable business expenses incurred prior to the date of termination, subject, however to the provisions of Section 4.1, and (y) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

5.3 **Death.** In the event of the death of the Executive during the term of his employment hereunder, the Company shall: (a) pay to the estate of the deceased Executive any unpaid Base Salary through the Executive's date of death, (b) pay to the estate of the deceased Executive his accrued and declared but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the Executive's date of death, (c) pay to the estate of the deceased Executive (within forty-five (45) days after the end of the Bonus Period in which his death occurs) a prorata portion (based upon the period ending on the date of death) of the Incentive Compensation, if any, for the Bonus Period in which his death occurs, as calculated pursuant to the terms of the Incentive Compensation Plan; provided that, the goals under the Incentive Compensation Plan for each period used in the calculation of the Executive's Incentive Compensation shall be based on: (i) the portion of the Bonus Period through the end of the Bonus Period in which the Executive's death occurs, and (ii) unaudited financial information prepared in accordance with generally accepted accounting principles, applied consistently with prior periods, as approved and reviewed by the Board. The Company shall have no further liability hereunder other than for: (x) reimbursement for reasonable business expenses incurred prior to the date of the Executive's death, subject, however to the provisions of Section 4.1, and (y) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

5.4 **Termination Without Cause.** At any time the Company shall have the right to terminate the Executive's employment hereunder by written notice to the Executive. Upon any termination pursuant to this Section 5.4 that is not a termination under any of Sections 5.1, 5.2, 5.3 or 5.5, the Company shall: (a) pay to the Executive any unpaid Base Salary through the effective date of termination specified in such notice, (b) pay to the Executive accrued and declared but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the date of the termination of the Executive's employment with the Company, (c) continue to pay the Executive's Base Salary for a period of twelve (12) months following the termination of the Executive's employment with the Company, in the manner and at such time as the Base Salary otherwise would have been payable to the Executive, and (d) continue to pay the Executive Incentive Compensation and continue

5

to provide the Executive with the benefits he was receiving under Sections 4.2, 4.4 and 4.6 hereof, for a period of twelve (12) months following the termination of the Executive's employment with the Company, in the manner and at such times as the compensation or benefits otherwise would have been payable or provided to the Executive.   In the event that the termination of Executive's employment hereunder shall occur on or before December 31, 1997, then the Incentive Compensation and benefits payable under clause (d) of this Section 5.4 shall be equal to the amounts that would have been paid or provided to the Executive for the year ended December 31, 1997.   In the event that termination of Executive's employment hereunder shall occur after December 31, 1997, then the Incentive Compensation and other benefits payable under clause (d) of this Section 5.4 shall be equal to the amounts of such compensation and benefits payable or provided to the Executive for the calendar year immediately preceding the termination of Executive's employment hereunder.   In the event that the Company is unable to provide the Executive with a continuation of any savings, pension, profit-sharing or deferred compensation plans required hereunder by reason of the termination of the Executive's employment pursuant to this Section 5.4, then the Company shall pay the Executive cash equal to the value of the benefit that otherwise would have accrued for the Executive's benefit under the plan, for the period during which such benefits could not be provided under the plans, said cash payments to be made within forty-five (45) days after the end of the year for which such contributions would have been made or would have accrued.   The Company's good faith determination of the amount that would have been contributed or the value of any benefits that would have accrued under any plan shall be binding and conclusive on the Executive.   Further, the Executive shall continue to vest in the Executive's Stock Options through the Expiration Date in the same manner and to the same extent as if his employment hereunder terminated on the Expiration Date.   The Company shall have no further liability hereunder other than for: (i) reimbursement for reasonable business expenses incurred prior to the date of termination, subject, however, to the provisions of Section 4.1, and (ii) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

     5.5   **Resignation by Executive**.   The Executive shall at all times have the right, upon sixty (60) days written notice to the Company, to terminate the Executive's employment hereunder. Upon any termination pursuant to this Section 5.5, the Company shall: (a) pay to the Executive any unpaid Base Salary through the effective date of termination specified in such notice and (b) pay to the Executive his accrued but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the termination of Executive's employment with the Company.   The Company shall have no further liability hereunder other than for: (i) reimbursement for reasonable business expenses incurred prior to the date of termination, subject, however, to the provisions of Section 4.1, and (ii) payment of compensation for unused vacation days that have

6

HTE - 0018

accumulated during the calendar year in which such termination occurs.

5.6 <u>Survival</u>. The provisions of this Article 5 shall survive the termination of this Agreement, as applicable.

6. <u>Restrictive Covenants</u>.

6.1 <u>Non-competition</u>. At all times while the Executive is employed by the Company and for a two (2) year period after the termination of the Executive's employment with the Company for any reason, the Executive shall not, directly or indirectly, engage in or have any interest in any sole proprietorship, partnership, corporation or business or any other person or entity (whether as an employee, officer, director, partner, agent, security holder, creditor, consultant or otherwise) that directly or indirectly (or through any affiliated entity) engages in competition with the Company in the United States, Canada or any foreign market where the Company markets and sells software applications or its services (for this purpose, any business that engages in the development and/or marketing of software applications in the public sector marketplace shall be deemed to be in competition with the Company); provided that such provision shall not apply to the Executive's ownership of Common Stock of the Company or the acquisition by the Executive, solely as an investment, of securities of any issuer that is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, and that are listed or admitted for trading on any United States national securities exchange or that are quoted on the National Association of Securities Dealers Automated Quotations System, or any similar system or automated dissemination of quotations of securities prices in common use, so long as the Executive does not control, acquire a controlling interest in or become a member of a group which exercises direct or indirect control or, more than five percent of any class of capital stock of such corporation.

6.2 <u>Nondisclosure</u>. The Executive shall not at any time divulge, communicate, use to the detriment of the Company or for the benefit of any other person or persons, or misuse in any way, any Confidential Information (as hereinafter defined) pertaining to the business of the Company. Any Confidential Information or data now or hereafter acquired by the Executive with respect to the business of the Company (which shall include, but not be limited to, information concerning the Company's financial condition, prospects, technology, customers, suppliers, sources of leads and methods of doing business) shall be deemed a valuable, special and unique asset of the Company that is received by the Executive in confidence and as a fiduciary, and Executive shall remain a fiduciary to the Company with respect to all of such information. For purposes of this Agreement, "Confidential Information" means information disclosed to the Executive or known by the Executive as a consequence of or through his employment by the Company (including information conceived, originated, discovered or

7

HTE - 0019

developed by the Executive) prior to or after the date hereof, and not generally known, about the Company or its business. Notwithstanding the foregoing, nothing herein shall be deemed to restrict the Executive from disclosing Confidential Information to the extent required by law.

6.3  Nonsolicitation of Employees and Clients.  At all times while the Executive is employed by the Company and for a two (2) year period after the termination of the Executive's employment with the Company for any reason, for the Executive shall not, directly or indirectly, for himself or for any other person, firm, corporation, partnership, association or other entity: (a) employ or attempt to employ or enter into any contractual arrangement with any employee or former employee of the Company, unless such employee or former employee has not been employed by the Company for a period in excess of six months, and/or (b) call on or solicit any of the actual or targeted prospective clients of the Company on behalf of any person or entity in connection with any business competitive with the business of the Company, nor shall the Executive make known the names and addresses of such clients or any information relating in any manner to the Company's trade or business relationships with such customers, other than in connection with the performance of Executive's duties under this Agreement.

6.4  Ownership of Developments. All copyrights, patents, trade secrets, or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, or works of authorship developed or created by Executive during the course of performing work for the Company or its clients (collectively, the "Work Product") shall belong exclusively to the Company and shall, to the extent possible, be considered a work made by the Executive for hire for the Company within the meaning of Title 17 of the United States Code.  To the extent the Work Product may not be considered work made by the Executive for hire for the Company, the Executive agrees to assign, and automatically assign at the time of creation of the Work Product, without any requirement of further consideration, any right, title, or interest the Executive may have in such Work Product.  Upon the request of the Company, the Executive shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.

6.5  Books and Records. All books, records, and accounts relating in any manner to the customers or clients of the Company, whether prepared by the Executive or otherwise coming into the Executive's possession, shall be the exclusive property of the Company and shall be returned immediately to the Company on termination of the Executive's employment hereunder or on the Company's request at any time.  ..

6.6  Definition of Company.  Solely for purposes of this

8

Section 6, the term "Company" also shall include any existing or future subsidiaries of the Company that are operating during the time periods described herein and any other entities that directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with the Company during the periods described herein.

6.7 <u>Acknowledgement by Executive</u>. The Executive acknowledges and confirms that the length of the term of the provisions of this Section 6 and the geographical restrictions contained in Section 6.1 are fair and reasonable and not the result of overreaching, duress or coercion of any kind. The Executive further acknowledges and confirms that his full, uninhibited and faithful observance of each of the covenants contained in this Section 6 will not cause him any undue hardship, financial or otherwise, and that enforcement of each of the covenants contained herein will not impair his ability to obtain employment commensurate with his abilities and on terms fully acceptable to him or otherwise to obtain income required for the comfortable support of him and his family and the satisfaction of the needs of his creditors. The Executive acknowledges and confirms that his special knowledge of the business of the Company is such as would cause the Company serious injury or loss if he were to use such ability and knowledge to the benefit of a competitor or were to compete with the Company in violation of the terms of this Section 6.

6.8 <u>Reformation by Court</u>. In the event that a court of competent jurisdiction shall determine that any provision of this Section 6 is invalid or more restrictive than permitted under the governing law of such jurisdiction, then only as to enforcement of this Section 6 within the jurisdiction of such court, such provision shall be interpreted and enforced as if it provided for the maximum restriction permitted under such governing law.

6.9 <u>Extension of Time</u>. If the Executive shall be in violation of any provision of this Section 6, then each time limitation set forth in this Section 6 shall be extended for a period of time equal to the period of time during which such violation or violations occur. If the Company seeks injunctive relief from such violation in any court, then the covenants set forth in this Section 6 shall be extended for a period of time equal to the pendency of such proceeding including all appeals by the Executive.

6.10 <u>Survival</u>. The provisions of this Section 6 shall survive the termination of this Agreement, as applicable.

7. <u>Injunction</u>. It is recognized and hereby acknowledged by the parties hereto that a breach by the Executive of any of the covenants contained in Section 6 of this Agreement will cause irreparable harm and damage to the Company, the monetary amount of which may be virtually impossible to ascertain. As a result, the

9

Executive recognizes and hereby acknowledges that the Company shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining any violation of any or all of the covenants contained in Section 6 of this Agreement by the Executive or any of his affiliates, associates, partners or agents, either directly or indirectly, and that such right to injunction shall be cumulative and in addition to whatever other remedies the Company may possess.

8.  **Arbitration.** Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in Orange or Seminole Counties, Florida, in accordance with the Rules of the American Arbitration Association then in effect (except to the extent that the procedures outlined below differ from such rules).  Within thirty (30) days after written notice by either party has been given that a dispute exists and that arbitration is required, each party must select an arbitrator and those two arbitrators shall promptly, but in no event later than thirty (30) days after their selection, select a third arbitrator.  The parties agree to act as expeditiously as possible to select arbitrators and conclude the dispute.  The selected arbitrators must render their decision in writing.  The cost and expenses of the arbitration and of enforcement of any award in any court shall be borne equally by both parties.  If advances are required, each party will advance one-half of the estimated fees and expenses of the arbitrators.  Judgment may be entered on the arbitrators' award in any court having jurisdiction.  Although arbitration is contemplated to resolve disputes hereunder, either party may proceed to court to obtain an injunction to protect its rights hereunder, the parties agreeing that either could suffer irreparable harm by reason of any breach of this Agreement. Pursuit of an injunction shall not impair arbitration on all remaining issues.

9.  **Assignment.** Neither party shall have the right to assign or delegate his rights or obligations hereunder, or any portion thereof, to any other person.

10. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

11. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and, upon its effectiveness, shall supersede all prior agreements, understandings and arrangements, both oral and written, between the Executive and the Company (or any of its affiliates) with respect to such subject matter.  This Agreement may not be modified in any way unless by a written instrument signed by both the Company and the Executive.

12. **Notices.** All notices required or permitted to be given hereunder shall be in writing and shall be personally delivered by courier, sent by registered or certified mail, return receipt

10

requested or sent by confirmed facsimile transmission addressed as set forth herein. Notices personally delivered, sent by facsimile or sent by overnight courier shall be deemed given on the date of delivery and notices mailed in accordance with the foregoing shall be deemed given upon the earlier of receipt by the addressee, as evidenced by the return receipt thereof, or three (3) days after deposit in the U.S. Mail. Notice shall be sent: (a) if to the Company, addressed to 390 North Orange Avenue, Suite 2000, Orlando, Florida, 32801, Attention: General Counsel, and (b) if to the Executive, to his address as reflected on the payroll records of the Company, or to such other address as either party hereto may from time to time give notice of to the other.

13. **Benefits; Binding Effect**. This Agreement shall be for the benefit of and binding upon the parties hereto and their respective heirs, personal representatives, legal representatives, successors and, where applicable, assigns, including, without limitation, any successor to the Company, whether by merger, consolidation, sale of stock, sale of assets or otherwise.

14. **Severability**. The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part thereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted. If such invalidity is caused by length of time or size of area, or both, the otherwise invalid provision will be considered to be reduced to a period or area which would cure such invalidity.

15. **Waivers**. The waiver by either party hereto of a breach or violation of any term or provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation.

16. **Damages**. Nothing contained herein shall be construed to prevent the Company or the Executive from seeking and recovering from the other damages sustained by either or both of them as a result of its or his breach of any term or provision of this Agreement. In the event that either party hereto brings suit for the collection of any damages resulting from, or the injunction of any action constituting, a breach of any of the terms or provisions of this Agreement, then the party found to be at fault shall pay all reasonable court costs and attorneys' fees of the other.

17. **Section Headings**. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11

HTE - 0023

18. <u>No Third Party Beneficiary</u>. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person other than the Company, the parties hereto and their respective heirs, personal representatives, legal representatives, successors and assigns, any rights or remedies under or by reason of this Agreement.

19. <u>Conflict with Severance Agreement</u>. The Company and the Executive expect to enter into a Change in Control Severance Agreement (the "Severance Agreement") that will provide for certain payments and other obligations following a "Change in Control" (as defined therein). The Company and the Executive hereby agree that, upon the "Effective Date" under such Severance Agreement, the Company's payment and other compensation obligations to the Executive shall be limited to those specified in the Severance Agreement (it being the parties' intent and agreement to avoid any duplication of salary, bonuses and/or other compensation otherwise payable hereunder).

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

COMPANY:

H.T.E., INC.

By:
Name: L. A. Gornto, Jr.
Title: Exec. Vice President

EXECUTIVE:

Dennis J. Harward

12

HTE - 0024

FILE No.717 07/30 '99 12:45    ITE    FAX:407 3    50    PAGE  2

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made and entered into as of February 1, 1997, by and between H.T.E., INC., a Florida corporation (the "Company"), and JACK L. HARWARD (hereinafter called the "Executive").

## R E C I T A L S

**A.** The Executive is currently employed as the Executive Vice President of the Company.

**B.** The Executive possesses intimate knowledge of the business and affairs of the Company, its policies, methods and personnel.

**C.** The Board of Directors of the Company (the "Board") recognizes that the Executive has contributed to the growth and success of the Company, and desires to assure the Company of the Executive's continued employment and to compensate him therefor.

**D.** The Board has determined that this Agreement will reinforce and encourage the Executive's continued attention and dedication to the Company.

**E.** The Executive is willing to make his services available to the Company and on the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein, the parties agree as follows:

1.  **Employment.**

    1.1  **Employment and Term.**  The Company hereby agrees to employ the Executive and the Executive hereby agrees to serve the Company on the terms and conditions set forth herein. This Agreement having been duly authorized and approved by the Company's Board of Directors, including the Directors representing BancBoston Ventures, Inc. and Meridian Venture Partners, supersedes and replaces that certain Employment Agreement between the Executive and the Company dated November ___, 1994.

    1.2  **Duties of Executive.**  During the term of this Agreement, the Executive shall serve as the Executive Vice President of the Company, and shall diligently perform all services as may be assigned to him by the Board (provided that, such services shall not materially differ from the services currently provided by the

1

HTE - 0001

Executive), and shall exercise such power and authority as may from time to time be delegated to him by the Board and as provided by the Bylaws of the Company. The Executive shall devote his full time and attention to the business and affairs of the Company, render such services to the best of his ability, and use his best efforts to promote the interests of the Company.

2.   Term.

2.1   Initial Term.  The initial term of this Agreement, and the employment of the Executive hereunder, shall commence on February 1, 1997 (the "Commencement Date") and shall expire on December 31, 1999, unless sooner terminated in accordance with the terms and conditions hereof (the "Initial Term").

2.2   Renewal Terms.  At the end of the Initial Term, this Agreement shall automatically renew for successive one year terms, subject to earlier termination of this Agreement as provided herein.

2.3   Expiration Date.  The date on which the term of this Agreement shall expire (including the date on which any renewal term shall expire), is sometimes referred to in this Agreement as the Expiration Date.

3.   Compensation.

3.1   Base Salary.  The Executive shall receive a base salary at the annual rate of One Hundred Forty-two Thousand Five Hundred Dollars ($142,500) (the "Base Salary") during the term of this Agreement, with such Base Salary payable in installments consistent with the Company's normal payroll schedule, subject to applicable withholding and other taxes.  The Base Salary also shall be reviewed, at least annually, for merit and cost of living adjustment increases and may, by action and in the discretion of the Board, be increased at any time or from time to time.

3.2   Bonuses.  During the term of this Agreement, the Executive shall be eligible to receive bonuses ("Incentive Compensation") pursuant to the H.T.E., Inc. 1997 Executive Incentive Bonus Plan, as may be amended from time to time (the "Incentive Compensation Plan").  Each period for which Incentive Compensation is payable under the Incentive Compensation Plan is sometimes hereinafter referred to as a Bonus Period.

4.   Expense Reimbursement and Other Benefits.

4.1   Reimbursement of Expenses.  During the term of Executive's employment hereunder, upon the submission of proper substantiation by the Executive, and subject to such rules and guidelines as the Company may from time to time adopt, the Company shall reimburse the Executive for all reasonable expenses actually

2

paid or incurred by the Executive in the course of and pursuant to the business of the Company.  The Executive shall account to the Company in writing for all expenses for which reimbursement is sought and shall supply to the Company copies of all relevant invoices, receipts or other evidence reasonably requested by the Company.

4.2  Compensation/Benefit Programs.  During the term of this Agreement, the Executive shall be entitled to participate in all medical, dental, hospitalization, accidental death and dismemberment, disability, travel and life insurance plans, and any and all other plans as are presently and hereinafter offered by the Company to its executives, including savings, pension, profit-sharing and deferred compensation plans.

4.3  Working Facilities.  The Company shall furnish the Executive with an office, secretarial help and such other facilities and services suitable to his position and adequate for the performance of his duties hereunder.

4.4  Automobile.  The Company shall continue to provide the Executive with an automobile comparable to the existing automobile provided by the Company to Executive, together with reimbursement of the reasonable operating expenses thereof.

4.5  Stock Options.  During the term of this Agreement, the Executive shall be eligible to be granted options (the "Stock Options") to purchase common stock (the "Common Stock") of H.T.E., Inc. under (and therefore subject to all terms and conditions of) the Company's 1997 Executive Incentive Compensation Plan as amended, and any successor plan thereto (the "Executive Incentive Compensation Plan") and all rules of regulation of the Securities and Exchange Commission applicable to stock option plans then in effect.  The number of Stock Options and terms and conditions of the Stock Options shall be determined by the Committee appointed pursuant to the Executive Incentive Compensation Plan, or by the Board of Directors of the Company, in its discretion and pursuant to the Executive Incentive Compensation Plan.

4.6  Other Benefits.  The Executive shall be entitled to eight weeks of vacation each calendar year during the term of this Agreement, to be taken at such times as the Executive and the Company shall mutually determine and provided that no vacation time shall interfere with the duties required to be rendered by the Executive hereunder.  Any vacation time not taken by Executive during any calendar year may be carried forward into any succeeding calendar year in accordance with HTE policy.  The Executive shall receive such additional benefits, if any, as the Board of the Company shall from time to time determine.

3

HTE - 0003

OCT-11-99 MON 12:40 PM

FILE No.717 07/30 '99 12:45   ID:                    FAX:407 304 39      PAGE   5

5.   <u>Termination</u>.

5.1   <u>Termination for Cause</u>.   The Company shall at all
times have the right, upon written notice to the Executive, to
terminate the Executive's employment hereunder, for cause.   For
purposes of this Agreement, the term "cause" shall mean: (a) an
action or omission of the Executive which constitutes an
intentional, willful and material breach of this Agreement which is
not cured within thirty (30) days after receipt by the Executive of
written notice of same, (b) fraud, embezzlement, misappropriation
of funds or breach of trust in connection with his services
hereunder, (c) conviction of any crime which involves dishonesty or
a breach of trust, or (d) gross negligence in connection with the
performance of the Executive's duties hereunder.   Any termination
for cause shall be made in writing to the Executive, which notice
shall set forth in detail all acts or omissions upon which the
Company is relying for such termination.   The Executive shall have
the right to address the Board regarding the acts set forth in the
notice of termination.   Upon any termination pursuant to this
Section 5.1, the Company shall pay to the Executive his Base Salary
to the date of termination.   The Company shall have no further
liability hereunder other than for: (i) reimbursement for reasonable
business expenses incurred prior to the date of termination,
subject, however, to the provisions of Section 4.1, and (ii) payment
of compensation for unused vacation days that have accumulated
during the calendar year in which such termination occurs.

5.2   <u>Disability</u>.  The Company shall at all times have the
right, upon written notice to the Executive, to terminate the
Executive's employment hereunder, if the Executive shall become
entitled to benefits under the Company's Long Term Disability Plan
as then in effect, or, if the Executive shall as the result of
mental or physical incapacity, illness or disability, become unable
to perform his obligations hereunder for a period of 180 days in any
12-month period.  The Company shall have sole discretion based upon
competent medical advice to determine whether the Executive
continues to be disabled.   Upon any termination pursuant to this
Section 5.2, the Company shall: (a) pay to the Executive any unpaid
Base Salary through the effective date of termination specified in
such notice, (b) pay to the Executive his accrued and declared but
unpaid Incentive Compensation, if any, for any Bonus Period ending
on or before the date of termination of the Executive's employment
with the Company, and (c) pay to the Executive (within forty-five
(45) days after the end of the Bonus Period in which such
termination occurs) a prorata portion (based upon the period ending
on the date of termination of the Executive's employment hereunder)
of the Incentive Compensation, if any, for the Bonus Period in which
such termination occurs, as calculated pursuant to the Incentive
Compensation Plan; provided that the goals under the Incentive
Compensation Plan for each period used in the calculation of the
Executive's Incentive Compensation, shall be based on: (i) the

4

portion of the Bonus Period through the end of the Bonus Period in which such termination occurs and (ii) unaudited financial information prepared in accordance with generally accepted accounting principles, applied consistently with prior periods, as approved and reviewed by the Board.   The Company shall have no further liability hereunder other than for: (x) reimbursement for reasonable business expenses incurred prior to the date .of termination, subject, however to the provisions of Section 4.1, and (y) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

5.3  Death.   In the event of the death of the Executive during the term of his employment hereunder, the Company shall: (a) pay to the estate of the deceased Executive any unpaid Base Salary through the Executive's date of death, (b) pay to the estate of the deceased Executive his accrued and declared but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the Executive's date of death, (c) pay to the estate of the deceased Executive (within forty-five (45) days after the end of the Bonus Period in which his death occurs) a prorata portion (based upon the period ending on the date of death) of the Incentive Compensation, if any, for the Bonus Period in which his death occurs, as calculated pursuant to the terms of the Incentive Compensation Plan; provided that, the goals under the Incentive Compensation Plan for each period used in the calculation of the Executive's Incentive Compensation shall be based on: (i) the portion of the Bonus Period through the end of the Bonus Period in which the Executive's death occurs, and (ii) unaudited financial information prepared in accordance with generally accepted accounting principles, applied consistently with prior periods, as approved and reviewed by the Board.  The Company shall have no further liability hereunder other than for: (x) reimbursement for reasonable business expenses incurred prior to the date of the Executive's death, subject, however to the provisions of Section 4.1, and (y) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

5.4  Termination Without Cause.   At any time the Company shall have the right to terminate the Executive's employment hereunder by written notice to the Executive.  Upon any termination pursuant to this Section 5.4 that is not a termination under any of Sections 5.1, 5.2, 5.3 or 5.5, the Company shall: (a) pay to the Executive any unpaid Base Salary through the effective date of termination specified in such notice, (b) pay to the Executive the accrued and declared but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the date of the termination of the Executive's employment with the Company, (c) continue to pay the Executive's Base Salary for a period of twelve (12) months following the termination of the Executive's employment with the Company, in the manner and at such time as the Base Salary otherwise would have

5

HTE - 0005

been payable to the Executive, and (d) continue to pay the Executive Incentive Compensation and continue to provide the Executive with the benefits he was receiving under Sections 4.2, 4.4 and 4.6 hereof, for a period of twelve (12) months following the termination of the Executive's employment with the Company, in the manner and at such times as the compensation or benefits otherwise would have been payable or provided to the Executive.  In the event that the termination of Executive's employment hereunder shall occur on or before December 31, 1997, then the Incentive Compensation and benefits payable under clause (d) of this Section 5.4 shall be equal to the amounts that would have been paid or provided to the Executive for the year ended December 31, 1997.  In the event that termination of Executive's employment hereunder shall occur after December 31, 1997, then the Incentive Compensation and other benefits payable under clause (d) of this Section 5.4 shall be equal to the amounts of such compensation and benefits payable or provided to the Executive for the calendar year immediately preceding the termination of Executive's employment hereunder.  In the event that the Company is unable to provide the Executive with a continuation of any savings, pension, profit-sharing or deferred compensation plans required hereunder by reason of the termination of the Executive's employment pursuant to this Section 5.4, then the Company shall pay the Executive cash equal to the value of the benefit that otherwise would have accrued for the Executive's benefit under the plan, for the period during which such benefits could not be provided under the plans, said cash payments to be made within forty-five (45) days after the end of the year for which such contributions would have been made or would have accrued.  The Company's good faith determination of the amount that would have been contributed or the value of any benefits that would have accrued under any plan shall be binding and conclusive on the Executive.  Further, the Executive shall continue to vest in the Executive's Stock Options through the Expiration Date in the same manner and to the same extent as if his employment hereunder terminated on the Expiration Date.  The Company shall have no further liability hereunder other than for: (i) reimbursement for reasonable business expenses incurred prior to the date of termination, subject, however, to the provisions of Section 4.1, and (ii) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

     5.5  **Resignation by Executive**.  The Executive shall at all times have the right, upon sixty (60) days written notice to the Company, to terminate the Executive's employment hereunder.  Upon any termination pursuant to this Section 5.5, the Company shall: (a) pay to the Executive any unpaid Base Salary through the effective date of termination specified in such notice and (b) pay to the Executive his accrued but unpaid Incentive Compensation, if any, for any Bonus Period ending on or before the termination of Executive's employment with the Company.  The Company shall have no further

6

liability hereunder other than for: (i) reimbursement for reasonable business expenses incurred prior to the date of termination, subject, however, to the provisions of Section 4.1, and (ii) payment of compensation for unused vacation days that have accumulated during the calendar year in which such termination occurs.

5.6  <u>Survival</u>.  The provisions of this Article 5 shall survive the termination of this Agreement, as applicable.

6.  <u>Restrictive Covenants</u>.

6.1  <u>Non-competition</u>. At all times while the Executive is employed by the Company and for a two (2) year period after the termination of the Executive's employment with the Company for any reason, the Executive shall not, directly or indirectly, engage in or have any interest in any sole proprietorship, partnership, corporation or business or any other person or entity (whether as an employee, officer, director, partner, agent, security holder, creditor, consultant or otherwise) that directly or indirectly (or through any affiliated entity) engages in competition with the Company in the United States, Canada or any foreign market where the Company markets and sells software applications or its services (for this purpose, any business that engages in the development and/or marketing of software applications in the public sector marketplace shall be deemed to be in competition with the Company); provided that such provision shall not apply to the Executive's ownership of Common Stock of the Company or the acquisition by the Executive, solely as an investment, of securities of any issuer that is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, and that are listed or admitted for trading on any United States national securities exchange or that are quoted on the National Association of Securities Dealers Automated Quotations System, or any similar system or automated dissemination of quotations of securities prices in common use, so long as the Executive does not control, acquire a controlling interest in or become a member of a group which exercises direct or indirect control or, more than five percent of any class of capital stock of such corporation.

6.2  <u>Nondisclosure</u>.  The Executive shall not at any time divulge, communicate, use to the detriment of the Company or for the benefit of any other person or persons, or misuse in any way, any Confidential Information (as hereinafter defined) pertaining to the business of the Company.  Any Confidential Information or data now or hereafter acquired by the Executive with respect to the business of the Company (which shall include, but not be limited to, information concerning the Company's financial condition, prospects, technology, customers, suppliers, sources of leads and methods of doing business) shall be deemed a valuable, special and unique asset of the Company that is received by the Executive in confidence and as a fiduciary, and Executive shall remain a fiduciary to the

7

Company with respect to all of such information. For purposes of this Agreement, "Confidential Information" means information disclosed to the Executive or known by the Executive as a consequence of or through his employment by the Company (including information conceived, originated, discovered or developed by the Executive) prior to or after the date hereof, and not generally known, about the Company or its business. Notwithstanding the foregoing, nothing herein shall be deemed to restrict the Executive from disclosing Confidential Information to the extent required by law.

6.3 <u>Nonsolicitation of Employees and Clients</u>. At all times while the Executive is employed by the Company and for a two (2) year period after the termination of the Executive's employment with the Company for any reason, for the Executive shall not, directly or indirectly, for himself or for any other person, firm, corporation, partnership, association or other entity: (a) employ or attempt to employ or enter into any contractual arrangement with any employee or former employee of the Company, unless such employee or former employee has not been employed by the Company for a period in excess of six months, and/or (b) call on or solicit any of the actual or targeted prospective clients of the Company on behalf of any person or entity in connection with any business competitive with the business of the Company, nor shall the Executive make known the names and addresses of such clients or any information relating in any manner to the Company's trade or business relationships with such customers, other than in connection with the performance of Executive's duties under this Agreement.

6.4 <u>Ownership of Developments</u>. All copyrights, patents, trade secrets, or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, or works of authorship developed or created by Executive during the course of performing work for the Company or its clients (collectively, the "Work Product") shall belong exclusively to the Company and shall, to the extent possible, be considered a work made by the Executive for hire for the Company within the meaning of Title 17 of the United States Code. To the extent the Work Product may not be considered work made by the Executive for hire for the Company, the Executive agrees to assign, and automatically assign at the time of creation of the Work Product, without any requirement of further consideration, any right, title, or interest the Executive may have in such Work Product. Upon the request of the Company, the Executive shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.

6.5 <u>Books and Records</u>. All books, records, and accounts relating in any manner to the customers or clients of the Company, whether prepared by the Executive or otherwise coming into the Executive's possession, shall be the exclusive property of the

8

HTE - 0008

FILE No.717 07/30 '99 12:48   ID:                    FAX:407 304 390        PAGE  10

Company and shall be returned immediately to the Company on termination of the Executive's employment hereunder or on the Company's request at any time.

6.6  Definition of Company.  Solely for purposes of this Section 6, the term "Company" also shall include any existing or future subsidiaries of the Company that are operating during the time periods described herein and any other entities that directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with the Company during the periods described herein.

6.7  Acknowledgement by Executive.  The Executive acknowledges and confirms that the length of the term of the provisions of this Section 6 and the geographical restrictions contained in Section 6.1 are fair and reasonable and not the result of overreaching, duress or coercion of any kind.  The Executive further acknowledges and confirms that his full, uninhibited and faithful observance of each of the covenants contained in this Section 6 will not cause him any undue hardship, financial or otherwise, and that enforcement of each of the covenants contained herein will not impair his ability to obtain employment commensurate with his abilities and on terms fully acceptable to him or otherwise to obtain income required for the comfortable support of him and his family and the satisfaction of the needs of his creditors.  The Executive acknowledges and confirms that his special knowledge of the business of the Company is such as would cause the Company serious injury or loss if he were to use such ability and knowledge to the benefit of a competitor or were to compete with the Company in violation of the terms of this Section 6.

6.8  Reformation by Court.  In the event that a court of competent jurisdiction shall determine that any provision of this Section 6 is invalid or more restrictive than permitted under the governing law of such jurisdiction, then only as to enforcement of this Section 6 within the jurisdiction of such court, such provision shall be interpreted and enforced as if it provided for the maximum restriction permitted under such governing law.

6.9  Extension of Time.  If the Executive shall be in violation of any provision of this Section 6, then each time limitation set forth in this Section 6 shall be extended for a period of time equal to the period of time during which such violation or violations occur.  If the Company seeks injunctive relief from such violation in any court, then the covenants set forth in this Section 6 shall be extended for a period of time equal to the pendency of such proceeding including all appeals by the Executive.

6.10  Survival.  The provisions of this Section 6 shall survive the termination of this Agreement, as applicable.

9

HTE - 0009

7.   **Injunction**.  It is recognized and hereby acknowledged by
the parties hereto that a breach by the Executive of any of the
covenants contained in Section 6 of this Agreement will cause
irreparable harm and damage to the Company, the monetary amount of
which may be virtually impossible to ascertain.  As a result, the
Executive recognizes and hereby acknowledges that the Company shall
be entitled to an injunction from any court of competent
jurisdiction enjoining and restraining any violation of any or all
of the covenants contained in Section 6 of this Agreement by the
Executive or any of his affiliates, associates, partners or agents,
either directly or indirectly, and that such right to injunction
shall be cumulative and in addition to whatever other remedies the
Company may possess.

8.   **Arbitration.**  Any dispute or controversy arising under or
in connection with this Agreement shall be settled exclusively by
arbitration in Orange or Seminole Counties, Florida, in accordance
with the Rules of the American Arbitration Association then in
effect (except to the extent that the procedures outlined below
differ from such rules).   Within thirty (30) days after written
notice by either party has been given that a dispute exists and that
arbitration is required, each party must select an arbitrator and
those two arbitrators shall promptly, but in no event later than
thirty (30) days after their selection, select a third arbitrator.
The parties agree to act as expeditiously as possible to select
arbitrators and conclude the dispute.  The selected arbitrators must
render their decision in writing.   The cost and expenses of the
arbitration and of enforcement of any award in any court shall be
borne equally by both parties.  If advances are required, each party
will advance one-half of the estimated fees and expenses of the
arbitrators.   Judgment may be entered on the arbitrators' award in
any court having jurisdiction.  Although arbitration is contemplated
to resolve disputes hereunder, either party may proceed to court to
obtain an injunction to protect its rights hereunder, the parties
agreeing that either could suffer irreparable harm by reason of any
breach of this Agreement.  Pursuit of an injunction shall not impair
arbitration on all remaining issues.

9.   **Assignment**.  Neither party shall have the right to assign
or delegate his rights or obligations hereunder, or any portion
thereof, to any other person.

10.   **Governing Law**.  This Agreement shall be governed by and
construed in accordance with the laws of the State of Florida.

11.   **Entire Agreement**.  This Agreement constitutes the entire
agreement between the parties hereto with respect to the subject
matter hereof and, upon its effectiveness, shall supersede all prior
agreements, understandings and arrangements, both oral and written,
between the Executive and the Company (or any of its affiliates)
with respect to such subject matter.   This Agreement may not be

HTE - 0010

modified in any way unless by a written instrument signed by both the Company and the Executive.

12.   **Notices.**  All notices required or permitted to be given hereunder shall be in writing and shall be personally delivered by courier, sent by registered or certified mail, return receipt requested or sent by confirmed facsimile transmission addressed as set forth herein.  Notices personally delivered, sent by facsimile or sent by overnight courier shall be deemed given on the date of delivery and notices mailed in accordance with the foregoing shall be deemed given upon the earlier of receipt by the addressee, as evidenced by the return receipt thereof, or three (3) days after deposit in the U.S. Mail.  Notice shall be sent: (a) if to the Company, addressed to 390 North Orange Avenue, Suite 2000, Orlando, Florida, 32801, Attention: General Counsel, and (b) if to the Executive, to his address as reflected on the payroll records of the Company, or to such other address as either party hereto may from time to time give notice of to the other.

13.   **Benefits: Binding Effect.**  This Agreement shall be for the benefit of and binding upon the parties hereto and their respective heirs, personal representatives, legal representatives, successors and, where applicable, assigns, including, without limitation, any successor to the Company, whether by merger, consolidation, sale of stock, sale of assets or otherwise.

14.   **Severability.**  The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part thereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted.  If such invalidity is caused by length of time or size of area, or both, the otherwise invalid provision will be considered to be reduced to a period or area which would cure such invalidity.

15.   **Waivers.**  The waiver by either party hereto of a breach or violation of any term or provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation.

16.   **Damages.**  Nothing contained herein shall be construed to prevent the Company or the Executive from seeking and recovering from the other damages sustained by either or both of them as a result of its or his breach of any term or provision of this Agreement.  In the event that either party hereto brings suit for the collection of any damages resulting from, or the injunction of

11

HTE - 0011

FILE No.717 07/30 '99 12:49   ID:H          FAX:407 304 390(          PAGE  13

any action constituting, a breach of any of the terms or provisions of this Agreement, then the party found to be at fault shall pay all reasonable court costs and attorneys' fees of the other.

17.  Section Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

18.  No Third Party Beneficiary.  Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person other than the Company, the parties hereto and their respective heirs, personal representatives, legal representatives, successors and assigns, any rights or remedies under or by reason of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

COMPANY:

H.T.E., INC.

By:
Name:  L.A. Gorato, JR
Title:  EVP

EXECUTIVE:

Jack L. Harward

12

HTE - 0012

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement") is entered into by and between Tyler Technologies, Inc., a Delaware corporation ("Buyer"), on the one part, and Dennis Harward ("DH") and Jack Harward ("JH"), on the other part (DH and JH are collectively referred to herein as the "Sellers").

### Background

Sellers beneficially and of record own 5,618,952 shares (collectively, the "Shares") of H.T.E., Inc. ("HTE") common stock ("HTE Common Stock"). Sellers collectively also own 515,000 shares which are registered shares, and which will not be subject to this Stock Purchase Agreement.

Buyer desires to purchase the Shares from Sellers, and Sellers desire to sell the Shares to Buyer, on the terms and subject to the conditions set forth in this Agreement.

THEREFORE, in consideration of the mutual representations and promises contained herein, along with other good and valuable consideration, the receipt and sufficiency of which all parties mutually acknowledge, Buyer and Seller, intending to be legally bound, agree as follows:

### Article I
### Purchase and Sale of Shares

**Section 1.1    Purchase and Sale of Initial Shares.**  At the Initial Closing (as defined below), Sellers shall sell, transfer, assign, and deliver to Buyer, and Buyer shall purchase, accept, and assume, and receive, good and marketable title to 4,650,000 Shares, 2,825,110 of which shall be sold, transferred, assigned, and delivered to Buyer by DH and 1,824,890 of which shall be sold, transferred, assigned, and delivered to Buyer by JH ("Initial Shares").  The aggregate purchase price for the Initial Shares shall be 2,325,000 shares of Tyler Technologies, Inc. common stock, $.01 par value per share (the "Tyler Shares"), 1,412,555 of which shall be delivered to DH and 912,445 of which shall be delivered to JH.

**Section 1.2    Put and Call Options.**

(a)    From and after the Initial Closing until the close of business on March 31, 2000, Sellers shall have the right and option to "put" a total of 968,952 Shares (the "Remaining Shares") to Buyer and require Buyer to purchase all of the Remaining Shares, and Buyer shall have the right and option to "call" all the Remaining Shares and require Sellers to sell all of the Remaining Shares to Buyer.  No party may exercise its option until such time as Buyer and Sellers shall have filed all notifications required under the Hart-Scott-Rodino Antitrust Improvements Act of 1974 ("HSR Act") with respect to the purchase of the Remaining Shares and all applicable waiting periods under the HSR Act shall have expired or been terminated.  The parties may exercise their respective options, by giving written notice to the other parties at their respective addresses shown below their signatures hereto.  Notice may be given by personal delivery, facsimile, certified mail return receipt requested or registered mail.

(b)    At the Second Closing (as defined below), Sellers shall sell, transfer, assign, and deliver to Buyer, and Buyer shall purchase, accept, and assume, and receive, good and marketable title to the Remaining Shares, 588,688 of which shall be sold, transferred, assigned, and delivered to Buyer by DH and 380,264 of which shall be sold, transferred, assigned, and delivered to Buyer by JH.  The aggregate purchase price for the Remaining Shares shall be



EXHIBIT

HTE - 0308

484,476 Tyler Shares, 294,344 of which shall be delivered to DH and 190,132 of which shall be delivered to JH.

(c)      Buyer and Sellers covenant to file all required notifications under the HSR Act within thirty (30) days after the Initial Closing, and to use their commercially reasonable effort to obtain termination of any applicable waiting periods as soon as practicable after filing of such notifications.

Section 1.3    Purchase Price Adjustment.  In the event of the direct or indirect acquisition by Buyer of HTE, whether pursuant to a merger, consolidation, or acquisition of substantially all of HTE's stock or assets (an "Acquisition"), pursuant to which the exchange ratio received by the common stockholders of HTE is less than two shares of HTE Common Stock for one share of Buyer common stock (the "Final HTE Exchange Ratio"), then in such event, and in order for such Acquisition to meet the "pooling of interests" transaction requirements, whether or not such Acquisition is in fact a "pooling of interests", the number of Tyler Shares delivered by Buyer to Sellers pursuant to this Agreement will be subject to a post-closing purchase price adjustment (the "Purchase Price Adjustment"), in an amount that would increase the number of Tyler Shares received by Sellers pursuant to this Agreement to equate them with the number of Tyler Shares that such Sellers would have received under such Final HTE Exchange Ratio. Buyer shall pay such Purchase Price Adjustment in shares of common stock of the Buyer (which shall be treated as "Tyler Shares" for all purposes under this Agreement) promptly following the completion of the Acquisition.

Section 1.4    Legend on Tyler Shares.  Each certificate representing the Tyler Shares to be issued by Buyer in accordance with this Agreement will bear substantially the following legend:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE APPLICABLE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE REQUIREMENTS OF ALL SUCH LAWS.

### Article II
### Closing

Section 2.1    Closing.  The transfer of the Shares contemplated by this Agreement (collectively, the "Closing") shall take place at the offices of Buyer, or such other place as the parties agree.  The transfer of the Initial Shares shall take place on the date the deliveries by Sellers and Buyer are completed, (the "Initial Closing").  The transfer of the Remaining Shares shall take place on the fifth business day following delivery of the notice of exercise by a party of its put or call option relating to such shares (the "Second Closing").  Neither party shall be obligated to close under this Agreement until such time as Buyer makes a general public announcement of its intention to acquire all of the issued and outstanding shares of HTE common stock on terms substantially similar to those given to Sellers under this Agreement.

Section 2.2    Deliveries by Sellers.  Sellers covenant and agree to deliver or cause to be delivered the following at each Closing, and it shall be a condition to Buyer's obligations under this Agreement that all of the following be delivered at each Closing:

(a)      DH shall deliver or cause to be delivered stock certificates with fully executed stock powers and signature guarantees evidencing the requisite number of shares of HTE Common Stock and any other documentation necessary or appropriate to effect the transfer thereof to Buyer.

2

(b)    JH shall deliver or cause to be delivered stock certificates with fully executed stock powers and signature guarantees evidencing the requisite number of shares of HTE Common Stock and any other documentation necessary or appropriate to effect the transfer thereof to Buyer.

(c)    Such other documents or instruments as may be necessary or appropriate to carry out the transactions contemplated by this Agreement.

Section 2.3    Deliveries by Buyer. Buyer covenants and agrees to deliver or cause to be delivered the following at each Closing, and it shall be a condition to Sellers' obligations under this Agreement that all of the following be delivered at each Closing:

(a)    Buyer shall deliver evidence of written instruction to its transfer agent directing such transfer agent to issue the Tyler Shares to Sellers in the names and in denominations as requested by Sellers, which delivery of the Tyler Shares will occur within five (5) business days of each Closing.

(b)    Such other documents or instruments as may be necessary or appropriate to carry out the transactions contemplated by this Agreement.

Section 2.4    Delivery of Certificates to Transfer Agent. Buyer covenants and agrees that it will deliver the stock certificates and other documentation delivered by Sellers at each Closing to HTE's transfer agent promptly following Closing in order to effect the transfer of the Shares on the stock transfer records of HTE.

## Article III
## Representations and Warranties of Sellers

Sellers hereby jointly and severally represent and warrant to Buyer as follows:

Section 3.1    Authority. Each Seller has full legal authority and capacity to execute and deliver this Agreement, to perform his obligations hereunder, and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by each Seller and, assuming the due authorization, execution, and delivery of this Agreement by Buyer, constitutes the legal, valid, and binding obligations of each Seller enforceable in accordance with its terms.

Section 3.2    Validity of Shares. The Shares are duly authorized, validly issued, fully paid and nonassessable and were not issued in violation of any preemptive subscription or other right of any person to acquire HTE Common Stock.

Section 3.3    Title to Shares. Sellers have good and marketable title to the Shares and the absolute right to sell, assign, transfer, and deliver same to Buyer (subject to any restrictions imposed under federal securities laws and any applicable state securities laws), free and clear of all claims, security interests, liens, pledges, charges, escrows, options, proxies, rights of first refusal, security agreements, or any other limitation, encumbrance, or restriction of any kind.

Section 3.4    No Conflict. The execution and delivery of this Agreement by Sellers do not, and the consummation of the transactions contemplated hereby will not, (i) to the knowledge of the Sellers, conflict with or violate in any material respect any federal, state, foreign, or local law, statute, ordinance, rule, regulation, order, judgment, or decree applicable to Sellers or by which any of their respective properties is bound or subject; or (ii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default)

3

under any note, bond, mortgage, indenture, contract, or other agreement to which each Seller is a party or by or to which each Seller or any of their respective properties is bound or subject.

**Section 3.5      No Consents.**  The execution and delivery of this Agreement by Sellers do not, and the consummation of the transactions contemplated by this Agreement will not, require either Seller to obtain any consent, license, permit, approval, waiver, authorization, or order of, or to make any filing with or notification to, any governmental or regulatory authority, domestic or foreign ("Governmental Entity"), except as required pursuant to the HSR Act.

**Section 3.6      No Brokers Fees.**  All negotiations relative hereto and the transactions contemplated hereby have been carried on by Sellers directly with Buyer without any act by Sellers that would give rise to any claim against Buyer for a brokerage commission, finder's fee or other similar payment.

**Section 3.7      Securities Law Matters.**

(a)      Each Seller, by reason of his business and financial experience, has the capacity to protect his interests in investments in illiquid securities such as the Tyler Shares. Each Seller has carefully evaluated his financial resources and investment position and the risks associated with an investment in the Tyler Shares and is able to bear the economic risk of such investment. Each Seller has adequate means for providing for his current needs and personal contingencies and has no need for liquidity in this investment. Each Seller's overall commitment to investments that are not readily marketable is not disproportionate to his net worth and such Seller's investment in the Tyler Shares will not cause such overall commitment to become excessive.

(b)      Each Seller has reviewed the merits of an investment in the Tyler Shares with tax and legal counsel and an investment advisor to the extent deemed advisable by such Seller. Each Seller acknowledges that he has been given a full opportunity to ask questions of and to receive answers from the officers, agents and representatives of Buyer concerning the terms and conditions of the investment and the business of Buyer and to obtain such other information as desired in order to evaluate an investment in the Tyler Shares. Each Seller further acknowledges that he has relied solely upon his own independent investigations, and has received no representation or warranty from Buyer or any of its affiliates, employees or agents. Each Seller further acknowledges and understands that no federal or state agency has made any finding or determination as to the fairness of an investment in, or any recommendation or endorsement of, the Tyler Shares.

(c)      Each Seller understands that the Tyler Shares to be issued pursuant to the Merger will constitute "restricted securities" within the meaning of Rule 144 under the Securities Act of 1933, as amended (the "Securities Act") and may not be sold, pledged, or otherwise transferred in the absence of an effective registration statement pertaining thereto under the Securities Act and under any applicable state securities laws or an exemption from the registration requirements thereof. Each Seller further understands that the Tyler Shares will bear substantially the legend set forth in Section 1.03:

(d)      Each Seller acknowledges and agrees that the sale of Tyler Shares will be solely for such Seller's account, and not for the account of any other person or with a view to any resale or distribution thereof. Each Seller understands that the Tyler Shares have not been registered under the Securities Act, or the securities laws of certain states, in reliance upon specific exemptions from registration thereunder, and agrees that the Tyler Shares may not be sold, offered for sale, transferred, pledged, hypothecated or otherwise disposed of except in compliance with the Securities Act and applicable state

4

securities laws. Each Seller further understands that it may not be possible for such Seller to liquidate an investment in the Tyler Shares on an emergency basis.

(e)        Each Seller understands that the representations and warranties set forth in this Section 3.5 are being provided to determine whether the Tyler Shares may be issued to such Seller pursuant to section 4(2) of the Securities Act and similar exemptions under applicable state securities laws.


## Article IV
## Representations and Warranties of Buyer

Section 4.1    Tyler Shares.  The Tyler Shares to be issued pursuant to this Agreement will, when issued and delivered, be duly authorized, validly issued, fully paid, and nonassessable and not subject to statutory preemptive rights.

Section 4.2    Organization.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the state of its incorporation, and is duly qualified to do business as a foreign corporation in each jurisdiction in which the failure to be so qualified would affect the validity or enforceability of this Agreement or would have a material adverse effect on the business, operations, assets, financial condition, results of operations, or prospects of Buyer.

Section 4.3    Capitalization.  The authorized capital stock of Buyer consists of 100,000,000 shares of common stock and 1,000,000 shares of preferred stock, $10 per share, of which, as of June 30, 1999, 39,301,211 shares of common stock and no shares of preferred stock were issued and outstanding. Each of the outstanding shares of capital stock of Buyer is duly authorized, validly issued, and fully paid and nonassessable, and has not been issued in violation of any preemptive or similar rights under the certificate of incorporation or bylaws of Buyer, federal or state securities laws, or any agreement to which Buyer is a party or by which it is bound.

Section 4.4    Authority.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated  hereby. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution, and delivery of this Agreement by each of the Sellers, constitutes the legal, valid, and binding obligations of Buyer, enforceable in accordance with its terms.

Section 4.5    No Conflict.  The execution and delivery of this Agreement by Buyer does not, and the consummation of the transactions contemplated hereby will not, (i) conflict with or violate the certificate of incorporation or bylaws, in each case as amended or restated as of the date of this Agreement, of Buyer; (ii) to the knowledge of Buyer, conflict with or violate any federal, state, foreign, or local law, statute, ordinance, rule, regulation, order, judgment, or decree applicable to Buyer or by which any of its properties is bound or subject; or (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, accelerations or cancellation of, or result in the creation of a lien or encumbrance on any of the properties or assets of Buyer pursuant to, any material note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise, or other instrument or obligation to which Buyer is a party or by or to which Buyer or any of its respective properties is bound or subject.

5

Section 4.6    No Consents. The execution and delivery of this Agreement by Buyer do not, and the consummation of the transactions contemplated by this Agreement will not, require Buyer to obtain any consent, license, permit, approval, waiver, authorization, or order of, or to make any filing with or notification to, any Governmental Entity, except as pursuant to the HSR Act. To the extent a filing or filings are required pursuant to the HSR Act, either as a result of the Initial Closing, or the exercise of a put or call option, the Buyer will pay for all fees and expenses associated with such filing(s), including Seller's attorneys' fees and expenses.

Section 4.7    Absence of Litigation. Except as disclosed in the Buyer's SEC filings, there is no material investigation by any Governmental Entity nor any material claim, action, suit, litigation, proceeding, or arbitration of any kind, at law or in equity (including actions or proceedings seeking injunctive relief), pending or threatened against Buyer or any properties or rights of Buyer, or relating to this Agreement or the transactions contemplated by this Agreement, and Buyer is not subject to any material continuing order of, consent decree, settlement agreement, or other similar written agreement with, or continuing investigation by, any Governmental Entity, or any material judgment, order, writ, injunction, decree, or award of any Governmental Entity or arbitrator, including, without limitation, cease-and-desist or other orders.

Section 4.8    SEC Documents. Buyer has delivered or made available to Sellers all reports filed by Buyer under Sections 13(a), 14(a), 14(c) and 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") with the Securities and Exchange Commission on or after December 31, 1997 (the "SEC Documents"). As of their respective dates, each of the SEC Documents complied in all material respects with all applicable requirements of the Securities Act and the Exchange Act. The audited financial statements and unaudited financial statements of Buyer included in the SEC Documents fairly present the financial position of Buyer as of the date of such financial statements and the results of Buyer's operations and cash flows for the periods then ended.

Section 4.9    No Material Adverse Change. Since the date of the most recent filing by Buyer under the Exchange Act that included audited financial statements prior to the date hereof, Buyer has suffered no material adverse change in its condition (financial or other), results of operations or cash flows or any developments that have had a material adverse effect on its condition (financial or other), results of operations or cash flows.

Section 4.10    No Brokers Fees. All negotiations relative hereto and the transactions contemplated hereby have been carried on by Buyer directly with Sellers without any act by Buyer that would give rise to any claim against Sellers for a brokerage commission, finder's fee or other similar payment.

Section 4.11    Accredited Investor; Investor Intent. Buyer is an "accredited investor" as that term is defined in Regulation D promulgated pursuant to the Securities Act of 1933, as amended. Buyer is acquiring the Shares for its own account for investment purposes and not with a view to the distribution thereof within the meaning of the Securities Act or applicable state laws. Buyer understands that the Shares constitute "restricted securities" within the meaning of the Securities Act and may not be sold, pledged, or otherwise disposed of unless they are subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from registration is available. Buyer, by reason of its business and financial experience, is capable of evaluating the risks and merits of purchasing the Shares and of protecting its own interests in connection with such purchase. Buyer has had an opportunity to ask questions and receive answers from Sellers regarding the terms and conditions of acquisition of the Shares and has further had the opportunity to obtain all information that Buyer deems necessary to evaluate its investment in the Shares. Buyer has received and reviewed all information which it considers necessary or appropriate for deciding whether to acquire the Shares and enter into the transactions contemplated hereby. Buyer is relying solely upon its own due diligence and independent investigation of the assets, business, financial affairs and other aspects of HTE, and not any written or oral information provided or made available to Buyer in

connection with this transaction. Buyer acknowledges that because HTE files reports pursuant to the Exchange Act, Buyer has access to the type of information that would be disclosed if the sale of the Shares to Buyer hereunder were registered under the Securities Act.

## Article V
## Registration Rights

Section 5.1    Certain Definitions.  As used in this Article V, the following terms shall have the meanings set forth below:

(a)    "Commission" means the Securities and Exchange Commission.

(b)    "Other Stockholders" mean persons other than Sellers who, by virtue of agreements with Buyer, are entitled or permitted to include their securities in certain registrations hereunder.

(c)    "Registrable Securities" mean (i) the Tyler Shares and (ii) any common stock issued as a dividend or other distribution with respect to or in exchange for or in replacement of the shares referenced in (i) above; provided, however, that Registrable Securities shall not include any shares of common stock which have previously been registered or which have been sold to the public.

(d)    The terms "register," "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of the effectiveness of such registration statement.

(e)    "Registration Expenses" mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for Buyer, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, but shall not include Selling Expenses and fees and disbursements of counsel for Sellers (but excluding the compensation of regular employees of Buyer, which shall be paid in any event by Buyer).

(f)    "Rule 144" means Rule 144 as promulgated by the Commission under the Securities Act, as such rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(g)    "Rule 145" means Rule 145 as promulgated by the Commission under the Securities Act, as such rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(h)    "Securities Act" means the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(i)    "Selling Expenses". means all underwriting discounts and selling commissions applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Seller (other than the fees and disbursements of counsel included in Registration Expenses).

(j)    "Triggering Event" means the direct or indirect acquisition by Buyer of HTE, whether pursuant to a merger, consolidation, acquisition of more than fifty percent of the

HTE - 0314

outstanding common stock and the voting control of HTE, or acquisition of substantially all of its assets.

5.2    Requested registration.

(a)    Request for registration.  Following the consummation of the Triggering Event, and subject to Section 5.2(d) below, if Buyer shall receive from any Seller at any time or times a written request that Buyer effect any registration with respect to all or a part of the Registrable Securities, Buyer will:

(i)    promptly give written notice of the proposed registration to the other Seller; and

(ii)    as soon as practicable, use its best efforts to effect such registration (including, without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request together with all or such portion of Registrable Securities of any other Seller specified in a request to Buyer received within 20 days after such Seller received written notice hereunder from Buyer.

(b)    Underwriting.  Notwithstanding the foregoing, if the amount of Registrable Securities requested to be registered by a Seller exceeds the amount that such Seller would be entitled to sell pursuant to subsection (e) of Rule 144 if such Seller was otherwise eligible to sell such Registrable Securities under Rule 144, then Buyer may require that such Registrable Securities be sold pursuant to a firm commitment underwriting.  As soon as practicable, Buyer shall (together with all participating Sellers and other persons proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by Buyer, which underwriters are reasonably acceptable to the participating Sellers.

(c)    Other Shares.  The registration statement filed pursuant to the request of a Seller may include other securities of Buyer designated by Buyer, with respect to which registration rights have been granted, and may include securities of Buyer being sold for the account of Buyer.

(d)    Condition.  Notwithstanding the above, in the event Buyer effects a "Pooling of Interest" in the acquisition of HTE, the Sellers will not be entitled to submit a request for registration until after the Buyer has reported at least thirty (30) days of combined earnings.

(e)    Expiration.  The registration rights granted to Sellers pursuant to this Section 5.2 are exercisable only once, and shall expire on the first anniversary of this Agreement.

5.3    Buyer Registration.  If Buyer shall determine to register any of its securities either for its own account or the account of any Other Stockholder, other than a registration relating solely to employee benefit plans, or registration relating solely to a Rule 145 transaction, or a registration on any registration form that does not permit secondary sales, Buyer will:

(a)    promptly give to each Seller written notice thereof; and

(b)    use its best efforts to include in such registration (and any related qualification under blue sky laws or other compliance), all the Registrable Securities specified in a written request or requests, made by any Seller and received by Buyer within twenty (20) days after the written notice from Buyer described in clause (i) above is mailed or delivered by Buyer.  Such written request may specify all or a part of a Seller's Registrable Securities.

8

Notwithstanding the above, if in the opinion of the Underwriter conducting such offering that including all of the Registrable Securities is not commercially viable, then, in such event, the amount of Registrable Securities shall be reduced on a pro rata basis with all other Shares held by persons possessing similar registration rights, to make such registration commercially viable.

     5.4    <u>Expenses of Registration</u>. All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant this Agreement and reasonable fees of one counsel for the Sellers shall be borne by Buyer. All Selling Expenses relating to securities so registered shall be borne by the Sellers of such securities pro rata on the basis of the number of shares of securities so registered on their behalf.

     5.5    <u>Registration Procedures</u>. In the case of each registration effected by Buyer pursuant to this Article, Buyer will keep each Seller advised in writing as to the initiation of each registration and as to the completion thereof. At its expense, Buyer will use its best efforts to:

     (a)    Keep such registration effective for a period of one hundred twenty (120) days or until Seller or Sellers have completed the distribution described in the registration statement relating thereto, whichever first occurs; provided, however, that (i) such 120-day period shall be extended for a period of time equal to the period Seller refrains from selling any securities included in such registration at the request of an underwriter of common stock (or other securities) of Buyer; and (ii) in the case of any registration of Registrable Securities on Form S-3 which are intended to be offered on a continuous or delayed basis, such 120-day period shall be extended, if necessary, to keep the registration statement effective until all such Registrable Securities are sold, provided that Rule 415, or any successor rule under the Securities Act, permits an offering on a continuous or delayed basis, and provided further that applicable rules under the Securities Act governing the obligation to file a post-effective amendment permit, in lieu of filing a post-effective amendment that (I) includes any prospectus required by Section 10(a)(3) of the Securities Act or (II) reflects facts or events representing a material or fundamental change in the information set forth in the registration statement, the incorporation by reference of information required to be included in (I) and (II) above to be contained in periodic reports filed pursuant to Section 13 or 15(d) of the Exchange Act in the registration statement;

     (b)    Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

     (c)    Furnish such number of prospectuses and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Seller from time to time may reasonably request;

     (d)    Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing, and at the request of any such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing;

9

(e)   Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by Buyer are then listed; and

(f)   In connection with any underwritten offering pursuant to a registration statement, Buyer will enter into an underwriting agreement reasonably necessary to effect the offer and sale of common stock, provided such underwriting agreement contains customary underwriting provisions and provided further that if the underwriter so requests the underwriting agreement will contain customary contribution provisions.

5.6   <u>Indemnification.</u>

(a)   Buyer will indemnify each Seller, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Seller within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this Article, and each underwriter, if any, an each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular, or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by Buyer of the Securities Act or any rule or regulation thereunder applicable to Buyer and relating to action or inaction required of Buyer in connection with any such registration, qualification, or compliance, and will reimburse each such Seller, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Seller, each such underwriter, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action, provided that Buyer will not be liable in any such case to the extent that any such claim, loss, damage, liability, or expense arises out of or is based on any untrue statement or omission based upon written information furnished to Buyer by such Seller or underwriter and stated to be specifically for use therein. It is agreed that the indemnity agreement contained in this Section shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of Buyer (which consent has not been unreasonably withheld).

(b)   Each Seller will, if Registrable Securities held by him are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify Buyer, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of Buyer's securities covered by such a registration statement, each person who controls Buyer or such underwriter within the meaning of Section 15 of the Securities Act, each other such Seller and Other Stockholder, and each of their officers, directors, and partners, and each person controlling such Seller or Other Stockholder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular, or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse Buyer and such Sellers, Other Stockholders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to Buyer by such Seller and stated to be specifically for use therein; provided, however, that the obligations of such Seller hereunder shall

10

not apply to amounts paid in settlement of any such claims, losses, damages, or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Seller (which consent shall not be unreasonably withheld).

(c)    Each party entitled to indemnification under this Section (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense, and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 1, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

(d)    If the indemnification provided for in this Section is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to therein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

### Article VI
### Miscellaneous

Section 6.1    Entire Agreement. This Agreement contains the entire understanding of the parties relating to the subject matter hereof and supersedes all prior written or oral and all contemporaneous oral agreements and understandings relating to the subject matter hereof. This Agreement cannot be modified or amended except in writing signed by the party against whom enforcement is sought.

Section 6.2    Attorneys' Fees and Costs. Buyer agrees to pay all legal fees and expenses incurred by Sellers in connection with this transaction, at the Closing hereof. If attorneys' fees or other costs are incurred to secure performance of any obligations under this Agreement, or to establish damages for the breach thereof or to obtain any other appropriate

HTE - 0318

relief, whether by way of prosecution or defense, the prevailing party will be entitled to recover reasonable attorneys' fees and costs incurred in connection therewith.

Section 6.3    Further Assurances.   Each party agrees to execute any and all documents and to perform such other acts as may be necessary or expedient to further the purposes of this Agreement and the transactions contemplated by this Agreement.

Section 6.4    Counterparts.   This Agreement may be executed in one or more counterparts for the convenience of the parties to this Agreement, all of which together will constitute one and the same instrument.

Section 6.5    Assignment.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned or delegated by any party, without the prior written consent of the other parties.   This Agreement is not intended to confer any rights or benefits to any person or entity other than the parties to this Agreement.

Section 6.6    Specific Performance.   The parties hereby acknowledge and agree that the failure of any party to perform its agreements and covenants under this Agreement, including, without limitation, failure to take all actions as are necessary on its part to consummate the purchase and sale of the Shares will cause irreparable injury to the other parties for which damages, even if available, will not be an adequate remedy.   Accordingly, each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such party's obligations and to the granting by any court of the remedy of specific performance of its obligations under this Agreement.

Section 6.7    Governing Law.   This Agreement will be governed by, and construed in accordance with, the substantive laws of the State of Texas, without giving effect to any conflicts-of-law, rule, or principle that might require the application of the laws of another jurisdiction.

Section 6.8    Jurisdiction; Venue.   Any judicial proceeding brought by or against any of the parties to this Agreement on any dispute arising out of this Agreement or any matter related hereto shall be brought exclusively in any Federal or State court sitting in either Orange County, Florida, or Dallas County, Texas, and by execution and delivery of this Agreement, each of the parties to this Agreement accepts for itself the exclusive jurisdiction and venue of the aforesaid courts as trial courts, and irrevocably agrees to be bound by any final non-appealable judgment rendered in connection with this Agreement.

[remainder of page intentionally left blank

HTE - 0319

IN WITNESS WHEREOF, each of the parties to this Agreement has caused this Agreement to be executed by an authorized representative as of the date set forth below.

DATED:        August 17, 1999

TYLER TECHNOLOGIES, INC.,
a Delaware corporation
2800 West Mockingbird Lane
Dallas, Texas 75235

By:
Name:   Louis A. Waters
Title:    Chairman of the Board

SELLERS

Dennis Harward
4645 Albritton Road
St. Cloud, Florida 34772

Jack Harward
1266 Hill Stream Drive
Geneva, Florida 32732

ORL1 #493283 v4

13

HTE - 0320

[left column — partial text cut off]

of the class or

of dividends as
n, including any
organization, or
of reducing the
class or series;

shall not have
additional voting
on which results
ng an interested

r period preced-
interested share-
older, except as
ested directors,
ave received the
proportionately as
ces, guaranties,
r any tax credits
the corporation,
action with such

by a majority of
nformation state-
ion and comply-
nge Act and the
been mailed to
ation at least 25
n affiliated trans-
nformation state-
to the Exchange

do not apply:
articles of incor-
xpressly electing

pted an amend-
ior to January 1,
rned by this sec-
does not apply to
poration with an
nation date is on
mendment;

opts an amend-
ylaws, approved
other than inter-
and associates,
hares of the cor-
es of interested
nd associates,
l by this section,
articles of incor-
e until 18 months
hareholders and
tion of the corpo-
whose determina-
ve date of such

f the corporation
orporation which
inadvertently, if

such interested shareholder, as soon as practicable, divests itself of a sufficient amount of the voting shares of the corporation so that it no longer is the beneficial owner, directly or indirectly, of 10 percent or more of the outstanding voting shares of the corporation, and would not at any time within the 5-year period preceding the announcement date with respect to such affiliated transaction have been an interested shareholder but for such inadvertent acquisition.

(6)   Any corporation that elected not to be governed by this section, either through a provision in its original articles of incorporation or through an amendment to its articles of incorporation or bylaws may elect to be bound by the provisions of this section by adopting an amendment to its articles of incorporation or bylaws that repeals the original article or the amendment. In addition to any requirements of this act, or the articles of incorporation or bylaws of the corporation, any such amendment shall be approved by the affirmative vote of the holders of two-thirds of the voting shares other than shares beneficially owned by any interested shareholder.

History.—s. 94, ch. 89-154; s. 26, ch. 93-281.

**607.0902   Control-share acquisitions.—**
(1)   "CONTROL SHARES."—As used in this section, "control shares" means shares that, except for this section, would have voting power with respect to shares of an issuing public corporation that, when added to all other shares of the issuing public corporation owned by a person or in respect to which that person may exercise or direct the exercise of voting power, would entitle that person, immediately after acquisition of the shares, directly or indirectly, alone or as a part of a group, to exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of voting power:
(a)   One-fifth or more but less than one-third of all voting power.
(b)   One-third or more but less than a majority of all voting power.
(c)   A majority or more of all voting power.
(2)   "CONTROL-SHARE ACQUISITION."—
(a)   As used in this section, "control-share acquisition" means the acquisition, directly or indirectly, by any person of ownership of, or the power to direct the exercise of voting power with respect to, issued and outstanding control shares.
(b)   For purposes of this section, all shares, the beneficial ownership of which is acquired within 90 days before or after the date of the acquisition of the beneficial ownership of shares which result in a control share acquisition, and all shares the beneficial ownership of which is acquired pursuant to a plan to make a control-share acquisition shall be deemed to have been acquired in the same acquisition.
(c)   For purposes of this section, a person who acquires shares in the ordinary course of business for the benefit of others in good faith and not for the purpose of circumventing this section has voting power only of shares in respect of which that person would be able to exercise or direct the exercise of votes without further instruction from others.

(d)   The acquisition of any shares of an issuing public corporation does not constitute a control-share acquisition if the acquisition is consummated in any of the following circumstances:
1.   Before July 2, 1987.
2.   Pursuant to a contract existing before July 2, 1987.
3.   Pursuant to the laws of intestate succession or pursuant to a gift or testamentary transfer.
4.   Pursuant to the satisfaction of a pledge or other security interest created in good faith and not for the purpose of circumventing this section.
5.   Pursuant to a merger or share exchange effected in compliance with s. 607.1101, s. 607.1102, s. 607.1103, s. 607.1104, or s. 607.1107, if the issuing public corporation is a party to the agreement of merger or plan of share exchange.
6.   Pursuant to any savings, employee stock ownership, or other employee benefit plan of the issuing public corporation or any of its subsidiaries or any fiduciary with respect to any such plan when acting in such fiduciary capacity.
7.   Pursuant to an acquisition of shares of an issuing public corporation if the acquisition has been approved by the board of directors of such issuing public corporation before acquisition.
(e)   The acquisition of shares of an issuing public corporation in good faith and not for the purpose of circumventing this section by or from:
1.   Any person whose voting rights had previously been authorized by shareholders in compliance with this section; or
2.   Any person whose previous acquisition of shares of an issuing public corporation would have constituted a control-share acquisition but for paragraph (d),
does not constitute a control-share acquisition, unless the acquisition entitles any person, directly or indirectly, alone or as a part of a group, to exercise or direct the exercise of voting power of the corporation in the election of directors in excess of the range of the voting power otherwise authorized.
(f)   For the purpose of this section, persons shall not be deemed to be part of a "group" if such persons join together to exercise or direct the exercise of the voting power of an issuing public corporation (whether through a voting trust, a shareholder agreement, or through other arrangements), and the voting trustee of any voting trust shall not be deemed to be an "acquiring person" if such persons or all the parties to the voting trust:
1.   Are related by blood or marriage or are the personal representatives or trustees of such persons; and
2.   Such persons were shareholders (or the beneficial owners of shares) of the issuing public corporation (or were trustees, personal representatives, or heirs of such shareholders or beneficial owners) on July 1, 1987, and have continued to be shareholders (or the beneficial owners of shares) of the issuing public corporation (or have been trustees, personal representatives, or heirs of such shareholders or beneficial owners) since that time.

1165

Case 6:01-cv-01366-GAP   Document 64   Filed 05/03/02   Page 59 of 68 PageID 486

(3) "INTERESTED SHARES."—As used in this section, "interested shares" means the shares of an issuing public corporation in respect of which any of the following persons may exercise or direct the exercise of the voting power of the corporation in the election of directors:

(a) An acquiring person or member of a group with respect to a control-share acquisition.

(b) Any officer of the issuing public corporation.

(c) Any employee of the issuing public corporation who is also a director of the corporation.

(4) "ISSUING PUBLIC CORPORATION."—

(a) As used in this section, "issuing public corporation" means a corporation that has:

1. One hundred or more shareholders;

2. Its principal place of business, its principal office, or substantial assets within this state; and

3. Either:

a. More than 10 percent of its shareholders resident in this state;

b. More than 10 percent of its shares owned by residents of this state; or

c. One thousand shareholders resident in this state.

(b) The residence of a shareholder is presumed to be the address appearing in the records of the corporation.

(c) Shares held by banks (except as trustee or guardian), brokers, or nominees shall be disregarded for purposes of calculating the percentages or numbers described in this subsection.

(5) LAW APPLICABLE TO CONTROL-SHARE VOTING RIGHTS.—Unless the corporation's articles of incorporation or bylaws provide that this section does not apply to control-share acquisitions of shares of the corporation before the control-share acquisition, control shares of an issuing public corporation acquired in a control-share acquisition have only such voting rights as are conferred by subsection (9).

(6) NOTICE OF CONTROL-SHARE ACQUISITION.—Any person who proposes to make or has made a control-share acquisition may at the person's election deliver an acquiring person statement to the issuing public corporation at the issuing public corporation's principal office. The acquiring person statement must set forth all of the following:

(a) The identity of the acquiring person and each other member of any group of which the person is a part for purposes of determining control shares.

(b) A statement that the acquiring person statement is given pursuant to this section.

(c) The number of shares of the issuing public corporation owned, directly or indirectly, by the acquiring person and each other member of the group.

(d) The range of voting power under which the control-share acquisition falls or would, if consummated, fall.

(e) If the control-share acquisition has not taken place:

1. A description in reasonable detail of the terms of the proposed control-share acquisition; and

2. Representations of the acquiring person, together with a statement, in reasonable detail of the facts upon which they are based, that the proposed control-share acquisition, if consummated, will not be contrary to law and that the acquiring person has the financial capacity to make the proposed control-share acquisition.

(7) SHAREHOLDER MEETING TO DETERMINE CONTROL-SHARE VOTING RIGHTS.—

(a) If the acquiring person so requests at the time of delivery of an acquiring person statement and gives an undertaking to pay the corporation's expenses of a special meeting, within 10 days thereafter, the directors of the issuing public corporation or others authorized to call such a meeting under the issuing public corporation's articles of incorporation or bylaws shall call a special meeting of shareholders of the issuing public corporation for the purpose of considering the voting rights to be accorded the shares acquired or to be acquired in the control-share acquisition.

(b) Unless the acquiring person agrees in writing to another date, the special meeting of shareholders shall be held within 50 days after receipt by the issuing public corporation of the request.

(c) If the acquiring person so requests in writing at the time of delivery of the acquiring person statement, the special meeting must not be held sooner than 30 days after receipt by the issuing public corporation of the acquiring person statement.

(d) If no request is made, the voting rights to be accorded the shares acquired in the control-share acquisition shall be presented to the next special or annual meeting of the shareholders.

(8) NOTICE OF SHAREHOLDER MEETING.—

(a) If a special meeting is requested, notice of the special meeting of shareholders shall be given as promptly as reasonably practicable by the issuing public corporation to all shareholders of record as of the record date set for the meeting, whether or not entitled to vote at the meeting.

(b) Notice of the special or annual shareholder meeting at which the voting rights are to be considered must include or be accompanied by each of the following:

1. A copy of the acquiring person statement delivered to the issuing public corporation pursuant to this section.

2. A statement by the board of directors of the corporation, authorized by its directors, of its position or recommendation, or that it is taking no position or making no recommendation, with respect to the proposed control-share acquisition.

3. A statement that shareholders are or may be entitled to assert dissenters' rights, to be accompanied by a copy of ss. 607.1301, 607.1302, and 607.1320.

(9) RESOLUTION GRANTING CONTROL-SHARE VOTING RIGHTS.—

(a) Control shares acquired in a control-share acquisition have the same voting rights as were accorded the shares before the control-share acquisition only to the extent granted by resolution approved by the shareholders of the issuing public corporation.

(b) To be approved under this subsection, the resolution must be approved by:

Case 6:01-cv-01366-GAP   Document 64   Filed 05/03/02   Page 60 of 68 PageID 487

1. Each class or series entitled to vote separately on the proposal by a majority of all the votes entitled to be cast by the class or series, with the holders of the outstanding shares of a class or series being entitled to vote as a separate class if the proposed control-share acquisition would, if fully carried out, result in any of the changes described in s. 607.1004; and

2. Each class or series entitled to vote separately on the proposal by a majority of all the votes entitled to be cast by that group, excluding all interested shares.

(10) REDEMPTION OF CONTROL SHARES.—

(a) If authorized in a corporation's articles of incorporation or bylaws before a control-share acquisition has occurred, control shares acquired in a control-share acquisition with respect to which no acquiring person statement has been filed with the issuing public corporation may, at any time during the period ending 60 days after the last acquisition of control shares by the acquiring person, be subject to redemption by the corporation at the fair value thereof pursuant to the procedures adopted by the corporation.

(b) Control shares acquired in a control-share acquisition are not subject to redemption after an acquiring person statement has been filed unless the shares are not accorded full voting rights by the shareholders as provided in subsection (9).

(11) RIGHTS OF DISSENTING SHAREHOLDERS.

(a) Unless otherwise provided in a corporation's articles of incorporation or bylaws before a control-share acquisition has occurred, in the event control shares acquired in a control-share acquisition are accorded full voting rights and the acquiring person has acquired control shares with a majority or more of all voting power, all shareholders of the issuing public corporation shall have dissenters' rights to receive the fair value of their shares as provided in ss. 607.1301, 607.1302, and 607.1320 as provided in this section.

(b) As used in this subsection, "fair value" means a value not less than the highest price paid per share by the acquiring person in the control-share acquisition.

History.—s. 95, ch. 89-154; s. 27, ch. 93-281; s. 4, ch. 94-327; s. 6, ch. 97-230.

**607.0903  Application of ss. 607.0901 and 607.0902 to certain foreign corporations.—**

(1) The provisions of s. 607.0901 also apply to a foreign corporation that has:

(a) Been granted authority pursuant to this act to conduct business in this state;

(b) One hundred or more shareholders;

(c) Its principal place of business, its principal office, or substantial assets within this state;

(d) More than 500 residents of this state as employees, including employees of an entity as to which the foreign corporation owns, directly or indirectly, shares or other interests of such entity having a majority of the unlimited voting rights in matters as to which shareholders or interestholders of such entity are accorded voting rights;

(e) Gross annual payroll, including the payroll of an entity as to which the foreign corporation owns, directly or indirectly, shares or other interests of such entity having a majority of the unlimited voting rights in matters as to which shareholders or interestholders of such

entity are accorded voting rights, of more than $5 million to residents of this state; and

(f) Either:

1. More than 10 percent of its shareholders resident in this state;

2. More than 10 percent of its shares owned by residents of this state; or

3. More than 1,000 shareholders resident in this state.

For purposes of paragraph (f), the residence of a shareholder is presumed to be the address appearing in the records of the corporation, and shares held by banks (except as trustee or guardian), brokers, or nominees shall be disregarded for purposes of calculating the percentages or numbers described.

(2) Except as provided in subsection (3), the provisions of s. 607.0902 apply to a foreign corporation which meets the requirements of an "issuing public corporation" in s. 607.0902(4) and, in addition, has:

(a) Authority pursuant to this act to conduct business in this state;

(b) More than 500 residents of this state as employees, including employees of an entity as to which the foreign corporation owns, directly or indirectly, shares or other interests of such entity having a majority of the unlimited voting rights in matters as to which shareholders or interestholders of such entity are accorded voting rights; and

(c) Gross annual payroll, including the payroll of an entity as to which the foreign corporation owns, directly or indirectly, shares or other interests of such entity having a majority of the unlimited voting rights in matters as to which shareholders or interestholders of such entity are accorded voting rights, of more than $5 million to residents of this state.

(3) The acquisition of any shares of any foreign corporation which is subject to subsection (2) does not constitute a control-share acquisition if the acquisition is consummated pursuant to a merger or share exchange effected in compliance with s. 607.1107 and such foreign corporation is a party to the agreement of merger or plan of share exchange.

(4) The merger, consolidation, or share exchange of two foreign corporations does not constitute a control-share acquisition if the merger, consolidation, or share exchange is effected in compliance with the laws of the jurisdictions under which such corporations are organized and with the approval of the board of directors of the foreign corporation subject to subsection (2).

(5) If the laws of any jurisdiction under the laws of which a foreign corporation is organized contain provisions that are expressly inconsistent with the provisions of this section as applicable to such foreign corporation, the provisions of this section shall be inapplicable to such foreign corporation to the extent necessary to resolve such inconsistency.

History.—s. 96, ch. 89-154.

**607.1001  Authority to amend the articles of incorporation.—**

(1) A corporation may amend its articles of incorporation at any time to add or change a provision that is

## INCUMBENCY CERTIFICATE

I, L. A. Gornto, Jr., hereby certify that I am the duly elected Secretary of H.T.E., Inc., a Florida corporation (the "Company"), and that the following is a true and correct copy of certain resolutions adopted by the Board of Directors of the Company at a meeting held on October 12, 2001:

BE IT RESOLVED:

1.    That the Company shall have on or before the Effective Date entered into an irrevocable escrow agreement with the SunTrust Bank, Orlando, Florida pursuant to which the Company shall have deposited the Aggregate Redemption Price with the SunTrust Bank, which said funds are to be held for the purpose of payment of the Aggregate Redemption Price to Tyler upon the tender or surrender of the certificates representing the Shares;

2.    That the proper officers of the Company, and each of them, are hereby authorized, empowered and directed, in the name of and on behalf of the Company, to execute and deliver any of the documentation heretofore referenced and any amendments, changes or modifications thereto, with the execution of the same being evidence of the approval by them of such additional terms and conditions; and

3.    That the proper officers of the Company, and each of them, are hereby authorized, empowered and directed, in the name of and on behalf of the Company, to execute, deliver and file on behalf of the Company any and all other documents and take any and all other actions as any of them may deem reasonably necessary to enter into, consummate and perform the transactions contemplated by the foregoing resolutions, including any amendments or supplements thereto.

I do further certify that the following officers are duly qualified officers of the Company:

| Name | Office |
|------|--------|
| Joseph M. Loughry, III | President and CEO |
| Susan D. Falotico | Vice President and CFO |
| L. A. Gornto, Jr. | Exec. Vice President, Secretary and Treasurer |

that there is no provision in the Charter or Bylaws of the Corporation limiting the power of the Board of Directors to pass the foregoing resolution and that the same is in conformity with the provisions of said Charter and Bylaws.

IN WITNESS WHEREOF, I have hereunto subscribed my name as Secretary, pursuant to due and lawful corporate authority, as of the 26th day of October, 2001.

L. A. Gornto, Jr., Secretary



Headquarters:
1000 Business Center Drive, Lake Mary, FL 32746 ◆ (407) 304-3235

Application Solutions for Government
October 29, 2001


Via Facsimile #(214) 547-4041, U.S. Mail
and Federal Express #7916 8870 2000

Tyler Technologies, Inc.
5949 Sherry Lane, Suite 1400
Dallas, TX 75225

Attn: John M. Yeaman, President


Re: Redemption of 5,618,952 Shares of Common Stock of H.T.E., Inc.


Dear Mr. Yeaman:


This letter serves as notice to Tyler Technologies, Inc. ("Tyler") that H.T.E., Inc. (the "Company") has on October 29, 2001, effective at 8:00 A.M. (Eastern time), exercised its right under Section 607.0902(10)(b), Florida Statutes, to redeem the 5,618,952 shares of Company common stock (the "Shares") acquired by Tyler in a control share acquisition under Section 607.0902, Florida Statutes. The redemption price the Company is paying for the Shares is $1.30 per share, for an aggregate redemption price of $7,304,637.60 for all of the Shares. On October 12, 2001, the Company's Board of Directors approved the redemption of the Shares. The redemption price represents a 17.5% discount from the average closing share price for the 10 trading days commencing on October 15, 2001 and ending on October 26, 2001, as reported on the NASDAQ National Market for the regular trading hours or session each day. In determining the fair value of the Shares for the redemption, as provided under Section 607.0902(10)(a), the Company relied on a report prepared for the Company by a national investment banking firm, which recommended a discount ranging from 10% to 25% should be deducted from the Company's public share price. The Company's Board of Directors approved a discount that was at the mid-point of this recommended discount range.


We have escrowed the aggregate redemption price ($7,304,637.60) with SunTrust Bank as escrow agent. Pursuant to the escrow agreement between SunTrust Bank and the Company, SunTrust Bank has an irrevocable obligation to pay to Tyler the aggregate redemption price upon its surrender of all of the Shares. Please return the certificates representing the Shares to SunTrust Bank, 225 E. Robinson Street, Suite 250, Orlando,

John M. Yeaman, President
Tyler Technologies, Inc.
Page – 2 –

FL 32801, Attention: Corporate Trust Division.   Upon receipt of the certificates
representing all of the Shares, SunTrust Bank will release the aggregate redemption price
to Tyler.  Please indicate to SunTrust Bank how Tyler wishes to receive the funds (i.e., by
check or wire transfer), and if by wire transfer, please include in Tyler's transmittal letter
to SunTrust Bank the appropriate wiring instructions.

In accordance with Section 607.0721(4), Florida Statutes, the Shares are no longer
considered issued and outstanding shares of common stock of the Company, and all
rights with respect thereto have ceased, except only the right of Tyler to receive the
aggregate redemption price in the amount and manner described above. In that regard, the
Company has informed its transfer agent to put a stop transfer order on the Shares.

Very truly yours,

H.T.E., Inc.

By: _____
Joseph M. Loughry, III
President & Chief Executive Officer



## TYLER
### TECHNOLOGIES, INC.

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| **TO:** Joseph Loughry, III | **FROM:** H. Lynn Moore, Jr. |
| **COMPANY:** | **DATE:** 10/29/2001 |
| **FAX NUMBER:** 407-304-1075 | **TOTAL NO. OF PAGES INCLUDING COVER:** 2 |
| **PHONE NUMBER:** | **SENDER'S REFERENCE NUMBER:** |
| **RE:** | **YOUR REFERENCE NUMBER:** |

☐ URGENT  ☐ FOR REVIEW  ☐ PLEASE COMMENT  ☐ PLEASE REPLY  ☐ PLEASE RECYCLE

**NOTES/COMMENTS:**



**TYLER**
TECHNOLOGIES, INC.

*Via Facsimile (407) 304-1075*
*and Federal Express*

October 29, 2001

Mr. Joseph M. Loughry, III
President & Chief Executive Officer
H.T.E., Inc.
1000 Business Center Drive
Lake Mary, FL 32746

Mr. Loughry:

This letter serves as a response to your letter of October 29, 2001.

Tyler Technologies, Inc. ("Tyler") disagrees with H.T.E., Inc.'s ("H.T.E.") interpretation of Section 607.0902 of the Florida Corporations Code. Under Florida law, to the extent that H.T.E. maintained any right to redeem the "control shares" held by Tyler, such right expired 60 days from the date that the stockholders of H.T.E. did not grant Tyler voting rights to such "control shares," or January 5, 2001. Accordingly, H.T.E.'s purported redemption of Tyler's "control shares" effective October 29, 2001 is invalid.

Moreover, the right of a corporation to redeem its shares under the Florida control-share acquisition statute applies only to "control shares," or those shares that may "exercise or direct the exercise of. . .one-fifth or more but less than one-third of all voting power. . ." of the corporation. In other words, even assuming that H.T.E. maintains a right to redeem Tyler's "control shares" (which it does not), such right would be limited to those shares that Tyler owns that are in excess of 20% of H.T.E.'s issued and outstanding shares of common stock, not all of the shares currently held by Tyler.

Finally, even assuming the right to redeem Tyler's "control shares" (which it does not), Tyler vigorously disputes H.T.E.'s calculation of per share "fair value" as set forth in your letter.

Under Florida law, Tyler continues to be the owner of 5,618,952 shares of H.T.E. common stock and may continue to vote up to 20% of the issued and outstanding shares of H.T.E. common stock held by Tyler. Please be advised that Tyler is prepared to take all actions necessary to protect such rights.

Sincerely,

H. Lynn Moore, Jr.
Vice President, General Counsel, and Secretary

5949 Sherry Lane Suite 1400
Dallas, Texas 75225
214/547-4000