# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

### CASE NO. 6:01-CV-1366-ORL-31DAB

H.T.E., Inc., a Florida corporation,

      **Plaintiff,**

v.

TYLER TECHNOLOGIES, INC., a
Delaware corporation,

      **Defendant**              /

## HTE'S MEMORANDUM OF LAW IN OPPOSITION TO TYLER'S MOTION FOR SUMMARY JUDGMENT ON HTE'S AND TYLER'S DECLARATORY JUDGMENT ACTIONS

### I.    INTRODUCTION

On the issue as to the scope of the non-voting status of Tyler's HTE stock, this Court should deny Tyler's motion for summary judgment and enter summary judgment for HTE, and specifically declare that all of the shares of HTE stock acquired by Tyler from the Harwards were acquired in a control share acquisition and constitute control shares to which Tyler has no voting rights. HTE agrees with Tyler that this is purely a question of law and that, should this Court agree with HTE on this issue, then this Court should without further notice issue summary judgment in favor of HTE. Tyler's Motion for Summary Judgment on HTE's and Tyler's Declaratory Judgment Actions, at p. 4-5 n.3 (Docket no. 101). See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986)(stating that "district courts are widely acknowledged to possess the power

to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); Burton v. City of Belle Glade, 178 F.3d 1175, 1204 (11th Cir. 1999)("so long as the party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment *sua sponte* is entirely appropriate."); Gerber v. Longboat Harbour North Condominium, Inc., 757 F.Supp. 1339, 1341 (M.D. Fla. 1991)("[T]he district court may grant summary judgment against the movant, even though the opposite party has not actually filed a motion for summary judgment.").

As to the issue concerning any restoration of voting rights upon transfer, HTE would agree that voting rights should be restored to those control shares which are transferred by an acquirer to a third person who is not an affiliate of the acquirer or a member of a group with which the acquirer made the control share acquisition, provided that any such transfer is not itself part of, or does not constitute, a control share acquisition. If the transfer is itself part of, or constitutes, a control share acquisition, then the transferee must, of course, comply with the provisions of section 607.0902, Florida Statutes (2002).[1]

## II.  NO GENUINE ISSUES OF MATERIAL FACT EXIST IN THIS CASE AND THIS COURT SHOULD ENTER FINAL SUMMARY JUDGMENT

In that the remaining dispute primarily concerns the scope of the non-voting status of Tyler's HTE shares, the remainder of this memorandum will focus on said issue. The undisputed

---

[1] Specifically, if a transferee acquires any of the acquirer's control shares in a control share acquisition, those shares must be subject to a shareholder resolution regarding voting rights as expressed in section 607.0902 (7) and (9) and to redemption as set forth in section 607.0902(10).

facts pertaining to this issue are set forth in HTE's Memorandum of Law in Support of HTE's Motion for Partial Summary Judgment, at § I.B. (Docket no. 49), which is incorporated herein by reference. HTE and Tyler both concede that the remaining issues to be decided do not involve disputed issues of material fact and, accordingly, this matter is ripe for determination as a matter of law. *H.T.E., Inc. v. Tyler Technologies, Inc.*, 2002 U.S. Dist. LEXIS 17561 at *1-2, 2002 WL 31094769 (M.D. Fla. 2002) (Docket No. 98) (hereinafter called the "Order").[2]

### III.   ALL OF TYLER'S HTE SHARES ARE CONTROL SHARES WHICH, AS A RESULT OF A RESOLUTION APPROVED BY THE SHAREHOLDERS, HAVE NO VOTING RIGHTS.

In its Order, this Court previously stated:

"When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." (Citations omitted). However, if a statute is ambiguous, courts should apply the rules of statutory construction. "Ambiguity suggests that reasonable persons can find different meanings in the same language." (Citations omitted).

*Order* at *10.

As to the scope of voting rights, the Act conveys a clear and definite meaning, signifying that the Act must be given its plain and obvious meaning. More specifically, section 607.0902(9)(a), specifically provides:

Control shares acquired in a control-share acquisition have the same voting rights as were accorded the shares before the control-share acquisition only to the extent granted by resolution approved by the shareholders of the issuing public corporation.

---

[2] Citations to the Order will be to LEXIS.

Control shares are all of the shares acquired or to be acquired in a control-share acquisition.  Section 607.0902(1) defines "control shares" as follows:

> (1)  "CONTROL SHARES." –As used in this section, "control shares" means shares that, except for this section, would have voting power with respect to shares of an issuing public corporation that, when added to all other shares of the issuing public corporation owned by a person or in respect to which that person may exercise or direct the exercise of voting power, would entitle that person, **immediately after acquisition of the shares**, directly or indirectly, alone or as a part of a group, to exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of voting power:
>
> (a) One-fifth or more but less than one-third of all voting power.
> (b) One-third or more but less than a majority of all voting power.
> (c) A majority or more of all voting power.

Id. (Emphasis added).  It is plain and obvious from this language that control shares means all of those shares which are part of an acquisition that, when added to the acquirer's pre-acquisition or post-acquisition holdings, put the acquirer over one of the three specified thresholds of  voting power.  The scope of the acquisition of control shares is defined in section 607.0902(2).  This subsection defines "control-share acquisition" to mean the acquisition by any person of ownership of issued and outstanding "control shares," which includes **"all shares"** acquired within a 180-day period (i.e., 90 days before or after the date of the acquisition) and which also includes **"all shares"** acquired pursuant to a plan to make a control-share acquisition.  Specifically, subsection 2 states, in pertinent part::

> (2) "CONTROL-SHARE ACQUISITION."—
>    (a)  As used in this section, "control-share acquisition" means the acquisition, directly or indirectly, by any person of ownership of, or the power to direct the exercise of voting power with respect to, issued and outstanding **control shares**.

>    (b)  For purposes of this section, **all shares,** the beneficial ownership of which is acquired within 90 days before or after the date of the acquisition of the beneficial ownership of shares which result in a control share acquisition, and **all shares** the beneficial ownership of which is acquired pursuant to a plan to make a control-share acquisition **shall be deemed to have been acquired in the same acquisition**.

§ 607.0902(2), Fla. Stat. (emphasis added).[3]

In other words, subsection (2) of the Act determines the scope of control shares and the Act distinguishes those shares from "all other shares" (e.g., the pre-acquisition or post-acquisition holdings of the acquirer). For instance, assume that an acquirer owns 9.6% of an issuing public corporation's outstanding shares and then subsequently makes an acquisition of 17.9%, for a total of 27.5%. If the acquirer acquires the 17.9% within 90 days after acquisition of the 9.6%, or if the acquirer acquires both the 17.9% and 9.6% pursuant to a plan to make a control share acquisition, then the entire 27.5% would be deemed to have been acquired in the same acquisition under subsection (2)(b) of the Act, and the entire 27.5% would constitute "control shares". However, if the acquirer acquires the 17.9% outside of that 90-day window and said acquisition is not pursuant to a plan to make a control-share acquisition, then all 27.5% cannot be deemed to have been acquired in the same acquisition and only the 17.9% would constitute control shares.

---

[3]   It is indisputable that all of the shares of HTE stock acquired by Tyler from the Harwards meet the test for "control-share acquisition" set forth in subsection (2) of the Act. These indisputable facts were sufficiently set forth in HTE's previous memorandum and, therefore will not be restated here. See HTE's Memorandum of Law in Support of HTE's Motion for Partial Summary Judgment, at p. 9-13. Suffice it to say that, not only did Tyler acquire beneficial ownership of all of its shares of HTE common stock pursuant to a plan to make a control-share acquisition, but also Tyler acquired beneficial ownership within a 90-day period.

This is precisely the factual situation with which the United States Supreme Court dealt in <u>CTS Corp. v. Dynamics Corp. of America</u>, 481 U.S. 69 (1987).  More specifically, in <u>CTS Corp.</u>, the U.S. Supreme Court considered the constitutionality of Indiana's control-share acquisition statute, which is nearly identical to the Act.[4]   The U.S. Supreme Court defined "control shares" under Indiana's act to include all shares acquired in a control-share acquisition and not just the excess shares beyond the statutory threshold of one-fifth,  one-third or one-half of all voting shares.   Specifically, in <u>CTS Corp.</u>, the U.S. Supreme Court emphasized that "Dynamics will have no voting rights **in its shares** unless shareholders of CTS grant those rights in a meeting held pursuant to the Act."  481 U.S. at 78 n.5 (emphasis added).   Clearly, the Supreme Court deemed "control shares" to include all shares acquired in a control-share acquisition  and not just those shares which exceed the statutory threshold.  Indeed, the Official Comments to Indiana's control-share acquisition statute sum it up well:[5]

> "Control shares" are *not* "all shares" owned by the acquiring person, but only the shares acquired in the "control share acquisition" (**which can be acquired in separate purchases over a considerable period of time,** *see* IC 23-1-42-2) that, when added to the acquiring person's pre-acquisition holdings, put the person over one of the three specified thresholds of voting power. The facts in *CTS Corp. v. Dynamics Corp. of America* are illustrative. The acquiring person in *CTS* owned approximately 9.6% of the issuing public corporation's shares before the acquisition, and then acquired approximately 17.9% in a tender offer, giving it a total of about 27.5%. **Only the 17.9% acquired in the tender offer** -- which put the acquirer over the one-fifth threshold -- **were "control shares" whose voting power would be determined**, under IC 23-1-42-9, **by a vote of the disinterested shareholders.**

---

[4] As was noted by this Court, the Act was patterned upon the Indiana control-share acquisition act.  Order at *5n.2.

[5] For the Court's convenience, a complete copy of Indiana's control share acquisition act, with Official Comments, is attached hereto as Appendix 1.

Ind. Code Ann. § 23-1-42-1 (Burns 2001)(Official Comments)(emphasis added)(internal citations omitted).

That all shares acquired in a control-share acquisition are control shares which are subject to the shareholder vote is also plain and obvious from the clear and unambiguous language of subsection (7). This subsection, which deals with the shareholder meeting to determine control-share voting rights, states, in pertinent part:

> (a) If the acquiring person so requests at the time of delivery of an acquiring person statement. . . the directors of the issuing public corporation or others authorized to call such a meeting. . . shall call a special meeting of the shareholders of the issuing public corporation for the purpose of considering the voting rights to be accorded **the shares acquired or to be acquired in the control-share acquisition.**
>
> ***
>
> (d) If no request is made, the voting rights to be accorded **the shares acquired in the control-share acquisition** shall be presented to the next special or annual meeting of the shareholders.

§ 672.0902(7)(a) and (d), Fla. Stat. (emphasis added).[6]

In its Order, this Court discussed *inter alia* two rules of statutory construction:

- "Statutes must be construed as to avoid an unreasonable or absurd result."

- "A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant or mere surplusage."

---

[6] Tyler argues that "[i]f the Florida Legislature wished to subject all shares acquired in the control-share acquisition to voting restrictions, it could have easily done so by drafting the Act to apply to *all* shares acquired in a control-share acquisition." Tyler's Motion for Summary Judgment, at 7 (Docket No. 101). Well, the Legislature did draft the Act to apply to all shares acquired in a control-share acquisition. Indeed, subsection (7) of the Act sets forth the requirements for holding a shareholder meeting for consideration of "the voting rights to be accorded the shares acquired . . . in the control-share acquisition." § 607.0902(7)(a) and (d), Fla. Stat.

Order at *12-13 (citations omitted). Tyler's construction of the Act is inconsistent with both of these rules.

For instance, Tyler argues that the Act plainly defines "control shares" as only those shares above the statutory threshold and that the statute distinguishes between those control shares actually above the threshold and "all other shares". Tyler's Motion for Summary Judgment, at 6-7 (Docket No. 101). However, the Act does not plainly (or in any other way) define "control shares" as only those shares above the statutory threshold. If the Florida Legislature had wished to define control shares in this fashion, it could have easily done so by stating that "control shares" means those shares which constitute "one-fifth or more but less than one-third of all voting power. . ." However, the Florida Legislature did not do so. Nor, did the Florida Legislature express a distinction between control shares actually above the threshold and "all other shares". Instead, the Florida Legislature distinguished between the acquired shares and all other shares (e.g., the acquirer's pre-acquisition or post-acquisition holdings), and it defined "control shares" to mean all of the acquired shares that "when added to all other shares" owned by the acquirer would allow the acquirer, "immediately after acquisition of the shares, . . . to exercise or direct the exercise of the voting power" above the statutory thresholds. § 607.0902(1), Fla. Stat.[7]

---

[7] Tyler also argues that its purported distinction between the acquirer's control shares and all other shares is maintained in subsection (9) of the Act; however, it is plain and obvious that subsection (9) was not designed to limit the scope of "control shares" in any way. This subsection simply reflects the obvious, namely: control shares are what are acquired in a control-share acquisition. If the Florida Legislature had wished to restrict voting rights to only those shares above the statutory thresholds, it could have easily done so by drafting subsection (9) to state that all shares above the statutory thresholds have the same voting rights as were accorded said shares before the control-share acquisition only to the extent granted by resolution approved by the shareholders of the issuing public corporation.

Tyler's construction would render meaningless the statutory language, "immediately after acquisition of the shares," which is set forth in subsection (1) of the Act.[8]   Moreover, Tyler's argument that "control shares" are only those shares above the statutory threshold would render subsection (2)(b) entirely meaningless.  If "control shares" were only those shares above the statutory threshold, why would the Florida Legislature find it necessary to define the scope of the acquisition as being "**all shares**", the beneficial ownership of which is acquired within a 180-day statutory period (i.e., within 90 days before or after the date of the acquisition), and "**all shares**" the beneficial ownership of which is acquired pursuant to a plan to make a control-share acquisition?

Tyler's construction would lead to other absurd results as well.  For instance, if an acquirer acquires precisely one-fifth (20%) of a target company's stock within the 180-day time period or pursuant to a plan to make a control-share acquisition, under Tyler's construction only the single share that causes the acquirer to reach the 20% mark would constitute "control shares".  This would be absurd.

Additionally, the Act applies to an acquirer who acquires control shares "directly or indirectly, alone or as part of a group".  § 607.0902(1), Fla. Stat.   Suppose two companies (Company A and Company B) develop a plan pursuant to which Company A acquires 19% of a target company's stock and Company B acquires 6% of a target company's stock within the 180-day statutory period or pursuant to a plan to make a control-share acquisition.  Under Tyler's

---

[8] Indeed, in paraphrasing subsection 607.0902(1) in its motion for summary judgment, Tyler conspicuously omits any reference to the statutory language, "immediately after acquisition of the shares".  Tyler's Motion for Summary Judgment at 7 (Docket No. 101).

construction, would Company B's shares be "control shares" and Company A's shares not, or would some portion of each of Company A's and Company B's shares constitute control shares and some other portion not be control shares, or would. . . ?  Under HTE's construction, it is simple, to wit:  all of the shares would constitute control shares acquired in a control-share acquisition and they would have the same voting rights as were accorded those shares before the control-share acquisition only to the extent granted by resolution approved by the shareholders of the target company.  See § 607.0902(9)(a), Fla. Stat.

HTE's construction is consistent with the Act's Legislative history.  As the Court noted in its Order:

> . . . the purpose of the act is to protect Florida shareholders by affording them an opportunity to decide whether a change in corporate control is desirable, as well as creating a disincentive for Florida corporations to reincorporate in other states.

Order at *4.

When an acquirer makes a control-share acquisition, the acquirer is essentially indicating that it seeks to make a fundamental change in the nature of the existing target company.  As the facts of the instant case exemplify,[9] control-share acquisitions are obviously made by sophisticated companies or business persons who acquire a significant block of stock knowing full well the risks involved (i.e., either the disinterested shareholders will desire a fundamental change in the nature of their corporation and accord the acquirer voting rights, or the

---

[9] For instance, in the instant case, Tyler's in-house counsel, H. Lynn Moore, studied the Act and then served an Acquiring Person Statement for the specific purpose of blocking HTE's 60-day redemption right. Moore Depo. at 65-66. Additionally, Tyler specifically proposed to replace HTE's then current Board of Directors with Tyler's own directors "as a way to take over [HTE]." Moore Depo. at 84.

disinterested shareholders will <u>not</u> desire a fundamental change in the nature of their corporation and, accordingly, <u>not</u> accord the acquirer any voting rights).[10]  If the disinterested shareholders do not wish for the company to undergo a fundamental change in the nature of their corporation, the Act accords them the power to accord no voting rights to the shares acquired in a control-share acquisition (i.e., the acquirer's "control-shares").  This furthers the purpose of the Act in that it protects Florida shareholders and creates a disincentive for Florida corporations to reincorporate in other states, by ensuring that those sophisticated acquirers who attempt a takeover but fail  have no voice in regard to corporate governance issues to the full extent of the shares which were acquired in a control-share acquisition (i.e., those shares which were presumably acquired so as to allow the acquirer to affect a fundamental change in the nature of the disinterested shareholders' corporation).

In furthering its purpose, the Act strikes a fair balance between protecting Florida's disinterested shareholders and protecting the rights of the acquirer.  For instance, the Act ensures that only those shares meeting the test for "control-share acquisition" constitute "control-shares".  In other words, the control-shares must be acquired within the 180-day statutory period (i.e., within 90 days before or after the date of acquisition) or the shares must be acquired pursuant to a plan to make a control-share acquisition.  "All other shares" which do not meet this test, are not

---

[10]  "[T]he Control-Share Acquisition Chapter...was added to give the shareholders...a right to vote collectively on a potentially fundamental change in the nature of their corporation-namely, its shift to being an entity in which a single shareholder acquires a significant level of dominance over the future governance of the corporation."  Ind. Code Ann. §23-1-42-1 (Burns 2001)(Official Comments).

subject to the disinterested shareholder's vote and may be freely voted by the acquirer.[11] Additionally, the Act provides the acquirer with certain tools. The acquirer can file an Acquiring Person Statement, which blocks the target company's right to redeem the acquired shares within 60 days of the control-share acquisition and ensures the acquirer "that its views on the acquisition are communicated to the [disinterested] shareholders." Ind. Code Ann. § 23-1-42-6 (Burns 2001)(Official Comments). Moreover, even when the disinterested shareholders vote not to accord voting rights to the acquirer's control-shares, the acquirer may nevertheless sell or otherwise transfer appropriate quantities of its control shares with voting power intact to a third person who is acquiring them in good faith and not for the purpose of circumventing the Act, unless the sale or transfer constitutes a control-share acquisition.

In short, the acquirer can make a control-share acquisition, use the tools allowed by the Act to ensure that its views on the acquisition are communicated to the shareholders and have a vote of disinterested shareholders on whether or not the acquirer should have a significant voice in the governance of the Florida corporation. And, if the disinterested shareholders vote not to accord any voting rights to the acquirer's control shares, the acquirer can receive fair value either through an effective redemption or by transferring those shares to third parties in non-control-share acquisitions with voting power intact.[12]

---

[11] However, even these other shares of the acquirer would constitute "interested shares" under subsection (3)(a) of the Act, signifying that none of an acquirer's shares (i.e., shares acquired in a control-share acquisition, together with "all other shares") can vote on whether or not to accord voting rights to the acquirer's control-shares.

[12] Tyler argues that "HTE's interpretation is also in conflict with well-settled corporate law stating that the right to vote should not be taken away unnecessarily." Tyler's Motion for Summary Judgment, at p. 9. As evidenced by the cases to which Tyler cites for this principle, this principle does not apply to the instant case. For instance, Tyler relies upon a quote from Duval v. Moore, 276 F.Supp. 674, 679 (M.D. Iowa 1967), which was made in the context

In it's motion, Tyler asks the following rhetorical question:

> ...why should an acquiring corporation's non-controlling shares be subject to voting restrictions not imposed on any other shareholder?

Tyler's Motion for Summary Judgment, at p. 9 (Docket No. 101). This rhetorical question was answered by the United States Supreme Court in the <u>CTS Corp.</u> case, in which the Court stated, in pertinent part:

> No principal of corporation law and practice is more firmly established than a State's authority to define the voting rights of shareholders. See Restatement (Second) of Conflict of Laws § 304 (1971)(concluding that the law of the incorporating State generally should **"determine the right of a shareholder to participate in the administration of the affairs of the corporation"**).
>
> * * *
>
> It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs. There can be no doubt that the Act reflects these concerns. The primary purpose of the Act is to protect the shareholders of Indiana corporations. It does this by affording shareholders, when a takeover offer is made, an opportunity to decide collectively whether the resulting change in voting control of the corporation, as they perceive it, would be desirable.

---

of a claim alleging the unlawful usurpation of voting rights of a certain class of stock. The court in <u>Duval</u>, however, held that it was appropriate for the corporation's articles of incorporation to deprive the plaintiffs' class of stock of voting rights and that said plaintiffs were bound by that contract. <u>Id.</u> at 681-82. Similarly, Tyler relies on <u>Carmody v. Toll Bros., Inc.</u>, 723 A.2d 1180, 1193 (Del. Ch. 1998), for the general proposition that the shareholder vote has primacy in our system of corporate governance; however, <u>Carmody</u>, addressed defensive measures which were taken by a board of directors without any statutory authority. By contrast, the instant case involves an act which expressly allows disinterested shareholders to determine whether or not control shares acquired in a control-share acquisition should be accorded voting rights. And, the Act was patterned after the Indiana control share acquisition act which was specifically upheld by the United States Supreme Court in <u>CTS Corp.</u>

***

As indicated *supra*, at 1646, Indiana's concern with tender offers is not groundless. Indeed, the potentially coercive aspects of tender offers have been recognized by the SEC, see SEC Release No. 21079, p. 86,916, and by a number of scholarly commentators, see, *e.g.*, Bradley & Rosenzweig, Defensive Stock Repurchases, 99 Harv.L.Rev. 1377, 1412-1413 (1986); Macey & McChesney, A Theoretical Analysis of Corporate Greenmail, 95 Yale L.J. 13, 20-22 (1985); Lowenstein, 83 Colum.L.Rev., at 307-309. The Constitution does not require the States to subscribe to any particular economic theory. **We are not inclined "to second-guess the empirical judgments of lawmakers concerning the utility of legislation,"** *Kassel v. Consolidated Freightways Corp.,* 450 U.S., at 679, 101 S.Ct., at 1321 (BRENNAN, J., concurring in judgment). **In our view, the possibility of coercion in some takeover bids offer additional justification for Indiana's decision to promote the autonomy of independent shareholders.**

***

...We reiterate that this Act does not prohibit any entity--resident or nonresident--from offering to purchase, or from purchasing, shares in Indiana corporations, or from attempting thereby to gain control. It only provides regulatory procedures designed for the better protection of the corporations' shareholders. We have rejected the "notion that the Commerce **\*94** Clause protects the particular structure or methods of operation in a ...market." *Exxon Corp. v. Governor of Maryland*, 437 U.S., at 127, 98 S.Ct., at 2215. The very commodity that is traded in the securities market is one whose characteristics are defined by state law. Similarly, the very commodity that is traded in the "market for corporate control" -- the corporation--is one that owes its existence and attributes to state law. Indiana need not define these commodities as other States do; it need only provide that residents and nonresidents have equal access to them. This Indiana has done.

CTS Corp., 481 U.S. at 88-94 (emphasis added). So too has Florida.

In short, the Act strikes a fair balance between the disinterested shareholders and an

acquirer, and, in the end, accords the disinterested shareholders the right to determine whether or

14

not an acquirer who makes a control-share acquisition (and is, thus, presumably seeking to make a fundamental change in the nature of the target corporation), may "participate in the administration of the affairs of the corporation". CTS Corp., 481 U.S. at 89.[13]

Tyler also attempts to support its construction by relying upon the following language set forth in the Senate Staff Analysis and Economic Impact Statement, which preceded the Act:

> The Indiana law adopts special rules for "control-shares," i.e., shares held by any one person or firm in excess of 20 percent of the total stock outstanding.

See Tyler's Motion for Summary Judgment, at p.7 (excerpting from Senate Staff Analysis and Economic Impact Statement for Bill Nos. CS/CB 404,  Fla. Sen. Comm. on Commerce, at 2 (Apr. 14, 1987)); however, it is clear that this passing reference to "control-shares" was in no way an endeavor to definitively define "control-shares" or "control-share acquisition". This statement does have significance, however, in that it shows that the Florida Legislature modeled the Act after the Indiana act, the Official Comments to which plainly demonstrate that "control-shares" constitute all shares acquired in a control-share acquisition.  In addition to those parts discussed above, the following pertinent parts of the Official Comments warrant consideration:

---

[13]   In the instant case, it is clear that HTE's disinterested shareholders oppose Tyler's participation in the administration of the affairs of HTE.  Tyler acquired 5,618,952 shares of HTE common stock (i.e., about 32%). HTE's shareholders, at the November 16, 2000 annual shareholder meeting, voted not to approve a resolution to accord Tyler any voting rights.  Specifically, at that shareholder's meeting, more than 50% of the disinterested shareholders voted against the following:

> PROPOSAL TO confer voting rights on 5,618,952 shares of [HTE] common stock acquired by Tyler Technologies, Inc. from Dennis Harward and Jack Harward in a control-share acquisition.  Gornto Supp. Aff., ¶ 14, Ex. H (Docket No. 51).

- Section 1 defines "control shares" as shares that, when added to an acquiring person's pre-acquisition voting power, would (but for the rules of the Chapter) put that person over any of three thresholds of voting power in the election of directors of "an issuing public corporation" - - one-fifth, one-third or a majority. Ind. Code Ann. § 23-1-42-1 (Burns 2001) (Official Comments).

- Recognizing that a control share acquisition need not take place on a single day or as part of a single transaction, subsection (b) establishes a conclusive presumption that shares acquired during any 90-day period are deemed "to have been acquired in the same acquisition." Hence, a person that owns 5% of an issuing public corporation's shares and then acquires an additional 16% during a 90-day period has made a "control share acquisition," regardless of the number of separate purchases or the precise dates during that period on which particular purchases (or other forms of acquisition of the substantive ability to exercise or direct the exercise of voting power) took place.

  The fact that the acquisition takes place over a longer than 90-day period does not, however, establish any contrary presumption that a "control share acquisition" has *not* been made. Any acquisition of the substantive ability to exercise or direct the exercise of sufficient voting power, if made "pursuant to a plan to make a control share acquisition," will be deemed to have been made in the same acquisition. To use the simplest example, a 5% owner who intends to acquire a total of 21% of the voting power of an issuing public corporation cannot avoid application of the Chapter by acquiring an additional 14% of the shares on day 1 [and] the final 2% 91 days later. The attempted evasion need not, however, be this obvious. Whether a "plan to make a control share acquisition" exists with respect to purchases made over a longer than 90-day period will be a question of fact that, like any other such question, may be proved or rebutted by any relevant direct or circumstantial evidence. And if such a plan does exist, all acquisitions made pursuant to the plan will be deemed part of the same "control share acquisition." **Thus, in the example just**

16

> **used, the entire additional 16% of the shares obtained,
> and not just the final 2%, would be "control shares"**....

Ind. Code Ann. § 23-1-42-2 (Burns 2001) (Official Comments) (emphasis added).

Except for the United States Supreme Court in <u>CTS Corp.</u>, no court has expressly spoken on this topic.[14]   In its earlier memorandum, Tyler relied upon a federal district court case, <u>Atlantis Group, Inc. v. Alizac Partners</u>, 1991 U.S. Dist. LEXIS 12106 (W.D. Mich. 1991), to support its sweeping statement that its construction of "control-shares" is consistent with federal precedent.   <u>See</u> Tyler's Memorandum of Law in Opposition to HTE's Motion for Partial Summary Judgment, at p.19 (Docket No. 53).   Tyler's reliance on <u>Atlantis Group</u> is misplaced. In <u>Atlantis Group</u>, the district denied a motion to dismiss a count in which the target company had alleged a violation of Michigan's control-share acquisition act.   The defendants had allegedly formed a group and pooled their shares for voting purposes, so that they owned, together, more than 20% of the target company's stock (26.5%).   The target company specifically alleged a violation of Michigan's control-share acquisition act and the court agreed that a claim had been stated.   In restating or paraphrasing the allegations of the complaint, the district court stated that the Michigan statute is similar to Indiana's and added: "The statute thus limits a Control Share Acquirer's votes to 20% of the company's voting power, and strips the remaining shares over the 20% of their suffrage rights. M.C.L. § 450.1798; Complaint, paras. 94-103." <u>Atlantis Group</u>, LEXIS 12106 at *11.   The quoted statement does not even rise to the

---

[14] The United States Supreme Court is, of course, the ultimately authority on the topic.  This is particularly true in the instant case, because Florida's Control Share Acquisition Act is patterned after the Indiana act.  <u>See</u> Order at *5 n.2.

level of dicta.  Clearly, the court was not attempting to construe the meaning of "control-shares" under Michigan's Act and was, instead, simply paraphrasing certain allegations from the complaint.  The entire paragraph at which the court made the statement was preceded and succeeded by statements which also merely paraphrase the plaintiff's complaint.  <u>Moreover, the citation immediately following the court's statement includes a specific citation to the plaintiff's complaint</u>.  In short, <u>Atlantis Group</u>, is non-persuasive and is, in any event, trumped by the United States Supreme Court's decision in <u>CTS Corp.</u>

As was discussed above, in the <u>CTS Corp.</u> case, the acquirer owned approximately 9.6% of the target company's shares before the control-share acquisition.  The acquirer made a control-share acquisition of 17.9%, giving the acquirer a total of 27.5% of the target company.  As to the scope of any non-voting status accorded to the acquirer's shares, the United States Supreme Court expressly stated:

> Because we decide today [that the Indiana control share acquisition act was not violative of the Williams Act or the Commerce Clause, the acquirer] will have no voting rights **in its shares** unless the shareholders of CTS grant those rights in a meeting held pursuant to the Act.

<u>CTS Corp.</u>, 481 U.S. at 78 n.5 (emphasis added).

**IV.   CONCLUSION**

For the foregoing reasons, HTE respectfully requests that this Honorable Court deny Tyler's motion for summary judgment and enter summary judgment for HTE, and specifically adjudge and declare the following:

(A)     That all of the shares of HTE stock acquired by Tyler from the Harwards were acquired in a control-share acquisition and constitute control shares to which Tyler has no voting rights; and

(B)     That voting rights shall be restored to any control shares which are transferred by Tyler to any third party who is neither an affiliate of Tyler nor a member of a group with Tyler for the purpose of making a control-share acquisition, provided that any such transfer is not itself part of, or does not constitute, a control-share acquisition.   If any such transfer is itself part of, or constitutes, a control-share acquisition, then the transferee must comply with the provisions of section 607.0902, Florida Statutes (2002).  Specifically, if a transferee acquires any of Tyler's control shares in a control-share acquisition, those shares shall be subject to a shareholder resolution regarding voting rights as expressed in section 607.0902(7) and (9) of the Act and to redemption as set forth in section 607.0902(10)(as previously construed by this Court in the Order).

DATED this 15th day of October, 2002.

> Respectfully submitted,
> BAKER & HOSTETLER LLP
> 200 South Orange Avenue, Suite 2300
> Orlando, FL  32802-0112
> Telephone:  (407) 649-4000
>
> By:   _____
>        John W. Foster, Sr.
>        Florida Bar No. 318620
>        Attorneys for Plaintiff, H.T.E., Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of HTE's  memorandum of law in opposition to Tyler's motion for summary judgment on HTE's and Tyler's declaratory judgment actions has been furnished via hand delivery to:  **WILLIAM B. WILSON, ESQ.**, Holland & Knight LLP, 200 S. Orange Avenue, Suite 2600, Post Office Box 1526, Orlando, Florida 32802-1526 this 15th day of October, 2002.

John W. Foster, Sr.

G:\jwf0370\25944\00001\pleadings\FEDERAL\memo law opposing tyler's msj re dec jdmt.doc

# ADDITIONAL

# ATTACHMENTS

# <u>NOT</u>

# SCANNED

_____ Exceeds scanner's page limit
_____ Physical exhibit prevents scanning
___✓___ Other: ███████████████████

# **REFER TO COURT FILE**

Revised 09/15/99